WADDELL & REED FINANCIAL, INC., Waddell & Reed, Inc., and Waddell & Reed Investment Management Company, Plaintiffs,

v.

TORCHMARK CORPORATION, Ronald K. Richey, Harold T. McCormick, and Louis T. Hagopian, Defendants.

No. CIV.A. 01–2372–KHV.

United States District Court, D. Kansas.

Aug. 20, 2004.

568

James D. Griffin, Stephen J. Torline, Blackwell Sanders Peper Martin LLP, Kansas City, MO, Megan Sebastian Wright, Nicole B. Theophilus, Tanya M. Morrison, Thomas H. Dahlk, Trenten P. Bausch, Blackwell Sanders Peper Martin LLP, Omaha, NE, for Plaintiffs.

Betsy Palmer Collins, Caroline B. Keller, Craig H. Kuglar, Scott P. Hilsen, Alston & Bird LLP, Atlanta, GA, Hobart A. McWhorter, Jr., James W. Gewin, Matthew H. Lembke, Michael R. Pennington, Bradley Arant Rose & White LLP, Birmingham, AL, Matthew C. Miller, Scott C. Nehrbass, Shook, Hardy & Bacon L.L.P., Overland Park, KS, William J. Baxley, Baxley, Dillard, Dauphin & McKnight, Birmingham, AL, William R. Sampson, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Brenda Ranee Mesker, Learjet, Inc., Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Waddell & Reed Financial, Inc. ("W & R Financial"), Waddell & Reed, Inc. ("W & R") and Waddell & Reed Investment Management Company ("W & R Investment") have filed suit against Torchmark Corporation ("Torchmark") and Ronald K. Richey, Harold T. McCormick and Louis T. Hagopian. Torchmark is the former corporate parent of W & R Financial, W & R and W & R Investment, and the individual defendants were common directors of Torchmark and W & R Financial. Plaintiffs seek to recover under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and assert Kansas common law claims for breach of fiduciary duty, knowing participation in breach of fiduciary duty and fraud through silence.[1] This matter is before the Court on *Defendants' Motion For Summary Judgment* (Doc. # 368) filed May 7, 2004 and *Defendants' Motion To Strike Portions Of Affidavit Of Daniel C. Schulte* (Doc. # 393) filed June 4, 2004. For reasons stated below, defendants' motion to strike is overruled[2] and defendants' motion for summary judgment is sustained in part.[3]

---

1. The Court previously granted summary judgment in favor of Torchmark on the claim that Torchmark knowingly participated in breach of fiduciary duty owed to W & R Financial. *See Memorandum And Order* (Doc. # 79) filed February 4, 2003.

2. Many of the matters contained in the Schulte affidavit are immaterial to the Court's ruling, and the Court will not address defendants' motion except to the extent it concerns genuine issues of material fact which are set forth in this order.

3. Defendants ask for oral argument on their motion for summary judgment. *See Request For Oral Argument* (Doc. # 408) filed June 9, 2004. The Court finds that oral argument will not materially assist in the disposition of the motion.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith." To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not comply with Rule 56(e). *Maverick Paper Co. v. Omaha Paper Co., Inc.,* 18 F.Supp.2d 1232, 1234–35 (D.Kan. 1998).

### Factual Background

For purposes of defendants' motion for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiffs.[4]

Torchmark is a publicly traded holding company. Before March of 1998, it directly

---

Furthermore, to schedule oral argument would only delay the decision of defendants' motion— which is already overdue. Accordingly, defendants' request is overruled.

4. Under D. Kan. Rule 56.1, a party opposing a motion for summary judgment must set forth in separately numbered paragraphs any facts not contained in movant's memorandum unless such facts directly controvert one of the movant's facts. In response to several of defendants' facts,

plaintiffs have included facts which should have been set forth in separate factual statements because they did not directly address the factual statements to which they purported to respond. Defendants have nonetheless attempted to respond to plaintiffs' additional factual statements. Likewise, the Court has attempted to include the version of these additional facts in the light most favorable to plaintiffs.

or indirectly owned W & R Financial, W & R, W & R Investment and United Investors Life Insurance Company ("UILIC").[5] UILIC issued insurance products, including variable annuity policies which W & R distributed, underwrote and serviced for many years.[6] A variable annuity insurance policy is an investment vehicle which combines aspects of insurance and securities.[7]

## I. Spin–Off And IPO Of W & R Financial And Its Subsidiaries

In 1997, the Torchmark board approved a spin-off and initial public offering ("IPO") of W & R Financial and its subsidiaries. Torchmark board members unanimously agreed that Keith Tucker would resign from its board at the time of the IPO, and that after the spin-off, the 12–person board of directors of W & R Financial would include Tucker, the outside directors of Torchmark (including Ronald K. Richey, Louis T. Hagopian and Harold T. McCormick), Robert Hechler and Henry Herrmann. Throughout the IPO and spin-off, Richey was CEO and chairman of the board of Torchmark. At a

Torchmark board meeting on December 15, 1997, Richey stated that Torchmark intended to control the board of W & R Financial for at least two years after the spin-off.

In March of 1998, Torchmark had an IPO for W & R Financial. Eight months later, in November of 1998, Torchmark spun off W & R Financial and its subsidiaries. After the IPO and spin-off,, W & R Financial and Torchmark shared seven directors including Richey, McCormick and Hagopian—Richey from March 4, 1998 until his term expired on April 26, 2000, and Hagopian and McCormick from March 4, 1998 until they resigned on May 4, 2000.[8] After Richey, Hagopian and McCormick resigned from the board of W & R Financial, they continued to serve as directors of Torchmark.

W & R Investment managed and provided investment advisory services to W & R Target Funds, Inc. ("W & R Target"). W & R Target marketed 12 mutual funds which UILIC used to fund the variable annuity policies which W & R sold to UILIC policyholders.[9] UILIC compensated W & R In-

5. As discussed below, at this time, W & R is an indirect wholly-owned subsidiary of W & R Financial. W & R Investment is a direct subsidiary of W & R. UILIC remains a wholly-owned indirect subsidiary of Torchmark.

6. This fact and some of the factual statements below are based on the Court's *Memorandum And Order* (Doc. #79) and *Memorandum And Order* (Doc. #171) as well as various pleadings which the parties filed in related litigation in Alabama and the court opinions in the Alabama litigation. The Court sets forth these facts as background and context for the factual statements in the parties' present briefs.

7. *See W & R v. United Investors Life Ins. Co.*, 875 So.2d 1143, 1148 (Ala.2003). Traditional annuities are "typically thought of as insurance products because the annuitant receives a guaranteed stream of income for life, and the insurer assumes and spreads the 'mortality risk' of the annuity-the risk that the annuitant will live longer than expected, thereby receiving benefits that exceed the amount paid to the seller of the policy." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104 (2d Cir.2001). A deferred annuity is an accumulation product where the purchaser invests money and allows the value of the account to grow and then later draws down the value of the account. *See Patenaude v. Equitable Life Assurance Soc'y*, 290 F.3d 1020, 1027 (9th Cir.2002). In a fixed deferred annuity, the

purchaser invests premiums and receives from the insurer a fixed interest rate on the amount of invested premiums. In a variable deferred annuity, the purchaser is not guaranteed a particular rate of return. *See id.* The purchaser invests in one or more managed investment products (such as mutual funds offered through separate accounts of the insurer) and receives a variable rate of return depending upon the success of the underlying investment. *See id.* Deferred annuities typically retain two insurance features: a guarantee of monthly payments for life and a benefit that is payable if the annuitant dies before the payout begins. *See id.*

8. The record does not disclose why plaintiffs have sued only three of the seven common directors in this case.

9. Each policyholder of UILIC directed that a portion of his insurance or annuity premiums be invested in a mutual fund marketed by W & R Target. UILIC placed the premium from a policyholder in its bank account, then purchased shares in a W & R Target mutual fund in which the policyholder elected. UILIC held the shares in its name, in trust for the policyholder. *See W & R*, 875 So.2d at 1149–50, 1162. Policyholders paid UILIC compensation for the mortality risk and administrative expenses of each account, through so-called "M & E charges." Each month, W & R Target redeemed mutual fund shares in the UILIC trust accounts to pay that

vestment for its investment management services of the funds through fees based upon the value of the assets under management.

Since the spin-off, the W & R companies have been managed by the same group: the general counsel, chief financial officer, chief operating officer, chief marketing officer, chief investment officer and national director of marketing of W & R Financial. Since the spin-off, however, the individuals who hold some of these positions have changed.

## II. Principal Underwriting Agreement And Negotiations To Amend It

Before the spin-off and throughout 1999, W & R marketed, distributed and was principal underwriter for UILIC products—including life insurance policies and variable annuity contracts. Beginning in 1990, UILIC compensated W & R under a principal underwriting agreement ("PUA") which could be terminated by either party on 60 days written notice. Defendants' Exhibit J47. Under the PUA, all "monies payable under the Policies" were to be paid directly to UILIC or its designated servicing agent. *Id.* ¶ 1(d).

On March 3, 1998, W & R and UILIC amended the PUA to provide that it would terminate on December 31, 1998, shortly after the spin-off. They indefinitely extended the agreement effective December 31, 1998, but it remained terminable "at any time by either party ... on 60 days' written notice ... without the payment of any penalty." Defendants' Exhibit J48.

Beginning in late 1998 and early 1999, W & R began evaluating proposals from other variable annuity providers, including Security Benefit Life Insurance Company ("Security Benefit"). W & R shared these proposals with UILIC and in June of 1999, informed UILIC that unless it paid additional compensation with respect to in-force annuities, W & R was prepared to move its relationship to a provider which would pay 25 basis points on new sales.[10] At this time, W & R and UILIC also discussed sharing M & E charges on in-force annuity assets.[11] On June 29, 1999, W & R advised UILIC that it would be making a decision on a new provider on June 30, 1999 and asked whether it would consider sharing a portion of M & E charges on in-force annuities. UILIC refused to do so, and on July 1, 1999, W & R informed Security Benefit that it would accept its proposal, which included 25 basis points on in-force assets.

On July 2, 1999, Anthony McWhorter, the president and/or CEO of UILIC, telephoned Hechler, the CEO of W & R, and asked that W & R delay any commitment to Security Benefit. Four days later, on July 6, 1999, McWhorter faxed Hechler a letter which proposed that UILIC pay an additional 15 basis points on in-force annuities.[12] The letter stipulated that "[i]n return for this additional revenue, while we believe W & R is currently restricted with respect to replacing this business, we would expect to add specific language in the general agency agreement that restricted future replacement of [the existing block of variable annuity] business." Defendants' Exhibit J5. Absent such a stipulation, W & R could replace in-force UILIC policies with those of other insurance companies such as Security Benefit.

On July 7, 1999, apparently in response to McWhorter's letter of July 6, 1999, Hechler called McWhorter and proposed that UILIC pay 20 basis points on existing business. In

month's M & E charges to UILIC. *See id.* W & R Target placed the proceeds from the redeemed shares into its bank account at United Missouri Bank, which then wire transferred the M & E charges to a UILIC bank account. In a separate transaction, UILIC paid W & R the compensation it was due. *See id.*

10. Under the PUA, W & R received sales commissions based on new premiums invested each year. Security Benefit proposed to also pay asset-based commissions, calculated as an annual percentage of the value of policyholder accounts. These asset-based commissions were referred to as "basis points." *See W & R,* 875 So.2d at 1148 n. 2. One basis point equals 1/100 of one per cent of the asset value; 100 basis points equal one per cent of the asset value.

11. UILIC received compensation for the mortality risk and administrative expenses for each policy, based on the value of the account. Under the PUA, W & R did not receive any portion of the M & E charges which UILIC received from policyholders.

12. The letter of July 6, 1999 does not reference the telephone conference on July 2, 1999.

a telephone call later that same day, Hechler and McWhorter reached a verbal agreement that W & R and UILIC would continue their relationship; that beginning January 1, 2000, UILIC would pay 20 basis points on in-force business; and that on contracts sold on or after that date, UILIC would pay 25 basis points. After July 8, 1999, W & R ceased all negotiations with Security Benefit.

During their telephone conversation on July 7, 1999, McWhorter again raised the prospect of limiting W & R's ability to replace UILIC products. Hechler and McWhorter later gave conflicting testimony about their telephone conversations and understanding of July 7, 1999. McWhorter testified that W & R agreed to restrict its ability to replace UILIC annuities. Hechler testified that W & R made no such agreement. In any event, however, McWhorter sent the following letter to Hechler on July 8, 1999:

> As you requested, this letter will set forth some details of the agreement that we reached over the telephone on Wednesday, July 7.

**Compensation payable to Waddell & Reed beginning 1/1/2000**

> For variable annuity contracts issued beginning 1/1/2000:
>
> > 7.75% of premiums received, plus
> >
> > .25% annually of variable assets, paid monthly beginning the first month
>
> For the in force block of variable annuity business (i.e. issues of 1999 and earlier):
>
> > .20 % annually of variable assets, paid monthly

**Certain variable annuity product features**

> In addition to product features previously proposed, we agree to the following:
>
> > 1.25% of mortality & expense charge
> >
> > .15% admin. charge
> >
> > 7 year surrender charge period, with surrender charge pattern of 7%, 6, 5, 4, 3, 2, 1, 0%
> >
> > $25 contract maintenance fee, waived for accounts [greater than] $25,000

By agreeing to the foregoing arrangements, we acknowledge that Waddell & Reed has withdrawn its consideration of possible relationships on attractive terms with other third party insurance companies in order to establish a long-term relationship with us. In doing so, Waddell & Reed has relied on our representations with respect to our commitment to provide, jointly with Waddell & Reed, a first-class, competitive product that is fully supported and serviced by sufficient resources, including personnel, systems and technology. We acknowledge that Waddell & Reed will commit substantial · resources to market and provide a first-class, competitive product to its customers, and we agree that we will work cooperatively with Waddell & Reed and commit the reasonable resources necessary (a) to design, create, implement and introduce products and product features that will be first-class and competitive and (b) to enhance and improve such products and product features as the market for insurance products evolves. In addition, we acknowledge that the breadth and quality of client service is an integral component of providing a first-class, competitive product. Accordingly, we also agree to commit the reasonable resources necessary, including, but not limited to, personnel, systems and technology, to develop and/or acquire and implement the services necessary to support and service clients who purchase the products jointly offered by Waddell & Reed and us, and to enhance and improve such services in order to remain fully competitive.

Bob, I believe this fully describes the items that we discussed regarding compensation and product features. If you are in agreement with the foregoing terms and conditions, please sign this letter below and return a copy to me as soon as possible.

Defendants' Exhibit J107. The letter expressly purported to set forth only "some details" of the verbal agreement of July 7, 1999. Hechler did not know what that reference meant, and he never asked for clarification of any other details.

Two weeks after McWhorter's letter of July 8, 1999, on July 23, 1999, McWhorter

sent Hechler another letter which stated as follows:

> This follows my letter of July 8, 1999. As you know, the letter contained most of the details of the agreement we reached by telephone of Wednesday, July 7, 1999, My letter of general understanding needs to be formalized, however, into a specific amendment to the existing agreement between United Investors Life Insurance and Waddell & Reed, Inc. and also incorporate the oral agreement between Keith [Tucker] and C.B. [Hudson] reached on July 2, 1999. I have asked our Legal Department to provide me with the amendment sometime in August, and I will forward the same for review by you and your staff.
>
> I would like to meet with you following your review so that we may sign the amendment and discuss further the products, systems and services our companies are planning to offer as we move forward. Bob, I am looking forward to working with you and the other members of Waddell & Reed as we finalize our agreement and work together to offer the best possible products and services to our customers.

Defendants' Exhibit J33. Although this letter referenced an oral agreement between Tucker and Hudson (who was CEO, chairman and board member of UILIC), Tucker testified that he had no oral agreement with Hudson. *See* 4/19/04 Tucker Depo. at 102–03. Hudson testified that although "agreement" might not be a good choice of words, Tucker had assured him that W & R was not going to engage in a mass replacement of UILIC policies. *See* 11/4/00 Hudson Depo. at 119–21. Based on Tucker's statement, Hudson felt that UILIC might be able to pay basis points on in-force business. *See id.*

Over the next six months, from August of 1999 through January of 2000, the parties continued to negotiate and exchange proposed language to formally amend the PUA. On August 2, 1999, W & R sent UILIC a first draft which reflected the issues addressed in what it called the "letter agreement ... dated July 8, 1999." Defendants' Exhibit J50. The W & R draft did not include any provision regarding replacement of UILIC products. On August 13, 1999, UILIC

proposed an amended PUA and a separate agreement which would prevent W & R from replacing any annuity, life insurance or other insurance contract or policy which UILIC had issued pursuant to contract with W & R. *See* Defendants' Exhibit J51. At that time, Hechler knew that UILIC wanted an agreement which included restrictions on replacements, but he thought that the parties had already reached an agreement on the issues outlined in the letter of July 8, 1999. *See* 11/7/00 Hechler Depo. at 362; 1/30/01 Hechler Depo. at 735–36. On September 14, 1999, W & R advised UILIC that it could not agree to the proposed non-replacement agreement.

On September 28, 1999, counsel for UILIC sent a letter to counsel for W & R, concerning proposed contractual language that had been circulated among the parties. The letter provided in part as follows:

### REPLACEMENTS

> [UILIC] must maintain its insistence on the non-replacement language in any final agreement. While W & R felt that such language would put improper restrictions on its duty to its clients to be able to recommend the most suitable investment products, suitability is a point-of-sale concern. In addition UILIC has significant acquisition costs associated with this business, and W & R has a duty not to impair our ability to recoup these costs. Replacement of [UILIC] products would be doubly hard to justify from a suitability standpoint if the clients were being moved into products with substantially identical funds as those underlying the [UILIC] policies.

> \* \* \* \* \* \*

### COMMISSION SCHEDULE

> Mark, we will be pleased to change the titles of the two new asset-based fees. (We would suggest "Additional Compensation" and "Asset–Based Fees," respectively) We must, however, require that the Additional Compensation, payable on pre-January 1, 2000 policies, terminate upon any notice of termination of the Underwriting Agreement. After all, the Additional Compensation is a substantial additional cost for future variable annuity

production and it is only reasonable that if the future production is not forthcoming, the Additional Compensation should end.

The calculation of the Net Asset Values using the average of the daily values for the entire month should not pose any problem.

I look forward to working with you to iron out the final details of these Agreements.

Defendants' Exhibit J55.

## III. Knowledge Of Common Directors As To Status Of Negotiations

On July 14, 1999, W & R faxed a memo to Torchmark which included a draft press release announcing that the parties had "entered into an agreement." Defendants' Exhibit J93. Hudson forwarded the memo to the Torchmark directors, noting that the press release would be a topic of discussion at the Torchmark board meeting on July 22, 1999. At that time, Hudson did not think that the parties had a contract or that either party believed that they had a contract, but he did not contact anyone at W & R Financial or W & R to dispute the statements in the draft press release.

At a board meeting of W & R Financial on July 15, 1999, Hechler presented a summary of a "new fee arrangement" with UILIC. The board members received a copy of the letter dated July 8, 1999, a summary of the new annuity product features and a copy of the draft press release which announced the agreement with UILIC. *See* Defendants' Exhibit J7. According to Richey, the commission arrangement was described as "finalized."

On July 20, 1999, W & R Financial issued a press release which announced the new compensation agreement. The press release stated as follows:

[W & R] recently entered into an agreement with [UILIC] whereby commencing January 1, 2000, [W & R] will receive additional annual commissions from [UILIC] for selling variable products for which it is the underwriter. It is estimated that this arrangement will provide additional underwriting and distribution revenues of approximately $6.0 million in 2000.

Defendants' Exhibit J6 at 4.

The Torchmark board met on July 22, 1999. Its minutes reflect the following discussion concerning the agreement between W & R and UILIC:

Chairman Hudson reported that he believes a tentative agreement to continue the variable annuity relationship between W & R and UILIC had been reached. While a formal written contract remains to be negotiated and executed, it is generally understood that W & R will continue to issue UILIC's variable annuities with UILIC paying W & R a commission of 7.75% of premiums received on variable annuity business written by W & R representatives issued on or after January 1, 2000. Additionally, UILIC will pay W & R monthly an asset management fee of .25% times the fund value on variable annuity business issued by UILIC for applications received from W & R on or after January 1, 2000. Mr. Hudson stated that UILIC had also tentatively agreed that it would pay W & R monthly incentive compensation of .20% times the fund value of all variable annuity business issued by UILIC for applications received from W & R prior to January 1, 2000. He emphasized that this incentive compensation will immediately terminate upon termination of the agreement and would be paid for generation of new variable annuity business, not to avoid replacement of existing business. He further noted that any written contract between the parties documenting this agreement must provide that W & R would not rewrite any insurance or variable annuity business to another company.

Defendants Exhibit J94. After this meeting, Richey understood that the parties had agreed to a commission schedule but that other matters were going to be worked out.[13]

---

**13.** Hagopian testified that he does not recall seeing the letter of July 8, 1999 and that in July of 1999, he was not aware of any disputes concerning the nature and scope of the agreement referenced in that letter.

Hagopian and McCormick were members of the audit committee of W & R Financial. They and Richey reviewed the SEC filings for W & R Financial before they were made. On August 13, 1999, W & R Financial filed with the SEC a quarterly 10–Q report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. That report contained the following paragraph:

ENHANCED COMMISSION ARRANGEMENT FOR VARIABLE PRODUCT SALES

The Company recently entered into an agreement with United Investors Life Insurance Company whereby, commencing January 1, 2000, the Company will receive additional commissions from United Investors for selling variable products for which it is the underwriter. It is estimated that this arrangement will provide additional underwriting and distribution revenues of approximately $6.0 million in 2000.

Plaintiffs' Exhibit C44. On November 15, 1999, W & R Financial filed another 10–Q report which reiterated that it had "entered into an agreement with United Investors Life Insurance Company in July of 1999 whereby, commencing January 1, 2000, the Company will receive additional annual commissions from United Investors for selling variable products for which it is the underwriter." Plaintiffs' Exhibit C507.

### IV. Impasse Over Amendment Of PUA

Tucker and Daniel Schulte (general counsel of W & R Financial) claim that before January of 2000, they believed that the letter of July 8, 1999 was a contract. In January of 2000, however, Tucker asked Schulte for a legal opinion whether the letter was a binding contract. On January 19, 2000, representatives of UILIC (including McWhorter and Larry Hutchinson, general counsel of Torchmark) and W & R (including Hechler and Mark Buyle, associate general counsel of W & R) conferred by telephone. At that time, Hechler knew that UILIC disagreed with W & R's position, but he announced W & R's belief that the letter was an enforceable contract and that W & R would not consider any provision which restricted its ability to replace UILIC policies.

In 2000, UILIC introduced the Advantage Gold annuity as an alternative to the Advantage II annuity which W & R had previously sold for UILIC. On January 26, 2000, UILIC filed with the SEC a Form N–4 regarding Advantage Gold. The Form N–4 contained the following paragraph:

*Distribution of the Policies*

Waddell & Reed, Inc. of 6300 Lamar, Overland Park, Kansas, is the principal underwriter of the policies. Waddell & Reed, Inc. may enter into written sales agreements with various broker-dealers to aid in the distribution of the policies. A commission of 7.75% of each payment will be paid to Waddell & Reed, Inc. in connection with sales of the policies. In addition, a percentage of variable account values (currently 0.25% annually) will be paid to Waddell & Reed, Inc. Commissions to agents and other broker-dealers may be paid by Waddell & Reed, Inc. as varying percentages of purchase payments received and percentages of policy values.

Defendants' Exhibit J136. UILIC attached to the N–4 filing an unsigned "Amended and Restated Principal Underwriting Agreement" between it and W & R. Schedule A to the draft agreement set out the commissions which W & R would receive on annuity sales. The compensation schedule in Schedule A was consistent with the letter of July 8, 1999.

By letter dated January 26, 2000, Tucker advised UILIC that W & R would not sign any agreement which restricted replacements. In lieu of contractual protection against replacements, Tucker urged UILIC to accept W & R's good faith promise not to replace UILIC policies. On January 31, 2000, UILIC responded as follows:

Since we are both stewards of public companies that are no longer affiliates, and which are subject to the uncertainties about continuation of management inherent in such entities, we no longer have the luxury of the informality that characterized the past relationship. Both parties must have contractual arrangements that clearly express their rights and obligations and that will survive any changes in management or control. Just as you must have your compensation spelled out in de-

tail, we must have protection against improper replacement. Unfortunately, when the discussions commenced between the companies, our need for that protection was emphasized by Bob Heckler's [*sic* ] threat to replace all of United Investors' in force business unless Waddell & Reed's demands were met. In addition, we desire a structure with objective criteria that will reduce the risk of dispute.

Defendants' Exhibit J14.

## V. Withholding Of Mortality And Expense Charges

Until February of 2000, UILIC received monthly M & E payments for each policy, based on the value of the W & R Target mutual funds in each account.[14] Each month, W & R Target redeemed enough mutual fund shares from each policyholder account to pay that month's M & E charge, then deposited the proceeds into its bank account. W & R Target then wire transferred all of the M & E charges to a UILIC bank account. In a separate transaction, UILIC later paid the compensation to which the W & R entities were entitled under various management and sales agreements.

On February 8, 2000, W & R Financial directed W & R Target to withhold from monthly M & E charges otherwise due to UILIC the basis points set forth in the letter of July 8, 1999. At the time, W & R knew that UILIC was insisting that any agreement include restrictions with regard to replacement of UILIC products. W & R claims that it understood that UILIC had nonetheless agreed to all the provisions of the letter of July 8, 1999.

UILIC did not immediately contest the withholding of compensation from M & E charges. On May 3, 2000, however, it filed suit against the W & R entities in Alabama, claiming that they had converted M & E funds to which UILIC was entitled.[15]

Plaintiffs have maintained that they diverted the M & E charges in good faith reliance on their belief that the letter of July 8, 1999 was a binding contract. As explained below, the Alabama Supreme Court ultimately found that nothing in that letter authorized plaintiffs to divert the M & E payments. *See W & R*, 875 So.2d at 1163. Shortly after the Alabama Supreme Court ruling, W & R returned to UILIC approximately $12.8 million in diverted M & E charges. Meanwhile, however, an Alabama jury found that W & R, W & R Financial and W & R Financial Services had converted the M & E charges and assessed $45 million in punitive damages against them. Plaintiffs challenged that verdict in post-trial motions, but the Alabama trial court recently overruled those motions. *See* Order Filed July 14, 2004, attached to defendants' *Notice Of Filing Of Exhibit To Proposed Jury Instructions And Request For Judicial Notice* (Doc. # 456) filed August 17, 2004.

---

**14.** Defendants seek to exclude paragraph 9 of the Schulte affidavit which states:

> [UILIC] is paid monthly mortality and expense charges pursuant to the terms of its product prospectuses. The product prospectuses state that fees would also be paid to W & R, Inc. The manner in which funds were paid to W & R, Inc. for mortality and expense sharing, beginning in February 2000, was not inconsistent with the prospectuses. Moreover, [the manner in which W & R obtained compensation beginning in February of 2000] was consistent with the method in which [1] [W & R Investment] was historically compensated for its investment management fees, [2] Waddell & Reed Services Company ("WRSCO") (a sister company of [W & R Investment] and a wholly-owned subsidiary of W & R, Inc.) was paid accounting services fees and transfer agency fees, and [3] W & R, Inc. was paid its service

fees, as those fees were described in this product prospectuses.

Defendants argue that the Court should disregard paragraph 9 because (1) the prospectuses are not attached to the affidavit, (2) the paragraph contains legal conclusions, and (3) the legal conclusions are inconsistent with the findings of the Alabama Supreme Court in related litigation. Schulte has supplemented his affidavit and attached the relevant prospectuses. Except for the first two sentences, however, the Court will disregard paragraph 9 as conclusory and a legal opinion. Schulte does not explain how the withholding of M & E charges was consistent with the prospectuses or the method in which UILIC paid W & R entities on other matters.

**15.** The details of the Alabama action are discussed below. *See infra* text, Factual Background, part VIII.

## VI. Commencement of Litigation and Termination of Investment Services Agreement

Torchmark threatened litigation in January of 2000 if W & R attempted to exercise any rights under the letter of July 8, 1999. This threat put W & R on notice that litigation might be necessary. On March 20, 2000, Hudson sent Tucker a letter which advised that "[a]t this point in time, we believe it is in the best interest of [UILIC] and Waddell & Reed to agree upon an orderly termination of our relationship for the variable annuity products." Defendants' Exhibit J2. Hudson stated that despite the termination of the variable annuity relationship, UILIC was "willing to continue [the] relationship with respect to traditional and variable life products ... so long as no material and inappropriate replacement of annuity products occurs." *Id.*

In late March or early April of 2000, Tucker and Hudson met to discuss the dispute between their respective companies. Shortly after that meeting, Hudson told Tucker that UILIC was prepared to file suit if the matter could not be resolved. Hudson also told Tucker that if he did not respond to his letter of March 20, 2000, litigation could be required.

On April 26, 2000, W & R Financial held a board meeting where Tucker discussed the dispute with UILIC and noted Hudson's threat of litigation. The minutes state as follows:

> Mr. Mallow [of the Skadden Arps law firm] then specifically referenced the current dispute between [Torchmark and W & R] and stated that currently the presence of the common directors puts management in the awkward position of not being able to brief the full Board on the dispute going forward, especially if it proceeds to litigation as Torchmark has threatened. Mr. McCormick [a director of both Torchmark and W & R Financial] then stated that he didn't have any idea of what litigation he

was referring to regarding Torchmark. Mr. Tucker then reiterated the threat of litigation that had been communicated by Mr. Hudson.

Defendants' Exhibit J40. At the conclusion of the meeting, based on McCormick's comment, Tucker allegedly believed that no litigation was imminent.

On April 28, 2000, Tucker responded to Hudson's letter of March 20, 2000, sending a settlement offer "to avoid the risk of litigation." Prior to that time, Tucker had asked W & R lawyers to evaluate and prepare a declaratory judgment suit, but concluded that litigation would be very expensive. Tucker decided to await Hudson's response before he decided whether to file suit.

On May 3, 2000, UILIC filed suit against W & R Financial, W & R and three other W & R entities in the Circuit Court of Jefferson County, Alabama (the "Alabama action").[16] UILIC directed counsel to file the Alabama action without prior discussion with the Torchmark board. For ease of reference, the Court collectively refers to the five W & R entities in the Alabama action as the "Alabama Defendants."

On May 4, 2000, one day after UILIC filed suit, Hagopian and McCormick resigned from the board of W & R Financial. That same day, W & R filed a declaratory judgment action against UILIC in the District Court of Johnson County, Kansas. W & R asked the Kansas court to declare that the letter of July 8, 1999 was binding and that W & R was justified in withholding compensation under that agreement. UILIC removed the case to this Court, *see Waddell & Reed, Inc. v. United Invs. Life Ins. Co.,* No. 00–2209–CM (D.Kan.), then asked the Court to decline jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). In the alternative, in deference to the Alabama case, UILIC asked the Court to dismiss this action under the *Colorado River* doctrine. *See Colo. River Water Conserv. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47

---

**16.** The additional entities were W & R Financial Services, Inc., W & R Insurance Agency, Inc. and W & R Insurance Agency of Alabama, Inc. W & R Financial Services is a wholly-owned subsidiary of W & R Financial. *See* 11/15/01 Schulte Depo. at 20, 147; *see also Complaint* (Doc. # 1) filed July 26, 2001 ¶ 1(a). The latter two entities solicited applications and distributed non-variable insurance products on behalf of UILIC.

L.Ed.2d 483 (1976). The Honorable Carlos Murguia dismissed the case, refusing to exercise jurisdiction under the Declaratory Judgment Act. *See Waddell & Reed, Inc. v. United Invs. Life Ins. Co.,* 2000 WL 1595751 (D.Kan. Oct.18, 2000). Judge Murguia found that W & R had been "put on notice [by UILIC] in January 2000, that a lawsuit might be necessary." The Court also found that the facts raised an inference that "[W & R] filed [the Kansas] declaratory judgment action to provide an arena for a race to *res judicata.*" *Id.* at *5. Neither party appealed.

The boards of W & R Financial and Torchmark were not asked to vote or take action on any aspect of the dispute or litigation. Neither board was ever asked to take action, vote or pass any resolution regarding the letter of July 8, 1999, or the ensuing dispute and litigation.

Even after the spin-off, Torchmark had a subsidiary called Waddell & Reed Asset Management Company ("WRAMCO"). Under an agreement with WRAMCO, W & R Investment was the investment advisor for Torchmark general accounts. The agreement gave each party the right to terminate on 30 days notice. During the summer of 2000, Torchmark told W & R Financial that it was going to terminate the Investment Services Agreement if W & R refused to renegotiate the letter of July 8, 1999 in favor of UILIC.[17] On August 29, 2000, WRAMCO in fact notified W & R Investment that its service as investment advisor was terminated effective September 30, 2000.

## VII. Replacement Of UILIC Policies By W & R

Variable annuity policies are replaced when one variable annuity policy is exchanged for another. A replacement can be a taxable event or a 1035 exchange. A "1035 exchange" refers to a tax exempt exchange of one annuity contract for another. *See* 26 U.S.C. § 1035 (tax exempt status for various exchanges of life insurance, endowment and annuity contracts). Because of tax issues and charges associated with exchanges, replacements are not always in the best interests of policyholders. Accordingly, under rules established by the National Association of Securities Dealers ("NASD"), financial advisors must ensure that all recommendations to sell or exchange a variable annuity are suitable to the individual circumstances of the customer. A broker or dealer must establish and maintain supervisory procedures which are reasonably designed to achieve compliance with the so-called "suitability rule."

Before the dispute over the letter of July 8, 1999, few of UILIC's variable annuities had been replaced. Indeed, UILIC had one of the lowest policy lapse rates in the industry.

Before October 20, 2000, W & R had no products to sell, except those of UILIC, because it had no agreements with other issuers.[18] On October 20, 2000, W & R entered into a contract to market products, including variable annuity policies, of Nationwide. The contract specifically permitted W & R to sell a Nationwide Select Plus annuity which was designed to facilitate the 1035 exchange of UILIC policies. Beginning January 1, 2001, a number of W & R customers replaced UILIC policies with Nationwide annuities. From January of 2001 through April of 2004, W & R exchanged 10,560 Advantage II policies and 56 Advantage Gold policies for Nationwide products. During this period, W & R replaced 21.7 per cent of outstanding

---

17. Defendants seek to exclude paragraph 11 of the Schulte affidavit which states that during the summer of 2000, "counsel for the Torchmark group of companies threatened termination of the Investment Services Agreement if W & R, Inc. refused to renegotiate the July 8, 1999 letter in [UILIC's] favor." Defendants argue that the Court should disregard paragraph 11 because (1) Schulte does not claim to have personal knowledge of the alleged fact and (2) Schulte has not identified the alleged declarant. Schulte has supplemented his affidavit by stating that counsel for Torchmark personally communicated the threat to him. The Court therefore overrules defendant's objection to paragraph 11.

18. On December 6, 1999, W & R had entered into a General Agency Agreement with Nationwide Life Insurance Company ("Nationwide"). The agreement was a special purpose selling agreement which was executed solely to allow one W & R Financial advisor to place a $650,000 premium case with Nationwide after UILIC had declined to issue the policy.

Advantage II policies.[19] Some of these replacements were inconsistent with the NASD suitability rule. *See* 4/19/04 Tucker Depo. at 65–67 (some replacements were "not suitable"); 2/5/04 Schulte Depo. at 310–359 (between 175 and 200 replacements were "problematic").

In December of 2000, W & R developed new guidelines which required that division managers review the suitability of each replacement application. By letter dated February 12, 2001, W & R notified UILIC that because of these changes, it was terminating UILIC employees as agents of W & R and deregistering UILIC as a branch office of W & R. UILIC responded on February 28, 2001, by terminating the PUA effective April 30, 2001.

## VIII. The Alabama Action

As noted, on May 3, 2000, UILIC filed the Alabama action against W & R Financial, W & R and three other W & R entities. In its initial and amended complaints, UILIC asserted claims for breach of contract, conversion and tortious interference with the contractual relations with its policyholders. UILIC alleged that the original PUA was controlling and that W & R could not divert M & E charges based on the letter dated July 8, 1999. UILIC also sought to enjoin wrongful replacement of its variable annuities.

On May 24, 2000, the Alabama Defendants (including W & R Financial and W & R) filed an answer and counterclaims against UILIC, Torchmark and Richey. The counterclaims asserted fraudulent inducement, fraudulent suppression, breach of fiduciary duty, tortious interference with business relations, breach of contract, estoppel and unjust enrichment.[20]

On March 1, 2001, UILIC filed a second amended complaint in the Alabama litigation, adding claims relating to the Nationwide replacements which had begun in January of 2001, and seeking to enjoin replacements. On March 8, 2001, W & R and W & R Financial answered and again asserted counterclaims against Torchmark and Richey.[21]

19. Plaintiffs state that the number of exchanges from Advantage II into Nationwide is "below the industry average." Plaintiffs' Additional Statement of Facts ¶ 34. Plaintiffs cite deposition testimony that replacements accounted for 40 to 60 per cent of all sales in the industry. Plaintiffs' industry percentages reflect the dollar value of replacements divided by the total dollar value of all sales. In contrast, the 21.7 per cent figure reflects the number of replacements divided by the total number of in-force policies.

During the second half of 2002, UILIC changed the policy features of its Advantage II annuity and introduced a so-called Titanium annuity. Beginning in October of 2002, UILIC exchanged Advantage II and Advantage Gold annuities for its own Titanium annuities. From October of 2002 through April of 2004, UILIC exchanged 58 Advantage II policies for Titanium policies and nine Advantage Gold policies for Titanium policies.

20. The Alabama Defendants specifically alleged that UILIC had breached the letter agreement of July 8, 1999 and that UILIC, Torchmark and Richey had fraudulently induced them to enter into and perform that agreement and to abandon their arrangement with alternative providers. In their claim of fraudulent suppression, the Alabama Defendants alleged that UILIC, Torchmark and Richey had failed to disclose that UILIC would not improve its products and services or agree to pay additional compensation without an agreement that UILIC policies would not be re-

placed. In their claim for breach of fiduciary duty, the Alabama Defendants alleged that Richey had breached his fiduciary duty to W & R Financial by serving on the board of directors of both Torchmark and W & R Financial and making adverse decisions regarding W & R Financial while serving on its board. In support of the tortious interference claim, the Alabama Defendants alleged that Richey and Torchmark had intentionally interfered with various contractual relations between UILIC, W & R, Waddell & Reed Insurance Agency, Inc. and Waddell & Reed Insurance Agency of Alabama, Inc. by threatening legal action if W & R continued to exercise its contractual rights and causing or helping to cause UILIC to bring the Alabama action against W & R Financial and its affiliates. The Alabama Defendants also brought a tortious interference claim based on attempts by Torchmark and Richey to preclude W & R "from advising policyholders regarding United Investors' variable life insurance and annuity products and the potential advantages of annuities and life insurance policies offered by other life insurance companies." In part, W & R and W & R Financial sought damages against Torchmark and Richey for allegedly causing W & R to abandon its arrangement with an alternate provider.

21. The counterclaims in response to the second amended complaint did not include any claims by Waddell & Reed Financial Services, Inc., Waddell & Reed Insurance Agency, Inc. or Waddell & Reed Insurance Agency of Alabama, Inc.

On April 5, 2001, the Alabama court granted partial summary judgment in favor of UILIC, ruling that regardless how it characterized the letter of July 8, 1999, UILIC had the right to terminate it at will and to terminate the PUA on 60 days notice.[22] The Alabama court concluded that as a matter of law, as of April 30, 2001, W & R had no right to 20 basis points on UILIC policies that were in force before January 1, 2000.[23]

On August 3, 2001, UILIC filed a third amended complaint which re-asserted all but one claim from the second amended complaint and advanced six new claims relating to the replacement of UILIC policies after the PUA terminated on April 30, 2001. In December of 2001 and January of 2002, the Alabama trial court granted summary judgment in favor of Torchmark and Richey on the counterclaims of W & R and W & R Financial and dismissed them with prejudice. The Alabama Supreme Court affirmed these rulings on October 25, 2002. *See W & R Fin., Inc. v. Richey*, 877 So.2d 646 (Ala.2002) (table).

In the counterclaims, in addition to acts which they had asserted in their initial counterclaims, W & R and W & R Financial alleged certain facts pertaining to events that had occurred after the filing of their initial counterclaims in May of 2000. In particular, W & R and W & R Financial alleged that (1) Torchmark and its affiliates had terminated W & R Investment as investment advisor because W & R would not alter its arrangement with UILIC to include an anti-replacement agreement; (2) beginning in May of 2000, when UILIC filed suit in Alabama, UILIC introduced USA products which competed directly with products which W & R distributed; (3) UILIC structured the USA products so that they would be attractive replacements for UILIC products which W & R had distributed; and (4) UILIC never allowed W & R to distribute USA products. W & R and W & R Financial also alleged that based on Richey's breach of fiduciary duty to W & R Financial, UILIC had negotiated in bad faith with W & R to delay legal action until UILIC could file suit in Alabama and bring USA products to market in May of 2000. W & R and W & R Financial also alleged that Torchmark and Richey had intentionally interfered with various contractual relations between W & R and UILIC by (1) refusing to give W & R Financial a limited power of attorney to obtain a private letter ruling from the IRS to facilitate recapitalization of its stock, unless W & R altered its arrangement with UILIC; (2) terminating W & R Investment as investment advisor in September of 2000; and (3) instituting legal action against W & R in May of 2000.

In February and March of 2002, the Alabama court conducted a jury trial on UILIC's claims of tortious interference, breach of contract, conversion and fraud, UILIC's claim for declaratory relief, and W & R's counterclaims against UILIC for fraud, breach of contract and unjust enrichment. The jury found in favor of UILIC on all claims. On the complaint, the jury awarded UILIC $50 million in compensatory damages, but no punitive damages. The trial court entered a declaratory judgment in favor of UILIC, holding that the letter of July 8, 1999 was not a binding contract and that UILIC had "no past, present, or future obligation to pay either the 20 basis points or 25 basis points compensation referenced in the July 8, 1999 letter."

W & R appealed. On September 5, 2003, the Alabama Supreme Court reversed the $50 million judgment on the UILIC complaint, but affirmed the judgment in UILIC's favor on all W & R counterclaims including one for declaratory judgment regarding the letter of July 8, 1999. *See W & R*, 875 So.2d at 1166–67.[24] On the UILIC claims for tor-

In part, W & R and W & R Financial sought damages from UILIC, Torchmark and Richey for causing W & R to abandon its arrangement with Security Benefit Life.

W & R and W & R Financial maintain that in the Alabama action, they did not *seek damages* for the termination of W & R Investment as investment advisor in September of 2000. *See* Plaintiffs' Opposition Memorandum (Doc. # 387) at 46–47. Schulte, plaintiffs' Rule 30(b)(6) witness, testified that he was not sure why that claim was in the amended counterclaim in Alabama, since W & R Investment was not a party to that case. *See* 8/29/03 Schulte Depo. at 132–133.

22. The Alabama court ruled that because the letter of July 8, 1999 did not contain a termination or duration provision, it was terminable at will as a stand-alone contract. Alternatively, if the letter was an amendment to the PUA, it was terminable on 60 days notice. Finally, if the letter was not enforceable, UILIC had the right to terminate the PUA on 60 days notice.

23. UILIC did not seek summary judgment on the issue whether W & R was entitled to receive 25 basis points on sales after January 1, 2000.

24. The Alabama Supreme Court had issued two previous decisions in the case. On April 18,

tious interference and a portion of its fraud claims, the Alabama Supreme Court ruled that the trial court had erred in refusing to grant judgment as a matter of law in favor of the W & R defendants. The Alabama Supreme Court found that UILIC's claims for conversion, breach of contract and fraudulent suppression were properly submitted to the jury, but it reversed the judgment because the jury had returned a general verdict which included claims on which W & R prevailed on appeal. As to UILIC's conversion claim, the Alabama Supreme Court ruled that even if the letter of July 8, 1999 was a contract, it did not authorize the diversion of M & E charges. *See id.* at 1163. On W & R's counterclaim for declaratory judgment, the Alabama Supreme Court affirmed the trial court ruling that the letter of July 8, 1999 was not an enforceable contract and that UILIC had "no past, present or future obligation to pay either the 20 basis points or 25 basis points compensation referenced in the July 8, 1999 letter." *Id.* at 1166–67 (third opinion). The Alabama Supreme Court also affirmed the judgment in favor of UILIC on W & R's counterclaims for money damages. *See id.* at 1166.

On October 22, 2003, W & R and W & R Financial returned to UILIC some $12,784,965.00 in M & E charges, plus interest. On November 20, 2003, W & R and W & R Financial paid an additional $19,128.93 to remedy an error in the calculation.

In March of 2004, the Alabama trial court re-tried UILIC's claims of fraudulent suppression and conversion. Because W & R had returned the disputed funds, the jury did not consider compensatory damages on UILIC's conversion claim. W & R and W & R Financial contended that punitive damages could not be awarded because they had a "good faith belief" that the letter of July 8, 1999 was a binding contract. The trial court instructed the jury that punitive damages could only be awarded if it found by clear and convincing evidence that defendants had acted with fraud, malice, wantonness or oppression. At the conclusion of the trial, the jury rejected UILIC's fraudulent suppression claim. On the conversion claim, however, it awarded UILIC $15 million in punitive damages from each of three defendants, W & R, W & R Financial and W & R Financial Services. *See* Exhibit A42. On March 19, 2004, the trial court entered judgment on the verdict.

The Alabama Defendants filed motions for post-trial relief, complaining that the court had not instructed the jury that good faith was a defense to punitive damages and that punitive damages were improper because the jury did not award compensatory damages. On July 14, 2004, the Alabama trial court overruled the post-trial motions. *See* Order Filed July 14, 2004, attached to defendants' *Notice Of Filing Of Exhibit To Proposed Jury Instructions And Request For Judicial Notice* (Doc. # 456) filed August 17, 2004. The Alabama court ruled that it was not required to specifically instruct on a good faith defense to punitive damages because its instruction allowed the jury to consider any good faith by defendants. *Id.* at 6. As to the lack of compensatory damages, the Alabama court ruled that the Alabama Defendants had invited the alleged error by repeatedly conceding that compensatory damages were not in dispute because they had already repaid the money. *Id.* at 2–4.

As the holding company for other W & R entities, W & R Financial has chosen to pay the attorneys' fees of W & R and W & R Financial Services in the Alabama action. W & R has stated that it will also pay any final judgments against them, but that it intends to first appeal the trial court's judgment.

## IX. NASD Investigation and Charges

In April of 2001, NASD commenced an investigation of W & R sales practices, including its replacement of UILIC annuities

---

2003, it issued an opinion which stated in part that "it need not decide whether the July 1999 letter was a contract between the parties." *Id.* at 1167 n. 6. On UILIC's motion for rehearing, the Alabama Supreme Court issued a substituted opinion which stated that it was not deciding whether the letter of July 8, 1999 was a contract "in the context of UILIC's conversion claim." *Id.* W & R applied for rehearing, which resulted in the third opinion of September 5, 2003, holding that the letter of July 8, 1999 was not an enforceable contract.

with Nationwide annuities.[25] NASD visited the W & R home office, conducted a sales examination and reviewed hundreds of transactions. At the conclusion of its visit, NASD expressed concern about the high level of 1035 exchanges, particularly where clients incurred large surrender charges when they exchanged variable annuity and life insurance products.[26]

In an apparent attempt to persuade NASD to file a complaint and formally discipline W & R, Peter Bassett, an attorney for UILIC in the Alabama litigation, sent NASD numerous e-mails about the replacement of UILIC policies and the fact that W & R might be violating the suitability rule.[27] On April 20, 2001, Bassett sent an e-mail which expressed concern that "tens of millions of dollars of rollovers have already occurred and policy replacements appear to be escalating." Plaintiffs' Exhibit B1–5. Bassett acknowledged W & R's position that the Nationwide replacements were "entirely appropriate" and met all suitability requirements, and stated that UILIC could not "confidently comment" on the suitability issues. *Id.* From August of 2001 through May of 2003, however, he regularly gave the NASD spreadsheets regarding the volume of exchanges of UILIC policies by W & R. Beginning June 7, 2002, Betsy Collins, an attorney at Alston & Bird who represents Torchmark in the instant action, also sent spreadsheets.

On September 19, 2001, attorneys and other representatives of UILIC and Torchmark met with NASD representatives. UILIC attorneys provided materials on six topics, including litigation timelines, replacement activity, correspondence, and a matrix analyzing sales communications and applicable NASD rules.

On October 16, 2001, the NASD sent UILIC an e-mail regarding the relationship between surrender charges and annual deferred sales charges on Advantage II annuities.[28] The e-mail sought to confirm that when a customer replaced a policy while the surrender charge was in effect, the amount of the surrender charge was "approximately equal to what they would have paid in Annual Deferred Sales Charges had the policy not been replaced," so that effectively the customer was not harmed. Plaintiffs' Exhibit B1–9. UILIC's chief actuary responded that the customer was only harmed to the extent that the replacing policy had new surrender charges and a new surrender period. *Id.*

---

**25.** Defendants state that the investigation resulted from an anonymous letter by one of W & R's own financial advisors. Defendants have not authenticated the letter, however, or shown if and when NASD received it. The Court therefore excludes the letter.

Defendants have also presented an article by Robert Williams, national sales manager of W & R, which states that an anonymous letter prompted the NASD investigation. The Court excludes this portion of the article because Williams is not competent to testify to the cause of the NASD investigation and his statement is hearsay to the extent it is based on the statements of NASD personnel.

The Williams article also reports certain factual matters concerning the investigation, such as concerns which NASD raised to W & R during the initial examination. Plaintiffs object that this information is also hearsay, but they do not dispute that Williams made the statements and that the article is authentic. The statements are not hearsay. *See* Fed.R.Evid. 801(d)(2)(B), (C).

**26.** UILIC's variable annuity policies had a surrender charge period. For Advantage II policies, the surrender charge period was eight years. *See* Plaintiffs' Exhibit B1–9. If a policyholder replaced the policy in the first year, the surrender charge was eight per cent; in the second year, the it was seven per cent, and so on until the ninth year—when the policyholder could replace the policy with no surrender fee. UILIC apparently received the surrender charges and W & R was not entitled to a share of them.

**27.** Bassett was an attorney in the law firm of Alston & Bird. Bassett has not entered an appearance for Torchmark in this case, but four other attorneys from Alston & Bird have done so.

**28.** As explained above, Advantage II annuities had an eight-year surrender charge period. *See* Plaintiffs' Exhibit B1–9. For the first ten years, however, policyholders who did not surrender their policies were subject to annual deferred sales charges. In year one, the annual deferred sales charges were 8.5 per cent; in year two, 7.65 per cent and so forth. Because the annual deferred sales charges for continuing policyholders were roughly equal to or greater than the surrender charges for policyholders who exchanged their policies, policyholders who replaced Advantage II policies did not necessarily incur charges which were greater than those incurred by policyholders who had kept their policies.

Bassett also sent NASD e-mails on January 18 and 23, 2002. On January 30, 2002, McWhorter, Bassett and another attorney from Alston & Bird met with Jonathan Golumb, counsel for NASD Regulation, Inc., Scott Smith, supervisor of investigations for NASD, and Brian Mason, an NASD investigator. Bassett provided the following agenda:

1. Bring [the NASD] up to date on the status of the case, the evidence, experts etc. to see what else [the NASD] might be interested in;

2. Discuss the material in the "books" [counsel was] sending [that day];

3. Talk about the reps and the "retribution" problem;

4. Have [McWhorter] there to answer any questions [the NASD] may have about [UILIC] and address any "business" related issues.

Plaintiffs' Exhibit B1–16. On January 31, 2002, Bassett sent NASD an e-mail which expressed his hope that "the NASD will act before all the hapless horses are out of the barn and in the next county." Plaintiffs' Exhibit B1–19.

The first trial in the Alabama litigation took place from February 19 through March 19, 2002. On March 19, 2002, Bassett sent NASD an e-mail stating as follows: "Verdict is in: $ 50 Million for [UILIC]. Now, maybe you'll do some thing about this? ? ? ? ?" Plaintiffs' Exhibit B1–20. A week later, on March 25, 2002, Bassett followed up with an e-mail as follows:

I thought you might want to know that exit interviews with one or more jurors indicate that most of them wanted to give us $150 Million, but they had to deal with the few who reasoned "if what W & R was doing was so bad, why wasn't some regulatory outfit trying to do something about it"? Thanks a lot, Big Guy. You cost my poor client $100 Million!!!!!

Plaintiffs' Exhibit B1–21.

On August 19, 2002, Barrett received notification that his primary NASD contact, Brian Mason, would be leaving NASD. Barrett sent him an e-mail stating: "You can't leave now, just when maybekindasorta the NASD might actually be thinking about doing something!!! Who will I have to yell at about the ponderous and inscrutable bureaucracy at the NASD?" Plaintiffs' Exhibit B1–23.

On June 7, 2002, Collins sent NASD an e-mail which included the latest replacement data. Plaintiffs' Exhibit B1–22. On October 17, 2002 and April 11, 2003, Collins sent additional e-mails. On April 21, 2003, after the Alabama Supreme Court reversed the $50 million verdict, Collins sent another e-mail, stating: "They got off on the replacements on legal technicalities. If you guys don't do something, they get off scott free and think this conduct is okay." Plaintiffs' Exhibits B1–29. On April 30, 2003, Collins sent a further e-mail which stated:

FYI: W & R has gained new momentum from the Ala. S.Ct. decision. The effect of the decision is to leave [UILIC] without a remedy for W & R replacing the policies. . . . I have two new policyholders you might want to talk to if you are still looking at abusive sales tactics by W & R advisors. If they get away with the tactics they have employed to move this business, there is no telling what you will see them do in the future. I know that the expenses they attribute to their funds will not bear scrutiny.

Plaintiffs' Exhibit B1–30.

On June 6, 2003, Collins sent NASD an e-mail which attached an excerpt from a Form 8–K filing in which W & R Financial disclosed that the NASD was considering action against W & R. Collins stated, "You must have their attention if they are reporting because they take a very aggressive stance on what to report and how. This is uncharacteristically neutral to negative." Plaintiffs' Exhibit B1–31.

On January 14, 2004, NASD filed an enforcement action against W & R, Hechler (its president), and Williams (its national sales manager), alleging violations of NASD rules in connection with the replacement of UILIC variable annuities. The summary portion of the NASD enforcement complaint stated:

During the period from January 2001 to August 2002, Respondent Waddell & Reed, Inc. ("W & R") engaged in an ag-

gressive effort to switch the variable annuity investments of its customers from those provided by one insurance company to very similar annuities provided by another insurance company. As a result of those efforts, W & R registered representatives recommended, and W & R exchanged, more than 6,700 variable annuities worth approximately $616 million. Those exchanges generated more than $37 million in commissions to W & R, and cost its customers approximately $9.8 million in surrender charges. W & R failed to take adequate steps to ascertain whether there were reasonable grounds for the customers to enter into these exchanges. It failed to perform a sufficient analysis to determine whether the customers were likely to benefit or lose money from the exchanges and failed to establish sufficient guidance for the sales force or management to use in determining the suitability of the exchanges. As a result, W & R and its registered representatives did not have a reasonable basis for the recommended exchanges and the exchanges violated NASD's suitability rule. * * *

By virtue of this conduct, W & R violated Conduct Rules 2110, 2310, and 3010, Hechler violated Conduct Rule 2110 by causing violations of Rule 2310, and Williams violated Conduct Rules 2110 and 3010.

Exhibit 5016 ¶¶ 1–7.[29]

In answer to the NASD complaint, W & R, Hechler and Williams stated that "some" clients "decided to exchange [UILIC] policies

because Nationwide's policies were vastly superior and less costly for those clients than their existing UILIC policies." Defendants' Exhibit K1 ¶ 1.[30]

The NASD enforcement action is still pending, and is set for an administrative hearing in March of 2005.

## X. The California Action

On October 10, 2001, on behalf of variable annuity policyholders in California, UILIC filed suit against W & R, W & R Financial and other W & R entities and financial advisors in the Superior Court of Los Angeles County, California (the "California action"). Under a California statute that allows standing for private attorney generals, California Business and Professions Code §§ 17200, et. seq., UILIC sought injunctive relief to prevent W & R advisors from replacing policies of California policyholders through improper means. UILIC also sought restoration of money and/or property including commissions, an accounting, attorney fees and a constructive trust over any proceeds. The California defendants removed the case to the United States District Court for the Central District of California, which overruled their motion to dismiss and sua sponte remanded to state court. The California Defendants appealed that order but on February 23, 2004, the Ninth Circuit Court of Appeals held that it did not have jurisdiction

---

**29.** Plaintiffs object repeatedly that under Rule 802, Fed. R. Evid., the Court cannot consider the NASD complaint to establish as true the facts therein. See Plaintiffs' Opposition Memorandum (Doc. # 387) at 52–55. The Court agrees. It sets forth the NASD complaint and answer only to provide context for plaintiffs' assertion of damages related to the NASD investigation.

**30.** In contrast with plaintiffs' stated position in this case, the answer did not attribute the replacements to actions by UILIC, Torchmark, Richey, McCormick or Hagopian, or claim that by terminating the PUA or otherwise, defendants sought to increase the number of replacements and collection of surrender fees, or launch the NASD investigation. Indeed, in their answer, W & R, Hechler and Williams stated:

> UILIC went to great lengths to prevent Waddell's clients from even considering the exchange of UILIC policies for better policies.

UILIC sued Waddell in Alabama in May 2000 and sought to enjoin any exchanges of their policies, and then canceled the PUA in February 2001 after Waddell began offering Nationwide's products to its clients. In January 2001, UILIC issued subpoenas in its Alabama lawsuit to Waddell advisors and their clients involved in the exchange of UILIC's policies for Nationwide's in a transparent effort to intimidate those advisors who were considering a replacement recommendation. Then, in March 2001, UILIC sent intimidating letters to all Waddell advisors, and misleading letters to Waddell's clients who held UILIC policies.

Id. ¶ 23. Their answer to the NASD complaint also states that UILIC did not terminate the PUA until "after Waddell began offering Nationwide variable annuity products to its clients." Id. ¶ 11.

to review the remand order. *See United Investors Life Ins. Co. v. W & R*, 360 F.3d 960 (9th Cir.2004).

After remand, defendants filed a demurrer based on *Bowen v. Ziasun Techs., Inc.*, 116 Cal.App.4th 777, 11 Cal.Rptr.3d 522, 2004 WL 414897 (2004), a recent decision which held that Section 17200 of the California Business and Professions Code does not apply to securities actions. On May 3, 2004, the California state trial court sustained defendants' demurrer. Although no discovery has been conducted in the California action, it remains pending and UILIC intends to appeal.[31]

The Torchmark board was not involved in the decision to file the California action.

## XI. Corporate Relationship Between Plaintiffs

Waddell & Reed, Inc. and W & R Investment are separate legal entities. Each makes separate and different SEC filings and each is governed by a different regulatory body (W & R by NASD and W & R Investment by the SEC). All affiliated companies which are owned by Waddell & Reed Financial Services, Inc. maintain separate minute books.[32]

As of July of 2000, the following individuals held the following positions.[33]

| | W & R Financial | W & R Services | W & R | W & R Target |
|---|---|---|---|---|
| Keith Tucker [34] | chairman, CEO, director | president, chairman, CEO, director | chairman, director | chairman, director |
| Henry Herrmann [35] | president, CIO, director | executive vice-president, CIO, director | director | vice-president, director |

**31.** Though the parties have not supplemented the record on the issue, the Court assumes that UILIC has already filed its appeal.

**32.** Defendants seek to exclude paragraph 13 of the Schulte affidavit which states:

> Waddell & Reed, Inc. and Waddell & Reed Investment Management Company are separate legal entities that have separate assets, boards of directors, and officers. Generally, each makes separate and different regulatory filings to the SEC and are governed by different regulatory bodies, W & R, Inc. by the NASD and [W & R Investment] by the SEC. Separate minute books are maintained for all W & R affiliated companies owned by Waddell & Reed Financial Services, Inc.

Defendants argue that the Court should disregard paragraph 13 because (1) it contains legal conclusions and (2) the "regulatory filings" and "minute books" are not attached to the affidavit. "The affidavit is no place for ultimate facts and conclusions of law, nor for argument of the party's cause. But if the affidavit contains relevant material facts, although these are intermingled with conclusions of law, the court may disregard the conclusions of law and consider the rest of the affidavit." 6 Part 2, James Wm. Moore et al., *Moore's Federal Practice* ¶ 56–22[1], at 56–746 to –49 (1993).

As an officer of W & R and general counsel to W & R, W & R Financial and W & R Investment, Schulte has personal knowledge of all matters in paragraph 13. As to Schulte's opinion that W &

R and W & R Investment has "separate assets, boards of directors, and officers," he does not explain what the term "separate" means in this context or for what relevant time frame W & R and W & R Investment maintained such separateness. In any event, based on his corporate role with each plaintiff, Schulte can opine as to whether each corporate entity has legally separate assets, directors and officers.

As to defendants' objection that Schulte did not attach the regulatory filings and minute books to his affidavit, the Court finds that it was not necessary to do so in this case. Although Rule 56(e), Fed.R.Civ.P., states that all papers referred to in an affidavit shall be attached thereto or served therewith, the rule should not be interpreted to require meaningless work for the parties and the Court. Because Schulte did not refer to any specific minute book or regulatory filing, Rule 56(e) does not require that all minute books and regulatory filings be attached.

**33.** Except for Schulte, these individuals held the same positions in July of 1999.

**34.** Currently, Tucker is director, chairman and CEO of W & R Financial, director and chairman of W & R, and director and chairman of W & R Investment. He has held those positions since 1998.

**35.** Currently, Herrmann is president and chief investment officer of W & R Financial and W & R Investment.

| | | | | |
|---|---|---|---|---|
| Robert Hechler [36] | executive vice-president, COO, director | executive vice-president, COO, treasurer, director | president, CEO, treasurer, director | president, principal financial officer, director |
| Daniel Schulte [37] | vice president, secretary | senior vice president, secretary, director | senior vice president, secretary | vice president, asst. secretary, general counsel |

From 1999 through 2001, the boards of W & R and W & R Investment met only by written consent, and Tucker, Hechler and Herrmann were their only directors.

As general counsel of W & R Financial, Schulte reported to Tucker and on behalf of the Waddell & Reed entities in each case, had overall responsibility for the Alabama litigation and this litigation.

As of March 3, 1998, Article 8.1 of the Certificate of Incorporation of W & R Financial stated as follows:

> A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) for paying a dividend or approving a stock repurchase in violation of Section 174 of the Delaware General Corporation Law, or (d) for any transaction from which the director derived an improper personal benefit.

Plaintiffs' Exhibit D10.

## XII. Damages

Schulte testified that plaintiffs would have gone their separate way in July of 1999, if they had known that Torchmark did not consider the letter of July 8, 1999 to be an enforceable contract, and that in his opinion, the Alabama litigation would have never occurred. Tucker testified that W & R would not have continued its relationship with UIL-IC after July of 1999 if the common directors had disclosed to W & R Financial that Torchmark and UILIC viewed the letter of July 8, 1999 as tentative. Tucker also testified that in his opinion, the result of the Alabama action may have been different if the case had been litigated in Kansas. Tucker has not explained in what way, or for what reasons, the result may have been different.

W & R would have replaced UILIC annuities, even if it had entered into the agreement with Security Benefit in July of 1999. Schulte testified that in his opinion, UILIC probably would have contested the propriety of *those* exchanges. Plaintiffs argue that "[h]ad W & R gone to a new provider in July 1999, W & R would have received 25 basis points on the sales it would have made in 2000." *Plaintiffs' Memorandum In Opposition To Defendants' Motion For Summary Judgment* (Doc. # 387) filed May 24, 2004 at 70. The only evidence plaintiffs cite in support of this statement is the expert report of Timothy C. Pfeifer. Plaintiffs' Exhibit E–2. Plaintiffs apparently retained Pfeifer to estimate the actuarial value of compensation equal to 25 basis points on sales of annuities comparable to Advantage Gold. Plaintiffs cite no evidence, however, that in 2000, W & R would have received 25 basis points on sales from Security Benefit or any other provider

**36.** From 1998 through 2001, Hechler served as executive vice-president and chief operating officer of W & R Financial. From 1993 through 2001, he served as president and CEO of W & R. From 1999 through 2001, he was executive vice-president of W & R Investment.

**37.** As of August 29, 2003, Schulte was general counsel of W & R Financial, W & R and W & R Investment; vice-president and assistant secretary of W & R Financial; senior vice-president and secretary of W & R; and senior vice-president and secretary of W & R Investment. Today, Schulte is also the senior vice-president of W & R Financial. He is no longer the secretary of W & R or W & R Investment. As to all other W & R affiliates, Schulte is either general counsel or principal legal officer.

with which it could have contracted in July of 1999. For purposes of this motion, the Court therefore excludes this fact. *See Guidroz–Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 831–32 (9th Cir.2001) (although underlying factual details need not be disclosed in expert affidavit, underlying facts must exist); *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir.1981) (on motion for summary judgment, expert must back up opinion with specific facts).

Plaintiffs do not claim that they gave in to any demands of Torchmark or UILIC with regard to the dispute over the letter of July 8, 1999.

## XIII. Procedural History Of This Case

On July 26, 2001, W & R and W & R Financial filed this suit against Torchmark, Richey, McCormick and Hagopian. McCormick and Hagopian were not parties to the Alabama litigation. W & R Investment, which was not a defendant in the Alabama case, joined W & R and W & R Financial as a plaintiff in this case. The Court collectively refers to all three plaintiffs as the "Kansas Plaintiffs."

In their initial complaint, the Kansas Plaintiffs asserted that defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, breached fiduciary duties, knowingly participated in breach of fiduciary duty and interfered with prospective business relations. Specifically, Count I alleged that from October of 1997 through May of 2001, defendants engaged in a pattern of racketeering activity designed to injure W & R, W & R Financial and W & R Investment. *See Complaint* (Doc. # 1) ¶¶ 60–61. In particular, plaintiffs alleged that defendants did not disclose (1) that on April 19, 1999, UILIC had entered into a secret agreement with United Securities Alliance, Inc. to establish a competitive distribution network; and (2) that Torchmark viewed the letter of July 8, 1999 as a tentative agreement. *See id.* ¶¶ 21, 32.[38]

Count II alleged that Richey, McCormick and Hagopian breached their fiduciary duties as directors of W & R Financial. Count III alleged that Torchmark knowingly participated and induced Richey, McCormick and Hagopian to breach their duties as directors of W & R Financial. On Counts I, II and III, the Kansas Plaintiffs sought damages for (1) the decline in value of W & R Financial's interest in its wholly-owned subsidiary, W & R Financial Services, Inc.; (2) losses which W & R and W & R Investment sustained on account of their delay in bringing to market a new competitive variable annuity product; (3) loss of revenue which W & R sustained regarding UILIC policies that would have been replaced beginning in January of 2000; (4) litigation costs which W & R incurred in Alabama; and (5) fees which W & R Investment lost when Torchmark terminated it as investment advisor for Torchmark general accounts. *See id.* ¶¶ 62–64. Count IV alleged that Torchmark, Richey, McCormick and Hagopian intentionally interfered with the business relations of UILIC and W & R, and sought compensation for the economic loss which W & R incurred from that interference.

On March 6, 2002, Torchmark and Richey filed a motion for summary judgment, arguing that by virtue of the Alabama judgment, the doctrine of res judicata precluded plaintiffs' claims in this jurisdiction. The Court sustained the motion as to the claims by W & R and W & R Financial against Torchmark and Richey, but otherwise overruled the motion. This ruling left intact the claims of W & R and W & R Financial against McCormick and Hagopian, and the claims of W & R Investment against all defendants.

On June 6, 2003, plaintiffs filed an amended complaint. *See Amended Complaint* (Doc. # 114). In the amended complaint, plaintiffs again asserted a RICO claim against all defendants. In addition to the allegations in their original complaint, plaintiffs' amended complaint alleged the following facts:

---

38. The Kansas Plaintiffs asserted that UILIC, W & R Financial and the common directors constituted enterprises within the meaning of RICO and that continuously from October of 1997 through May of 2001, defendants actively conducted the affairs of these enterprises through multiple acts of mail and wire fraud, one act of extortion and one act of interstate travel in aid of the racketeering enterprises. *See Complaint* ¶¶ 60–61.

1. Torchmark directed UILIC to have deposition subpoenas issued and served on W & R investment advisors and their customers who decided to enter into a 1035 exchange of a UILIC variable annuity for a variable annuity issued by Nationwide. *Id.* ¶ 73.

2. In January and February 2001, UILIC attorneys telephoned W & R advisors, and in at least one call, attempted to implicate W & R in engaging in a scheme to engage in wholesale replacement of UILIC policies. *Id.* ¶ 75.

3. After UILIC failed to discover any scheme to exchange UILIC policies with Nationwide polices, Torchmark directed UILIC to mail a letter dated February 28, 2001, which served as notice terminating the PUA effective April 30, 2001 and terminating the general agent contract effective December 31, 2001. *Id.* ¶ 77.

4. By terminating the PUA and its relationship with W & R, Torchmark was able to increase the short-term profitability of UILIC (when surrender fees were incurred) and to greatly increase the damages sought in the Alabama litigation.[39] *Id.* ¶¶ 78–79.

5. Torchmark and UILIC also caused the National Association of Securities Dealers ("NASD") to investigate the 1035 exchanges and on October 10, 2001, UILIC filed a lawsuit in California against W & R, W & R Financial and others, alleging that the exchanges were unlawful. *Id.* ¶ 79.

On the amended RICO claim, W & R Financial sought damages for (1) the cost of the Alabama litigation, (2) the cost of the NASD investigation and possible imposition of a fine in the future, (3) the cost of the California litigation, (4) the amount of any judgment entered after retrial in the Alabama litigation, and (5) the amount of any judgment in the California litigation. *Id.* ¶ 87. On its RICO claim, W & R sought damages for loss of income on variable annuity sales in 2001. *See id.* ¶ 88. W & R Investment sought damages for its termination as investment advisor for Torchmark and lost revenue because of (1) lost variable annuity sales and (2) the reduced amount of assets to service which was caused by the payment of surrender charges to UILIC. *See id.* ¶ 89.

On June 27, 2003, Torchmark and Richey filed a motion to dismiss the amended complaint, arguing that by virtue of the Alabama judgment, the doctrine of res judicata precluded the amended RICO claims of W & R and W & R Financial. The Court overruled defendants' motion, see *Memorandum And Order* (Doc. # 171) filed November 20, 2003, holding that although the amended claims were related to and factually overlapped the Alabama counterclaims, they were not based on the same cause of action.[40]

On November 26, 2003, plaintiffs filed a second amended complaint. *See Second Amended Complaint* (Doc. # 172). In their second amended complaint, plaintiffs dropped their claim for intentional interference with prospective business relations. W & R, however, added a claim against the individual defendants for fraudulent nondisclosure. Specifically, W & R alleged that the common directors knew that in a press release and SEC filings, W & R Financial had announced the existence of a final agreement between W & R and UILIC; that they failed

---

**39.** As explained above, the Advantage II had a surrender charge period of eight years. *See* Plaintiffs' Exhibit B1–9. When policyholders replaced policies before the end of eight years, they had to pay UILIC a surrender fee between one and eight per cent. Plaintiffs allege that UILIC received some $15 million in surrender fees related to the exchange of UILIC policies for Nationwide policies. *See id.* ¶ 79.

**40.** Because of the summary judgment motion, and with the benefit of hindsight, the Court now has a much greater familiarity with the facts and issues in this case. If it had occasion to reconsider the issue in a summary judgment context, it would probably find that the amended RICO claims of W & R and W & R Financial were compulsory counterclaims in the Alabama action and that the doctrine of res judicata bars the amended RICO claims in this case because they are part of the cause of action which W & R and W & R Financial asserted in Alabama. Moreover, as set forth below, the Court would be inclined to hold that W & R Investment is bound by the judgment in that case. Such a ruling would not resolve plaintiffs' amended RICO claim against Hagopian and McCormick, however, and the amended RICO claim suffers from other deficiencies which make it imprudent to revisit the doctrine of res judicata at this time.

to disclose that Torchmark and UILIC were taking the position that the letter of July 8, 1999 was a "tentative" agreement; and that their failure to disclose was fraudulent. *See id.* ¶ 98.

In the pretrial order, which supercedes all of the foregoing pleadings, plaintiffs assert three claims:

**First Theory:** All plaintiffs assert a RICO claim against all defendants. Plaintiffs allege that after the spin-off, Torchmark and the individual defendants had a fraudulent scheme to "improperly maintain control" of W & R Financial and its subsidiaries. *See Pretrial Order* (Doc. # 390) at 6, 8. In particular, plaintiffs allege that defendants purported to negotiate a new compensation agreement while harboring a plan to obtain additional financial concessions (protection against replacement of UILIC annuities) before performing that agreement. *See id.* at 5.

**Second Theory:** W & R Financial asserts a breach of fiduciary duty claim against McCormick and Hagopian. W & R Financial alleges that McCormick and Hagopian breached their fiduciary duties as members of its board of directors by not disclosing Torchmark's position that the letter of July 8, 1999 was not a final agreement and that McCormick breached his fiduciary duty at the board meeting of W & R Financial on April 26, 2000 when he represented that UILIC was not planning to file suit. *See id.* at 5–6.

**Third Theory:** W & R asserts a fraud through silence claim against Richey, McCormick and Hagopian. W & R alleges that the individual defendants committed fraud because between July and October of 1999, they knew that W & R Financial had announced the existence of a "final" agreement in a press release and SEC filings, and did not disclose the position of Torchmark and UILIC that the letter of July 8, 1999 was a "tentative" agreement. *See id.* at 32.

On its RICO and fiduciary duty claims, W & R Financial seeks (1) $12,146,101.01 for

the cost of the Alabama litigation, (2) $3,998,435.19 for the cost of the NASD investigation, (3) $967,762.88 for the cost of the California litigation and (4) $30,000,000.00 for the punitive damage award against it and W & R Financial Services in the Alabama litigation. *See id.* at 86. On its RICO and fraud through silence claims, W & R seeks $8,200,000.00 for loss of income on variable annuity sales in 2000 and 2001 and $15,000,000.00 for the punitive damage award against it in the Alabama litigation. *See id.* On its RICO claim, W & R Investment seeks (1) $16,485,276.07 in damages arising from its termination as investment advisor for Torchmark, (2) $7,831,556.94 on account of lost management fees on variable annuities after Torchmark terminated W & R Investment as investment advisor and (2) $824,812.84 in lost management fees on account of a reduced asset base resulting from surrender charges after UILIC terminated the PUA. *See id.* at 86–87.

On May 7, 2004, defendants filed a second motion for summary judgment in this case, seeking summary judgment on each of plaintiffs' claims. Defendants first claim that they are entitled to summary judgment because all of plaintiffs' damage claims flow from their unreasonable belief that UILIC viewed the letter of July 8, 1999 as an enforceable agreement.[41] As to plaintiffs' RICO claim, defendants argue that they are entitled to summary judgment because (1) the alleged predicate acts are not fraudulent and (2) the predicate acts do not constitute a "pattern" under RICO. As to the breach of fiduciary duty claim of W & R Financial, defendants argue that they are entitled to summary judgment because (1) W & R Financial has not shown that McCormick or Hagopian knew on July 22, 1999 that W & R Financial or anyone else was misinformed about UILIC's view of the letter of July 8, 1999; (2) under the Articles of Incorporation of W & R Financial, McCormick and Hagopian cannot be liable for negligently failing to uncover that W & R Financial was misin-

---

**41.** As explained elsewhere, the Alabama court has already determined that the letter of July 8, 1999 was not an enforceable agreement. Plaintiffs' claim, however, is based on the fact that in

July of 1999, defendants concealed the fact that Torchmark did not *view* the agreement as a final agreement.

formed about the nature of the letter of July 8, 1999; and (3) as of April 26, 2000, McCormick did not know that UILIC would initiate litigation in Alabama. As to W & R's fraud by silence claims, defendants argue that (1) W & R knew that Torchmark viewed the letter of July 8, 1999 as tentative, (2) W & R cannot show that it justifiably relied on the common directors to disclose UILIC's view of the agreement, and (3) under the doctrine of res judicata, the Alabama judgment bars the claim of W & R against Richey. Defendants also maintain that based on the Alabama judgment, the doctrine of res judicata bars (1) W & R Investment from asserting certain portions of its RICO claim and (2) W & R Financial from recovering the cost of the Alabama litigation from Torchmark and Richey. Defendants also seek summary judgment on plaintiffs' damage claims arising from the litigation in Alabama and California, the NASD investigation and the lost revenue to W & R Investment on account of surrender charges. Defendants argue that as a matter of law, plaintiffs' intervening acts—and not the actions of defendants—caused such damages. Defendants maintain that plaintiffs cannot recover damages related to the NASD investigation because (1) plaintiffs cannot show that defendants initiated the investigation; (2) such damages are barred under the *Noerr–Pennington* doctrine, see *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and (3) plaintiffs' claim is in reality one for malicious prosecution and plaintiffs cannot recover damages until the investigation terminates in their favor. As to the damage claim of W & R Investment for losses related to its termi-

nation as investment advisor for Torchmark, defendants invoke the doctrine of res judicata, based on the Alabama judgment against W & R and W & R Financial. As to the claim of W & R Financial for the cost of the Alabama and California cases (including any judgments in those cases), defendants argue that both actions are pending and that future attorney fees and expenses and the amounts of any judgments are speculative. Finally, defendants argue that (1) W & R Financial does not have standing to recoup punitive damages assessed against W & R Financial Services; (2) W & R cannot seek recovery of the punitive damages assessed against it in the Alabama litigation because such damages were not alleged in the second amended complaint; and (3) public policy prohibits plaintiffs from shifting punitive damage·liability to defendants.

### *Analysis*

**I. Damages From Defendants' Failure To Disclose Torchmark's View Of Agreement**

██ Plaintiffs allege that after the IPO and spin-off, W & R and UILIC entered into negotiations regarding compensation to be paid under the PUA and the need for UILIC to develop a more competitive product, and that W & R "believed the negotiations culminated in an agreement dated July 8, 1999." *Pretrial Order* (Doc. # 390) at 5. Plaintiffs allege that between July 22, 1999 and October of 1999, if Hagopian and McCormick had disclosed Torchmark's view that the agreement was not a "final agreement," W & R "would have immediately resumed negotiations with other variable annuity providers and entered into an alternative relationship." [42] *Id.* Plaintiffs claim that because

---

**42.** The pretrial order alleges that the common directors failed to disclose the fact that at its board meeting in late July of 1999, Torchmark referred to the agreement as "tentative." *Pretrial Order* (Doc. # 390) at 5. In response to defendants' motion for summary judgment, plaintiffs appear to maintain that as late as November 15, 1999—when W & R Financial filed a 10-Q report with the SEC, see Plaintiffs' Exhibit 507—defendants concealed Torchmark's position that no agreement had been reached. Although the pretrial order alleges that defendants did not disclose Torchmark's view from July of 1999

through October of 1999, a reasonable jury could find that plaintiffs incurred damages under each theory of recovery because they did not know Torchmark's position in late July of 1999. The record does not reflect that plaintiffs' damages would have been different if defendants had disclosed Torchmark's view in August, September or October of 1999. Accordingly, to address defendants' summary judgment motion on all damage claims, the Court only needs to consider whether plaintiffs knew so much by *late July of 1999* that they cannot recover any damages.

Hagopian and McCormick did not do so, W & R was "forced into a dysfunctional relationship throughout 2000 and the first quarter of 2001," *id.*, which caused them to incur the following damages:

W & R Financial:

| | |
|---|---|
| Cost of Alabama litigation | $12,146,101.01 |
| Cost of NASD investigation | $ 3,998,435.19 |
| Cost of California litigation | $ 967,762.88 |
| Alabama jury verdict | $30,000,000.00 |

W & R, Inc.

| | |
|---|---|
| Loss of payment of 25 basis points on 2000 and 2001 variable annuity sales of alternative variable annuity product | $ 8,200,000.00 |
| Alabama jury verdict | $15,000,000.00 |

W & R Investment:

| | |
|---|---|
| Lost investment management fees due to the termination of the PUA as a result of lost sales | $ 7,831,556.94 |
| Lost investment management fees due to the termination of the PUA as a result of surrender charges paid | $ 824,812.84 |
| Loss of investment management fees due to the termination of the Investment Services Agreement to manage Torchmark general account investments | $16,485,276.07 |

*Pretrial Order* (Doc. # 390) at 86–87. As noted, for purposes of this motion, plaintiffs' damage claims all flow from the proposition that in late July of 1999, they did not know that Torchmark viewed the agreement as "not final." *See* 4/19/04 Tucker Depo. at 245, 254, 261–64; 8/29/03 Schulte Depo. at 189 (if plaintiffs had known UILIC's view, they would have gone separate ways and no damage would have occurred); *see also* Plaintiffs' Opposition Memorandum (Doc. # 387) at 3 (because individual defendants did not disclose Torchmark's view of agreement in July of 1999, W & R suffered damages).

Defendants argue that they are entitled to summary judgment on all damage claims because as a matter of law, their actions did not proximately cause plaintiffs' damages. In particular, defendants maintain that as a matter of law, plaintiffs could not reasonably believe that the negotiations with regard to compensation and the need for a more competitive product culminated in an enforceable agreement in July of 1999, and that plaintiffs therefore suffered no damages from defendants' failure to disclose that the agreement was not final. Although defendants couch their argument in terms of proximate cause, they actually assert that because plaintiffs did not reasonably believe that Torchmark viewed the agreement as final, plaintiffs cannot satisfy essential elements of their claims.[43] As to plaintiffs' RICO claim (First Theory), which presumes mail and wire fraud, and W & R's claim of fraud by silence (Third Theory), the Court construes the argument to be that because UILIC had already communicated its views of the agreement directly to plaintiffs, plaintiffs cannot show that Torchmark, Richey, McCormick and Hagopian had knowledge of material facts which they did not have or could not have discovered by reasonable diligence.[44]

The pretrial order alleges that plaintiffs incurred damages because Hagopian and McCormick did not disclose Torchmark's view of the agreement. *See id.* at 5–6. It does not allege any damage based on Richey's failure to disclose this fact. In addressing defendants' motion for summary judgment, however, the Court will assume that W & R's fraud claim applies to all three individual defendants.

43. The purported agreement was between W & R and UILIC. For purposes of defendants' motion for summary judgment, however, the Court assumes that Torchmark had the same understanding as UILIC, its subsidiary, and that W & R Financial had the same understanding as W & R, its subsidiary.

44. Plaintiffs' only claim against Torchmark is a RICO claim. Torchmark argues that the doctrine of collateral estoppel bars that claim because in March of 2004, in the second trial of the Alabama action, the parties litigated the issue of plaintiffs' good faith belief that the letter of July 8, 1999 was an enforceable contract and that issue was resolved against plaintiffs. *See* Defendants' Memorandum (Doc. # 369) at 86–88. For the doctrine of collateral estoppel to apply, the following elements must be established: (1) an issue in a prior action was identical to the issue litigated in the present action; (2) the issue was actually litigated in the prior action; (3) resolution of the issue was necessary to the prior judgment; and (4) the same parties are involved

See *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman,* 267 Kan. 245, 260, 978 P.2d 922, 932 (1999) (element of fraud by silence claim is that defendant knew of material facts which plaintiff did not have and could not have discovered by exercise of reasonable diligence); *OMI Holdings, Inc. v. Howell,* 260 Kan. 305, 344–45, 918 P.2d 1274 (1996) (same); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 233 (justifiable reliance essential element of RICO claim); *Bank of China, New York Branch v. NBM LLC,* 359 F.3d 171, 176 (2d Cir.2004) (same); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 746–47 (3d Cir.1996) (affirming dismissal of RICO fraud claim because plaintiff knew true facts and therefore could not have relied on misrepresentation).

Similarly, as to the breach of fiduciary duty claim of W & R Financial against Hagopian and McCormick (Second Theory), the Court construes defendants' argument as this: because UILIC had already communicated its views directly to plaintiffs, the individual defendants did not have a duty to disclose UILIC's view of the agreement. *See Kahn v. Tremont Corp.,* 1996 WL 145452, at *17 (Del.Ch. Mar.21, 1996) (no need to disclose general and commonly understood as-

pects of transaction), *rev'd on other grounds,* 694 A.2d 422 (Del.1997); *Golden Cycle, LLC v. Allan,* 1998 WL 276224, at *9–10 (Del.Ch. May 20, 1998) (no obligation to disclose to shareholders information already disclosed by corporation's public filings); *Scarabello v. Reichle,* 1995 WL 153338, at *2 (N.D.Ill. Apr.6, 1995) (no fiduciary duty to disclose information that had already been disclosed); *Meyer v. Alco HealthServs. Corp.,* 1991 WL 5000, at *4 (Del.Ch. Jan.17, 1991) (no duty to disclose facts that are known or reasonably available to the stockholder); *Fisher v. United Techs. Corp.,* 1981 WL 7615, at *3 (Del. Ch. May 12, 1981) (no duty to disclose information to one who reasonably should be aware of it); *Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir.1978) (party's reasonable belief that other party has access to facts should excuse him from new disclosures which reasonably appear to be repetitive).[45]

In summary, to recover damages on their First and Third Theories, plaintiffs must prove that through the exercise of reasonable diligence in late July of 1999, they could not have discovered Torchmark's view of the letter of July 8, 1999. As to all theories of recovery, it is necessary (though on the First and Third Theories, not sufficient) for plaintiffs to show that in July of 1999, they did not

in the two actions." *Lee L. Saad Constr. Co., Inc. v. DPF Architects,* 851 So.2d 507, 520 (Ala.2002).

Torchmark has not shown that the issue of plaintiffs' good faith belief was identical in the two actions. The second Alabama trial involved the question whether plaintiffs acted in good faith in *February of 2000,* when W & R Financial directed W & R to withhold from monthly M & E charges otherwise due to UILIC the additional basis points referred to in the letter of July 8, 1999. Here, the issue is whether plaintiffs had a good faith belief in *July of 1999* that the letter of July 8, 1999 was an enforceable agreement. From the jury verdict in the Alabama action, the Court cannot assume that resolution of this issue was necessary to the Alabama verdict.

**45.** Very few cases address a director's fiduciary duty to disclose information to fellow board members, but such a duty is analogous to the duty owed to shareholders. At a minimum, a director should be excused from disclosing to fellow board members information which they already know. *Cf. In re Unisys Corp. Retiree Med. Ben. ERISA Litig.,* 57 F.3d 1255, 1262–63 (3d Cir.1995) (no fiduciary duty under ERISA to remind another of information already dis-

closed); *Matter of Seidman,* 37 F.3d 911, 935–36 (3d Cir.1994) (no fiduciary duty of candor to remind loan committee of financial interest because committee already knew such information).

Defendants' summary judgment motion is based on plaintiffs' actual knowledge. Therefore the Court does not address whether by exercise of reasonable diligence, plaintiffs could have discovered Torchmark's view of the agreement. Nor does it decide whether such a standard applies to the breach of fiduciary duty claim of W & R Financial. Although the Court need not decide the issue, the duty of loyalty appears to require a director to disclose material information even if by exercise of reasonable diligence, the corporation could discover such information. *See Hollinger Int'l. Inc. v. Black,* 844 A.2d 1022, 1061 (Del.Ch.2004); *see also HMG/Courtland Props., Inc. v. Gray,* 749 A.2d 94, 121 (Del.Ch. 1999) (concealment of facts from fellow board members implicates duty of loyalty); 1 Principles of Corporate Governance: Analysis & Recommendations, cmt. 6 § 5.02(a)(1) at 215 (director owes duty to avoid misleading corporation by misstatements and omissions and to affirmatively disclose material facts known to him).

know that Torchmark viewed the agreement as "not final."

It bears repeating: plaintiffs' claims emanate from the fact that the individual defendants did not disclose to W & R Financial that Torchmark did not view the letter of July 8, 1999 as a "final agreement." To establish fraud under plaintiffs' First and Third theories and to establish a duty to disclose under plaintiffs' Second Theory, plaintiffs must show that in late July of 1999, they did not know that Torchmark did not view the letter of July 8, 1999 as a "final agreement." [46]

Initially, the Court notes that the Alabama trial court addressed a similar but legally distinct question: whether the letter of July 8, 1999 was an enforceable agreement. Based on a jury verdict in 2002, the Alabama trial court entered a declaratory judgment in favor of UILIC, holding that the letter of July 8, 1999 was not a binding contract and that UILIC "ha[d] no past, present, or future obligation to pay either the 20 basis points or 25 basis points compensation referenced in the July 8, 1999 letter." Order filed October 25, 2002 at 2–3, 5, attached as Defendants' Exhibit A37. The Alabama Supreme Court affirmed the trial court's ruling. *See W & R v. UILIC*, 875 So.2d at 1166–67. Plaintiffs cannot re-litigate the issue whether the letter of July 8, 1999 is an enforceable agreement: it is not. *See Lee L. Saad*, 851 So.2d at 520 (elements of collateral estoppel); *see also* Transcript of Pretrial Conference at 30–31 (comment by plaintiffs' counsel that issue was resolved in Alabama and would not be re-litigated), attached as Defendants' Exhibit C34.

To ascertain whether plaintiffs already knew, in July of 1999, that Torchmark did not view the letter of July 8, 1999 as a "final agreement," the Court first examines the letter itself. It provided in relevant part as follows:

> As you requested, this letter will set forth some details of the agreement that we reached over the telephone on Wednesday, July 7.

### Compensation payable to Waddell & Reed beginning 1/1/2000

> For variable annuity contracts issued beginning 1/1/2000:
>
> > 7.75% of premiums received, plus
> >
> > .25% annually of variable assets, paid monthly beginning the first month
>
> For the in force block of variable annuity business (i.e. issues of 1999 and earlier):
>
> > .20% annually of variable assets, paid monthly

### Certain variable annuity product features

> In addition to product features previously proposed, we agree to the following:
>
> > 1.25% of mortality & expense charge
> >
> > .15% admin. charge
> >
> > 7 year surrender charge period, with surrender charge pattern of 7%, 6, 5, 4, 3, 2, 1, 0%
> >
> > $25 contract maintenance fee, waived for accounts [greater than] $25,000
>
> By agreeing to the foregoing arrangements, we acknowledge that Waddell & Reed has withdrawn its consideration of possible relationships on attractive terms with other third party insurance companies in order to establish a long-term relationship with us. In doing so, Waddell & Reed has relied on ·our representations with respect to our commitment to provide, jointly with Waddell & Reed, a first-class, competitive product that is fully supported and serviced by sufficient resources, including personnel, systems and technology. We

---

**46.** In complaining that they were uninformed of Torchmark's view that the "agreement was not a final agreement," plaintiffs do not explain what they mean by "final agreement," *Pretrial Order* (Doc. # 390) at 5. Plaintiffs could be characterizing Torchmark's view as a view (1) that the parties had no agreement; (2) that the parties had an agreement which was not "final" because it was not formalized; (3) that the parties had an agreement on some subjects but because negotia-tions were in process on other subjects, so the agreement was only partial; or (4) that the agreement was not final for some other reason. On this record, plaintiffs' theory appears to be that unbeknownst to them, Torchmark viewed the letter of July 8, 1999 as a partial and contin-gent agreement—one which did not embody the parties' entire agreement and one which would not become effective until it was executed as a formal amendment to the PUA.

acknowledge that Waddell & Reed will commit substantial resources to market and provide a first-class, competitive product to its customers, and we agree that we will work cooperatively with Waddell & Reed and commit the reasonable resources necessary (a) to design, create, implement and introduce products and product features that will be first-class and competitive and (b) to enhance and improve such products and product features as the market for insurance products evolves. . . . [W]e also agree to commit the reasonable resources necessary, including, but not limited to, personnel, systems and technology, to develop and/or acquire and implement the services necessary to support and service clients who purchase the products jointly offered by Waddell & Reed and us, and to enhance and improve such services in order to remain fully competitive.

Bob, I believe this fully describes the items that we discussed regarding compensation and product features. If you are in agreement with the foregoing terms and conditions, please sign this letter below and return a copy to me as soon as possible.

Defendants' Exhibit J107. On July 12, 1999, Hechler signed and returned the letter on behalf of W & R.

On July 23, 1999, McWhorter sent Hechler another letter which provided as follows:

This follows my letter of July 8, 1999. As you know, the letter contained most of the details of the agreement we reached by telephone of Wednesday, July 7, 1999, My letter of general understanding needs to be formalized, however, into a specific amendment to the existing agreement between [UILIC] and Waddell & Reed, Inc. and also incorporate the oral agreement between Keith [Tucker of W & R] and C.B. [Hudson of UILIC] reached on July 2, 1999. I have asked our Legal Department to provide me with the amendment sometime in August, and I will forward the same for review by you and your staff. I would like to meet with you following your review so that we may sign the amendment and discuss further the products, systems and services our companies are planning to offer as we move forward. Bob, I am looking forward to working with you and the other members of Waddell & Reed as we finalize our agreement and work together to offer the best possible products and services to our customers.

Defendants' Exhibit J33.

Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could find that even though the letter of July 8, 1999 was not an enforceable agreement, plaintiffs reasonably believed in July of 1999 that UILIC viewed it as such. From the letter of July 8, 1999, plaintiffs could reasonably believe that they and UILIC had an agreement on "compensation and product features" and to establish a "long-term relationship" based on a mutual commitment to market a first-class competitive product. McWhorter signed the letter of July 8 on behalf of UILIC and asked Hechler to sign it on behalf of W & R if he agreed to its terms and conditions. These facts could reasonably lead plaintiffs to conclude that the letter reflected an agreement which was "final," in the sense that it (1) evidenced the entire agreement of the parties on certain subjects (compensation and a long-term relationship); and (2) as to those subjects, was effective and enforceable without a need for further formalization.

McWhorter's letter of July 23, 1999 emphasized the need for a formal amendment and put plaintiffs on notice that Torchmark did not view the letter of July 8, 1999 as binding and enforceable just because W & R had signed and returned it. The letter of July 23 reiterated Torchmark's view that W & R had made additional oral agreements on July 2 and 7, 1999 and also put W & R on notice that it intended to seek to finalize an oral agreement between Tucker and Hudson on July 2, 1999. The letter of July 23 was consistent, however, with plaintiffs' belief that the letter of July 8, 1999 evidenced the parties' entire agreement regarding compensation and product features and a long-term relationship.[47] Viewing the evidence in the

---

**47.** Plaintiffs apparently maintain that the parties had no oral agreements except as stated in the letter of July 8, 1999.

light most favorable to plaintiffs as of late July of 1999, W & R had not agreed to refrain from replacing UILIC policies, Torchmark had not asserted that the parties had a non-replacement agreement, and Torchmark had not communicated any position that the agreement of July 8, 1999 was contingent on a non-replacement agreement. In these circumstances, a reasonable jury could find that throughout July of 1999, plaintiffs could reasonably believe that Torchmark viewed the letter of July 8, 1999 as the parties' entire agreement regarding compensation and product features and a long-term relationship, and that the agreement would become effective when the parties executed a routine amendment to the PUA effective January 1, 2000. While the record reflects ongoing discussions about possible replacement activity by W & R, it does not compel a conclusion that by the end of July of 1999, plaintiffs knew that Torchmark thought that the agreement was contingent upon further agreement that W & R would not replace existing UILIC policies or any other conditions.[48]

As noted, the record reveals a genuine issue of material fact whether in July of 1999, plaintiffs knew that Torchmark did not view the letter of July 8, 1999 as a "final agreement." Defendants are not entitled to summary judgment on the theory that plaintiffs suffered no damages because they never reasonably believed that the letter evidenced an enforceable agreement.

To resolve this issue, the Court has needed to look no further than the facts which occurred in July of 1999. To address a number of issues below, however, the Court must determine when plaintiffs necessarily had notice that Torchmark did not view the letter of July 8, 1999 as a "final agreement."

Viewing the evidence in the light most favorable to plaintiffs, the Court believes that

a jury could find that up until September 28, 1999, plaintiffs could reasonably believe that Torchmark viewed the letter as a "final agreement." On August 2, 1999, W & R sent UILIC a first draft which reflected the issues addressed in what it viewed as the "letter agreement ... dated July 8, 1999." Defendants' Exhibit J50. The draft agreement did not include any provision regarding replacement of UILIC products. On August 13, 1999, UILIC proposed an amended PUA and a separate agreement which would prevent W & R from replacing any contract or policy which UILIC issued pursuant to a contract with W & R. See Defendants' Exhibit J51. At that time, Hechler knew of UILIC's demand for an agreement which included restrictions on replacements, but he thought that the parties had already reached an agreement on the issues outlined in the letter of July 8, 1999. See 11/7/00 Hechler Depo. at 362; 1/30/01 Hechler Depo. at 735–36. In its letter of August 13, 1999, UILIC proposed the anti-replacement provision as part of "an additional Agreement embodying previous discussions." Defendants' Exhibit J51. UILIC maintained that the non-replacement provision was part of an oral agreement, beyond the scope of the agreement outlined in the letter of July 8, 1999. Its letter did not expressly state that the entire deal was off if plaintiffs did not agree to a non-replacement provision. On September 28, 1999, however, W & R had notice of UILIC's position. On that day, counsel for UILIC wrote counsel for W & R, as follows:

### REPLACEMENTS

[UILIC] must maintain its insistence on the non-replacement language in any final agreement. While W & R felt that such language would put improper restrictions on its duty to its clients to be able to recommend the most suitable investment

---

**48.** Viewing the record in the light most favorable to plaintiffs, a reasonable jury could find that throughout July of 1999, plaintiffs reasonably believed that although the parties reached final agreement on the matters set forth in the letter of July 8, 1999, UILIC was attempting to negotiate new conditions which it had no right to demand: formal amendment of the PUA, "other details" which McWhorter and Hudson discussed on July 7, an alleged oral agreement between Tucker and

Hudson on July 2, and a stipulation that W & R would not replace UILIC products. On the other hand, a reasonable jury could find that regardless whether UILIC had any right to make additional demands, the fact that it did so put plaintiffs on notice that Torchmark did not view the letter of July 8, 1999 as a final agreement and that further agreement on additional terms was essential to any final agreement.

products, suitability is a point-of-sale concern. In addition UILIC has significant acquisition costs associated with this business, and W & R has a duty not to impair our ability to recoup these costs. Replacement of [UILIC] products would be doubly hard to justify from a suitability standpoint if the clients were being moved into products with substantially identical funds as those underlying the [UILIC] policies.

Defendants' Exhibit J55. This letter gave plaintiffs ample notice that if W & R did not agree to a non-replacement provision, UILIC would not perform under the letter of July 8, 1999. Plaintiffs obviously disagreed with UILIC's position, and they may have believed that UILIC had no legal right to take it because the letter of July 8, 1999 was an enforceable, stand-alone agreement. They could not, however, ignore UILIC's position that non-replacement language must be included in any final agreement. Accordingly, on September 28, 1999, if not sooner, plaintiffs had to understand that Torchmark did not view the letter of July 8, 1999 as a "final agreement."

## II. RICO Claim

A violation of RICO requires conduct of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c); see Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). To prevail on their RICO claim, plaintiffs must show (1) that defendants were employed by or associated with an enterprise; (2) that the enterprise engaged in or affected interstate commerce; (3) that defendants conducted or participated in the conduct of the enterprise's affairs; and (4) that such conduct or participation was through a pattern of racketeering activity. See 18 U.S.C. § 1962(c). To prove a pattern of racketeering activity, plaintiffs must show at least two predicate offenses which are related to the activities of the enterprise. 18 U.S.C. § 1961; see Salinas, 522 U.S. at 61, 118 S.Ct. 469; Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1543 (10th Cir.1993); United States v. Zang, 703 F.2d 1186, 1194 (10th Cir.1982), cert. denied,

464 U.S. 828, 104 S.Ct. 103, 78 L.Ed.2d 107 (1983).

Plaintiffs allege that after the spin-off, Torchmark and the individual defendants had a scheme to "improperly maintain control" of W & R Financial and its subsidiaries. See Pretrial Order (Doc. # 390) at 6, 8; see also Plaintiffs' Opposition Memorandum (Doc. # 387) at 76–78. In particular, plaintiffs allege that defendants purported to negotiate a new compensation agreement while harboring a plan to obtain additional financial concessions (protection against replacements of UILIC annuities) before performing that agreement. See Pretrial Order (Doc. # 390) at 5; Plaintiffs' Opposition Memorandum (Doc. # 387) at 78.

Before addressing defendants' arguments, the Court notes that in an attempt to fully comprehend plaintiffs' RICO claim and the alleged scheme, it has scrutinized plaintiffs' memorandum in opposition to defendants' motion for summary judgment, the pretrial order, the second amended complaint, plaintiffs' trial brief, plaintiffs' proposed jury instructions, plaintiffs' witness and exhibit lists, and hundreds of exhibits. After viewing the evidence in the light most favorable to plaintiffs and liberally construing plaintiffs' allegations and arguments, the Court is forced to conclude that plaintiffs' RICO claim is either ill conceived, poorly explained or simply a naked legal maneuver to evade the effect of the judgment in the Alabama action.

Defendants argue that they are entitled to summary judgment on plaintiffs' RICO claim because (1) plaintiffs cannot establish any racketeering activity or predicate acts; and (2) the predicate acts do not constitute a "pattern" under RICO. To evaluate defendants' arguments, the Court initially must identify the alleged RICO enterprises and the duration of each enterprise.

Plaintiffs allege that defendants executed a scheme to defraud through one or more of the following RICO enterprises: UILIC, W & R Financial, various mutual funds ("the Funds") and the common directors of Torchmark and W & R Financial. See Pretrial

*Order* (Doc. # 390) at 8.[49]

### A. Definition And Duration Of RICO Enterprises

■ An enterprise may be either a legal entity or a "group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To establish an enterprise, plaintiffs must show (1) an ongoing organization with a decision-making framework or mechanism for controlling the group; (2) with associates that function as a continuing unit; and (3) which is separate and apart from the pattern of racketeering activity. *United States v. Sanders,* 928 F.2d 940, 943–44 (10th Cir.1991). "A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Dirt Hogs Inc. v. Nat. Gas Pipeline Co. of Am.,* 210 F.3d 389, 2000 WL 368411, at *2 (10th Cir. Apr.10, 2000) (quoting *United States v. Rogers,* 89 F.3d 1326, 1337 (7th Cir.1996)). RICO prohibits a "person" who is associated with an enterprise to conduct its affairs through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c). Under RICO, the "person" and the "enterprise" engaged in racketeering activities must be different entities. *See Brannon v. Boatmen's First Nat'l Bank,* 153 F.3d 1144, 1146 (10th Cir.1998).

### 1. Common Director Enterprise

Plaintiffs allege that the common directors constituted an association-in-fact enterprise and that it had an ongoing organization for the purpose of controlling the 12–person board of directors of W & R Financial from March 4, 1998 through May 4, 2000. *See id.* at 8.[50] As to the other alleged enterprises, plaintiffs have not alleged their durations. For reasons explained below, however, the Court construes the pretrial order and sec-

ond amended complaint as alleging that the other three alleged enterprises had the same duration as the common director enterprise.

### 2. UILIC Enterprise

■ Plaintiffs allege that Torchmark, Richey, McCormick and Hagopian conducted the affairs of the UILIC enterprise. As explained above, the "person" and the "enterprise" engaged in racketeering activities must be different entities. *See Brannon,* 153 F.3d at 1146. Thus, a corporation cannot violate RICO absent an association with an entity other than itself, and it is insufficient to allege that the corporation's officers and employees constituted this other entity. *See Bd. of County Comm'rs v. Liberty Group,* 965 F.2d 879, 885–86 (10th Cir.), *cert. denied,* 506 U.S. 918, 113 S.Ct. 329, 121 L.Ed.2d 247 (1992). Absent some allegation that by using a subsidiary, the parent corporation was able to more easily commit or conceal the fraud, a subsidiary is not considered an "enterprise" separate from the parent corporation. *Emery v. American General Finance, Inc.,* 134 F.3d 1321, 1324 (7th Cir.1998); *see Brannon,* 153 F.3d at 1149; *see also Bucklew v. Hawkins, Ash, Baptie & Co., LLP.,* 329 F.3d 923, 934 (7th Cir.2003) (RICO claim fails because alleged enterprise is wholly-owned subsidiary of alleged racketeer); *Bessette v. Avco Fin. Servs., Inc.,* 230 F.3d 439, 449 (1st Cir.2000) (absent further allegations, mere identification of subsidiary and parent fails distinctiveness requirement); *Fogie v. THORN Ams., Inc.,* 190 F.3d 889, 898 (8th Cir.1999) (RICO enterprise cannot be parent corporation of the alleged racketeers); *Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 228 (7th Cir.1997) (corporation or any subset of members of corporate family do not constitute enterprise); *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1412 (3d Cir.1993) (RICO claim against par-

---

**49.** Plaintiffs do not allege whether the enterprises worked together or separately. In the pretrial order, plaintiffs defined the "enterprises" by incorporating the allegations of the second amended complaint. *See id.* at 44. The second amended complaint, however, includes the same four enterprises and does not define them any more than the pretrial order does. *See Second Amended Complaint* (Doc. # 172) ¶¶ 83–85. From the pretrial order, plaintiffs appear to claim that the

four alleged enterprises had the same goal (control of plaintiffs) and engaged in the same activity to achieve that goal.

**50.** In proposed jury instructions, plaintiffs assert that defendants conducted the affairs of this enterprise from April of 1999 until May of 2000. *See Plaintiffs' Proposed Jury Instructions* (Doc. # 449) filed August 16, 2004, Inst. No. 15.

ent not stated when subsidiary, the alleged enterprise, merely acts on behalf of or to benefit its parent); *NCNB Nat'l Bank v. Tiller*, 814 F.2d 931, 936 (4th Cir.1987) ("person" is not distinct from "enterprise" when corporation and wholly-owned subsidiary are involved), *overruled on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir.1990). Because Torchmark is not distinct from the UILIC enterprise, Torchmark cannot be held liable for any racketeering acts of that enterprise.

In the pretrial order, plaintiffs allege that "defendants" were associated with and actively conducted the affairs of the UILIC enterprise. *Pretrial Order* (Doc. # 390) at 8. Liberally construing the allegations of the pretrial order, plaintiffs have sufficiently alleged that Richey, McCormick and Hagopian used the UILIC enterprise to commit racketeering activity from March 4, 1998, the date of the IPO, through May 4, 2000, when the last individual defendants resigned from the board of W & R Financial.[51]

### 3. W & R Financial Enterprise

Plaintiffs allege that Torchmark, Richey, McCormick and Hagopian conducted the affairs of the W & R Financial enterprise.[52] *See Pretrial Order* (Doc. # 390) at 8. Based on the allegations of the pretrial order, the Court finds that the duration of this alleged enterprise was from March 4, 1998 through May 4, 2000. Plaintiffs do not allege how

any defendant committed racketeering activity through this enterprise after May 4, 2000, when the last individual defendants resigned from the board of directors of W & R Financial. Likewise, plaintiffs have not alleged how Torchmark could have committed any acts of racketeering through the W & R Financial enterprise after the common directors resigned.

### 4. "The Funds" Enterprise

Plaintiffs also allege that Torchmark, Richey, McCormick and Hagopian conducted the affairs of "The Funds" enterprise. *See id.* As to this enterprise, plaintiffs state that W & R Investment provided investment advisory and management services to various mutual funds which comprise "The Funds." *See id.* Plaintiffs do not further identify the "various mutual funds" or explain how Torchmark or the individual defendants used them to commit racketeering activity. Even if the Court assumes that plaintiffs have sufficiently alleged the Funds as an enterprise, plaintiffs have alleged no facts which would suggest that "The Funds" enterprise extended beyond May 4, 2000.[53]

In sum, the Court construes the pretrial order and the second amended complaint as alleging that defendants conducted racketeering activity through the four RICO enterprises from March 4, 1998 through May 4, 2000.[54]

---

**51.** In their proposed jury instructions, plaintiffs do not assert that the individual defendants conducted the affairs of the UILIC enterprise. *See Plaintiffs' Proposed Jury Instructions* (Doc. # 449), Inst. No. 15. In contrast, in their trial brief, plaintiffs maintain that all four defendants conducted the affairs of the UILIC enterprise. *See Plaintiffs' Trial Brief* (Doc. # 451) filed August 16, 2004 at 12.

**52.** In their proposed jury instructions, plaintiffs do not assert that W & R Financial was an enterprise. *See Plaintiffs' Proposed Jury Instructions* (Doc. # 449), Inst. No. 7.

**53.** Of the 462 predicate acts identified in the pretrial order, only six appear to involve "the Funds." *See* Exhibits A and B to *Pretrial Order* (Doc. # 390) at i, viii. All six concern events which occurred in 1998: the nomination of a new director of the Funds, the status of incorporation of the Funds and Richey's resignation from the boards of the Funds. *See id.* Richey

was apparently the only defendant who was associated with the Funds. *See id.* at 8–9, 52.

Plaintiffs' reference to "the Funds" possibly addresses the mutual funds of W & R Target. Plaintiffs have not alleged, however, that after the individual defendants had resigned from the board of W & R Financial, the corporate parent of W & R Target, defendants used the funds in W & R Target to further the alleged RICO scheme.

In their proposed jury instructions, plaintiffs for the first time complain of a "Mutual Fund Boards enterprise," *Plaintiffs' Proposed Jury Instructions* (Doc. # 449), Inst. No. 7, which Richey allegedly conducted in 1998. *See id.*, Inst. No. 15; *Plaintiffs' Trial Brief* (Doc. # 451) at 15. The Court does not address this theory, as it is not outlined in the pretrial order.

**54.** The pretrial order lists numerous predicate acts after May 4, 2000, but plaintiffs have not linked such acts to any viable RICO enterprise. Because the substantive provisions of the pretrial

### B. Whether Plaintiffs Can Show Racketeering Activity

■ As noted above, a violation of RICO requires conduct of an enterprise through a pattern of racketeering activity. A pattern of racketeering activity must include commission of at least two predicate acts. 18 U.S.C. § 1961(5); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir.2003). Both mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, constitute "racketeering activity," *i.e.* predicate acts.[55] The elements of mail fraud are (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations or promises; (2) an intent to defraud; and (3) use of the mails to execute the scheme. *See United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir.2003); *United States v. Haber*, 251 F.3d 881, 887 (10th Cir.2001); 18 U.S.C. § 1341. The first and second elements of federal mail and wire fraud are identical. The third element of wire fraud is the use of interstate wire or radio communications to execute the scheme. *See Welch*, 327 F.3d at 1104; *United States v. Smith*, 133 F.3d 737, 742 (10th Cir.1997); 18 U.S.C. § 1343.[56]

The federal mail fraud and wire fraud statutes do not purport to reach all frauds, but only those limited instances in which the use of the mails or wires "is a part of the execution of the fraud." *Schmuck v. United States*, 489 U.S. 705, 710, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). To be part of the execution of the fraud the use of the mails or wires need not be an essential element of the scheme. *Id.* It is sufficient for the mailing to be "incident to an essential part of the scheme," or "a step in the plot." *Id.* at 711–12, 109 S.Ct. 1443 (quotations and citations omitted). A necessary element of mail fraud and wire fraud, however, is some scheme or artifice to defraud.

### 1. Preliminary Issues

Before the Court discusses whether the alleged predicate acts are non-fraudulent as a matter of law, it must confess some to bafflement regarding the purpose of the alleged RICO enterprises in this case. Plaintiffs allege that after the spin-off, Torchmark and the common directors had a scheme to "improperly control" W & R Financial and its subsidiaries, in that they purported to negotiate a new compensation agreement while harboring a plan to obtain additional financial concessions (protection against replacements of UILIC annuities) before performing that agreement.[57] The gravamen of this claim is fraudulent inducement: that UILIC procured plaintiffs' agreement to the letter of July 8, 1999, well knowing that it would not perform unless plaintiffs agreed to additional terms.[58] Plaintiffs, however, do

order do not allege a RICO enterprise which extends beyond May 4, 2000, the Court need not consider the predicate acts which allegedly occurred after that date.

55. Other examples of predicate acts include counterfeiting, gambling and money laundering. *See* 18 U.S.C. § 1961(1).

56. Under Sections 1341 and 1343, one may "defraud" by depriving another of property or "the intangible right of honest services." 18 U.S.C. § 1346. In their opposition brief, plaintiffs assert that defendants deprived W & R Financial of the intangible right of honest services of its directors. *See* Plaintiffs' Opposition Memorandum (Doc. # 387) at 76–77. No such claim is included in the pretrial order. *See* Pretrial Order (Doc. # 390) at 6, 8. In addition, Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs have not alleged with particularity facts which would support a theory that defendants defrauded them by depriving them of the intangible right of honest

services. Accordingly, the Court does not consider this fraud theory.

57. As noted, plaintiffs do not assert that the various RICO enterprises had different purposes. As best the Court can ascertain from plaintiffs' allegations and argument, the four alleged enterprises—the common directors, UILIC, W & R Financial and The Funds—had the same goal (control of plaintiffs) and engaged in the same activity to achieve that goal. The Court therefore need not analyze the purpose of the RICO scheme as to each alleged enterprise.

58. To prevail on a claim of fraudulent inducement, a party must establish by clear and convincing evidence that (1) defendant made an untrue statement of fact; (2) defendant knew that the statement was untrue or made it in reckless disregard for the truth; (3) defendant made the statement with the intent to induce plaintiff to act on the statement; (4) plaintiff justifiably relied on the statement to its detriment; and (5) plaintiff sustained injury as a result of its reliance. *Tetuan v. A.H. Robins Co.*, 241 Kan. 441,

not assert a fraudulent inducement claim. This is not surprising because as to Torchmark and Richey, the Alabama court has resolved this issue against W & R Financial and W & R. Indeed, plaintiffs' fraud claims in this case are nominally structured to artfully dodge the preclusive effect of the Alabama judgment. In the Alabama action, plaintiffs' theory was that Torchmark, UILIC and/or Richey fraudulently represented that the letter of July 8, 1999 was a final, enforceable agreement, when they had no existing intent to perform. Plaintiffs' theory in this case is no different, except that linguistically, it is the mirror image of the Alabama counterclaim. Here, instead of claiming that Torchmark and Richey affirmatively misrepresented their view that the agreement was "final," plaintiffs claim that Torchmark and Richey fraudulently concealed their view that the agreement was "not final." Because plaintiffs' RICO claim seeks to recoup all legal expenses incurred and all damages awarded in the Alabama litigation, it is hard to view the RICO claim as anything but a contrivance to avoid the effect of the Alabama judgment.[59]

Furthermore, the Court has struggled to understand what plaintiffs mean by their repeated claim that the purpose of the RICO scheme was to "improperly maintain control" over them. The Court cannot discern any manner in which defendants "controlled" or attempted to control plaintiffs, except

through contract negotiations and the filing of the Alabama litigation, or what feature of defendants' effort to control plaintiffs was "improper," except with regard to the failure to disclose Torchmark's view of the alleged agreement of July 8, 1999. Furthermore, because plaintiffs' theory on this subject is so vaguely outlined, the Court cannot discern how the objective of the scheme—to "improperly control" W & R Financial and its subsidiaries—relates to the alleged duration of the scheme: from March 4, 1998 (the date of the initial IPO for W & R Financial) to May 4, 2000 (the date when Hagopian and McCormick—the last of the common directors involved in this lawsuit—resigned from the board of W & R Financial). Plaintiffs seem to theorize that even as Torchmark was planning to spin-off W & R Financial, various RICO enterprises (including the common director enterprise and the UILIC enterprise which were both aligned with Torchmark) were embarking on a scheme to "improperly maintain control" over W & R Financial and its subsidiaries.[60] Plaintiffs do not explain why a corporation would try to control its subsidiary by spinning it off as a separate, independent company, or how the W & R Financial enterprise was part of a RICO scheme to "improperly" control itself and its subsidiaries.

Plaintiffs identify 459 predicate acts of mail and wire fraud beginning in October of 1997 and continuing through February of

---

465–67, 738 P.2d 1210, 1228–30 (1987); *Nordstrom v. Miller*, 227 Kan. 59, 65, 605 P.2d 545, 551–52 (1980); *Hutchinson Travel Agency, Inc. v. McGregor*, 10 Kan.App.2d 461, 463–64, 701 P.2d 977, 980 (1985). Plaintiffs' theory is squarely on point: (1) in the letter of July 8, 1999, UILIC represented that the parties had an agreement; (2) UILIC knew that it would not perform the agreement unless plaintiffs made additional concessions; (3) UILIC made the misrepresentation to induce plaintiffs not to procure an alternate provider of annuity products; (4) plaintiffs justifiably relied on the representations in UILIC's letter of July 8, 1999; and (5) plaintiffs sustained injuries as a result of UILIC's misrepresentation.

**59.** If plaintiffs are asserting that UILIC had an obligation to perform under the letter of July 8, 1999, and that it could not condition its performance on additional terms and conditions, this theory is fatally undermined by the Alabama

court's holding that the letter of July 8, 1999 is not—and never was—an enforceable agreement. Absent an enforceable agreement, UILIC could lawfully refuse to perform or to condition performance on plaintiffs' formal agreement not to replace UILIC products. A reasonable jury could not find that such a negotiation strategy was fraudulent or sinister, or that it constituted a scheme to "improperly control" W & R Financial and its subsidiaries.

**60.** Plaintiffs allege that the common directors of Torchmark and W & R Financial had an ongoing organization for the purpose of controlling the 12–person board of directors of W & R Financial from March 4, 1998 until May 4, 2000. The pretrial order does not explain the allegations with respect to the remaining "enterprises"— UILIC, W & R Financial and "The Funds." Maintenance of "improper control" is especially difficult to discern in that context.

2004.[61] *See* Exhibits A & B to *Pretrial Order* (Doc. # 390). As explained above, on these allegations, the alleged duration of the RICO enterprises cannot extend beyond May 4, 2000. Therefore, the Court need not consider predicate acts alleged beyond that date. *See supra* note 54. Defendants do not dispute that the alleged acts took place but they maintain that as a matter of law, they do not constitute mail or wire fraud. Specifically, defendants argue that plaintiffs have not offered direct evidence of fraudulent intent or a scheme to defraud, and that no reasonable jury could infer fraud based solely on the commission of the predicate acts alleged in the pretrial order between 1998 and May 4, 2000.

Because it is difficult to prove intent· to defraud from direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom. *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir.2003); *Chute v. Old Am. Ins. Co.*, 6 Kan.App.2d 412, 422, 629 P.2d 734, 742 (1981) (fraud may be proved by showing circumstances from which inference of fraud is natural and irresistible), *overruled on other grounds by Harper v. Prudential Ins. Co. of Am.*, 233 Kan. 358, 662 P.2d 1264 (Kan.1983). Deceitful concealment of material facts may constitute actual fraud. *United States v. Cochran*, 109 F.3d 660, 664–65 (10th Cir.1997); *see United States v. Prows*, 118 F.3d 686, 692 (10th Cir.1997); *see also United States v. Morris*, 80 F.3d 1151, 1161 (7th Cir.1996) (misleading omissions are actionable as mail fraud if intended to induce action that would harm plaintiff). "Intent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use." *United States v. Prows*, 118 F.3d 686, 692 (10th Cir.1997) (quotation omitted). Further, "[e]vidence of the schemer's indifference to the truth of statements can amount to evidence of fraudulent intent." *United States v. Trammell*, 133 F.3d 1343, 1352 (10th Cir. 1998) (quotation omitted). An inference of fraudulent intent is only reasonable, however, where there exists a "probability that the conclusion flows from the proven facts." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir.1995) (citation omitted). An inference is unreasonable where the jury must engage "in a degree of speculation and conjecture that renders its findings a guess or mere possibility." *Id.*

### 2. Predicate Acts Between July And November, 1999

Without attempting to explain how a jury could infer fraudulent intent or the existence of a scheme to defraud, plaintiffs maintain in their opposition brief that defendants' scheme included the following: [62]

1. On July 14, 1999, Hudson, CEO and chairman of Torchmark, telecopied the Torchmark board including McCormick and Hagopian and advised them that the announcement of a new agreement between UILIC and W & R, Inc. would be placed on the agenda for the Torchmark board meeting to be held July 22, 1999.

2. On July 15, 1999, the common directors including Richey, McCormick and Hagopian attended a W & R Financial board meeting and were advised of the

---

**61.** In the pretrial order, plaintiffs also allege two predicate acts of interference with commerce by threats and violence, see Hobbs Act, 18 U.S.C. § 1951, and one predicate act of interstate travel in aid of racketeering enterprises, see Travel Act, 18 U.S.C. § 1952. *See* Exhibits C & D to *Pretrial Order* (Doc. # 390). In their opposition to defendants' motion for summary judgment, plaintiffs do not address predicate acts other than mail and wire fraud. In their trial brief, plaintiffs state that they have elected to withdraw their claims related to the Hobbs Act. *See Plaintiffs' Trial Brief* (Doc. # 451) filed August 16, 2004 at 17–18. Accordingly, the Court limits its analysis to plaintiffs' mail fraud and wire fraud allegations.

**62.** Plaintiffs state that these acts are "some of the predicate acts" in furtherance of the scheme. Plaintiffs' Opposition Memorandum (Doc. # 387) at 77. In response to a motion for summary judgment, plaintiffs have the burden to show that genuine issues remain for trial and they cannot rest on their pleadings. *See Applied Genetics*, 912 F.2d at 1241. Accordingly, the Court is not required to sift through an additional 455 acts of alleged mail and wire fraud identified in the pretrial order to try to find some evidence of fraud.

new, *finalized* compensation agreement between UILIC and W & R.

3. At the July 22, 1999 board meeting of Torchmark, the common directors were advised of Torchmark's view that the new compensation agreement was *tentative*.

4. In August and November of 1999, Richey, McCormick and Hagopian reviewed and approved SEC filings that referenced the new compensation agreement between UILIC and W & R.

Plaintiffs' Opposition Memorandum (Doc. # 387) at 77 (emphasis added).

Plaintiffs have presented sufficient evidence for a jury to conclude that between July 22, 1999 and at the latest, September 28, 1999, Richey, McCormick and Hagopian knew that W & R Financial viewed the compensation agreement as "finalized" but that Torchmark viewed the agreement as "tentative," and that they did not communicate Torchmark's view to W & R Financial. For purposes of summary judgment, defendants do not dispute that plaintiffs proceeded on the incorrect assumption and suffered the consequences. *See* Defendants' Reply (Doc. # 395) at 45. The dispositive question is whether a reasonable jury could infer fraudulent intent and a scheme to defraud, based on the fact that between July 22 and September 28, 1999, defendants did not tell W & R Financial that Torchmark viewed the agreement as tentative.

Plaintiffs do not dispute that specific intent to defraud is an essential element of mail and wire fraud.[63] *See* Plaintiffs' Opposition Memorandum (Doc. # 387) at 76. Plaintiffs, however, have offered no evidence which would allow a reasonable jury to infer that defendants intentionally withheld material information or otherwise intended to defraud them.[64] The non-disclosure of a material fact by itself is insufficient to establish fraudulent intent. *See O'Ferral v. Trebol Motors Corp.*, 45 F.3d 561, 564 (1st Cir.1995) (nondisclosure by itself ordinarily insufficient to show RICO fraud or fraudulent intent); *see also Katzman*, 167 F.R.D. at 655 (plaintiff must allege fraudulent misrepresentation or omission and factual basis to infer fraudulent intent). No evidence suggests that the common directors had any reason to believe that Torchmark was withholding material information about its view of the letter of July 8, 1999, or that plaintiffs were relying on them for information on this subject.[65] Although the directors may have had a fiduciary duty to make such inquiry, see *infra* text, Analysis, part III, the alleged breach of fiduciary duty does not equate to fraud. *See Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir.1995) (mere non-performance of promises insufficient to infer fraudulent intent); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995) (allegation that executives were motivated to defraud public because inflated stock price

---

**63.** Plaintiffs cite no authority which suggests that intent to defraud need not be proved when a RICO claim is based on a fraudulent omission. The Court notes that to prove fraud by silence under Kansas law, plaintiffs need not show "a specific intent to deceive," but may rely on evidence that defendants' recklessness led to the deception. *Ensminger v. Terminix Int'l Co.*, 102 F.3d 1571, 1575 n. 3 (10th Cir.1996); *Wilson v. Meeks*, 98 F.3d 1247, 1254 (10th Cir.1996). Despite this somewhat relaxed standard of intent in fraudulent omission cases, federal mail and wire fraud claims require specific intent to defraud. *See United States v. Hanson*, 41 F.3d 580, 583 (10th Cir.1994) (mail or wire fraud require evidence that defendants intended to deceive); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y.1996) (as to RICO claim based on misrepresentation or omission, plaintiff must prove fraudulent intent).

In some cases, fraudulent intent may be inferred from the existence of the scheme. *See, e.g., United States v. Cochran*, 109 F.3d 660, 665

(10th Cir.1997) (where actual harm is natural and probable result of scheme, fraudulent intent may be inferred); *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir.1994) (when "necessary result" of actor's scheme is to injure, fraudulent intent may be inferred from scheme itself). For reasons explained above, however, plaintiffs offer no evidence that defendants had a scheme to defraud.

**64.** Plaintiffs have not offered circumstantial evidence that Richey, McCormick or Hagopian stood to benefit from withholding information from W & R Financial, or explained how withholding such information advanced their purpose of controlling the board of directors of W & R Financial.

**65.** Furthermore, because plaintiffs do not explain precisely what they mean by a "final agreement," it is not even clear that defendants appreciated the difference between an agreement that was "final"—as plaintiffs would use the term—and one which was "not final."

would increase their compensation insufficient to allege fraudulent intent); *Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994) (allegation that defendants manipulated stock price to protect executive positions, compensation and prestige insufficient to infer fraudulent intent). Likewise, a reasonable jury could not infer that Torchmark had fraudulent intent. At most, plaintiffs have shown that Torchmark had a profit motive to obtain a non-replacement provision. Such generalized motives are insufficient for a jury to find fraud. *See Schmidt v. Fleet Bank*, 1998 WL 47827, at *6 (S.D.N.Y. Feb.4, 1998) (generalized profit motive insufficient).

### 3. Predicate Acts After May 4, 2000

In addressing the pattern requirement of a RICO claim, plaintiffs argue that in addition to the foregoing predicate acts, which relate to the individual defendants' failure to tell plaintiffs that Torchmark viewed the letter of July 8, 1999 as "not final," other predicate acts include the following:

(1) When Plaintiffs refused to enter into an agreement that would violate their duties to the owners of the variable annuities, Defendants participated in the predicate acts leading up to the surprise filing of the Alabama litigation.

(2) When it still became apparent that W & R, Inc. would not accede to the demand to enter into an anti-replacement agreement, using the mails, Torchmark had the investment advisory contract with [W & R Investment] terminated to show Plaintiffs that Torchmark meant business.

(3) When that failed to exact the concession demanded, using the mails, Torchmark terminated the PUA between W & R, Inc. and [UILIC], believing this would force W & R, Inc. back to the negotiating table.

(4) When the negotiations again floundered and Plaintiffs filed this lawsuit, Torchmark systematically used the wires to supply the NASD with false information to force W & R, Inc. to accede to [UIL-

IC's] demands and caused [UILIC] to file the California litigation.

Plaintiffs' Opposition Memorandum (Doc. # 387) at 79.[66] Except for the filing of the Alabama litigation, all of the above acts took place after the alleged RICO enterprises had terminated on May 4, 2000. Even if the Court considered the above acts, plaintiffs have not offered sufficient evidence for a reasonable jury to infer that defendants had a scheme to defraud or that they acted with fraudulent intent.

As to the "surprise filing" of the Alabama litigation on May 3, 2000, plaintiffs lost the race to the courthouse by one day. Plaintiffs concede that in late April of 2000, plaintiffs had asked counsel to evaluate and prepare a declaratory judgment suit. Because of the expense of such a lawsuit, Tucker decided to wait until Hudson responded to his settlement proposal of April 28, 2000. Hudson did not respond, however, and Torchmark filed suit in Alabama on May 3, 2000. By waiting for Hudson to respond, plaintiffs obviously took the risk that Torchmark or UILIC would file suit first. McCormick and Hagopian may have had a fiduciary duty to ascertain Torchmark's litigation position and to report that information to W & R Financial. Standing alone, their failure to do so does not suggest fraudulent intent. Furthermore, the fact that Torchmark and the common directors did not formally announce their intent to file suit does not suggest fraud. UILIC had the right to seek legal relief because—as the Alabama court has ruled—plaintiffs had tortiously converted M & E charges which were due it under the PUA. No evidence suggests that the "surprise filing" of the Alabama lawsuit was fraudulent or part of a scheme to "improperly control" W & R Financial and its subsidiaries.

Similarly, plaintiffs have not demonstrated a genuine issue of material fact whether defendants acted pursuant to a RICO scheme or with fraudulent intent to "improperly control" them when they terminated W & R Investment as investment advisor on Torchmark accounts in September of 2000. Plain-

---

**66.** Plaintiffs' brief theorizes that despite all the hostilities, the terminated contracts and millions of dollars in litigation costs, defendants to this day truly desire to continue a relationship with plaintiffs so that they can "improperly control" them.

tiffs do not dispute that under the investment services agreement between WRAMCO (a Torchmark subsidiary) and W & R Investment, either party had the right to terminate the agreement on 30 days notice. *See* Plaintiffs' Opposition Memorandum (Doc. # 387) at 38.[67] Torchmark therefore had a lawful right to have WRAMCO terminate its contract with W & R Investment if W & R would not agree to a non-replacement provision.[68] A jury cannot infer fraud from the fact that one corporation threatens to use lawful leverage to convince another corporation to execute an agreement.

Similarly, the record evidence reveals no genuine issue of material fact whether defendants had a scheme to defraud or acted with intent to deceive when they terminated the PUA effective April 30, 2001. Plaintiffs present no evidence that Torchmark terminated the PUA in an effort to force W & R back to the negotiating table or that any use of such leverage (if that was Torchmark's intent) was fraudulent.

Finally, no reasonable jury could infer that defendants' communications with NASD were part of a fraudulent scheme. Plaintiffs do not explain why or how defendants would possibly gain "improper control" over them

by encouraging NASD to prevent W & R from replacing their policies and to discipline W & R for improper replacements.[69] Plaintiffs theorize that defendants intended to put plaintiffs in such a precarious financial position (as a result of the various court cases and NASD investigation) that W & R would be forced to return to the bargaining table and accept a deal which favored UILIC and gave Torchmark improper control of plaintiffs. *See* Plaintiffs' Opposition Memorandum (Doc. # 387) at 79 (Torchmark supplied NASD with false information to force W & R to accede to UILIC's demands). No reasonable jury, however, would so find.[70]

In sum, plaintiff has not offered evidence from which a reasonable jury could infer that defendants had a scheme to defraud plaintiffs or that defendants committed any predicate acts of mail or wire fraud. Absent evidence of fraud, plaintiffs cannot show "racketeering activity" by any defendant. *See BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1102–03 (10th Cir.1999). The Court sustains defendants' motion for summary judgment on plaintiffs' RICO claim because plaintiffs have not shown a genuine issue of material fact whether any defendant committed racketeering activity.

**67.** Plaintiffs argue that the contract did not allow a party to terminate it for an "unlawful purpose," *id.*, but plaintiffs do not explain what was unlawful about Torchmark's alleged motive, which was to secure a separate contract for its subsidiary on favorable terms.

**68.** Because the Alabama court has determined that the letter of July 8, 1999 is not an enforceable contract, Torchmark had the right to seek a more favorable deal than the one outlined in the letter of July 8, 1999. As explained above, plaintiffs cannot re-litigate the issue whether the letter of July 8, 1999 is an enforceable agreement and this Court is bound to follow the Alabama court's ruling under the doctrine of collateral estoppel.

**69.** In their trial brief, plaintiffs concede their realization that UILIC's termination of the PUA on February 28, 2001 was the "death knell of any future relationship" between them and UILIC. *See Plaintiffs' Trial Brief* (Doc. # 451) at 10. Therefore, at the outside, the alleged RICO scheme to control plaintiffs ended on April 30, 2001, when the PUA terminated.

The record reveals that counsel only sent one e-mail to NASD before that date. On April 20, 2001, counsel for UILIC and Torchmark advised

NASD of W & R's position that all replacements of UILIC policies had been suitable. *See* Plaintiffs' Exhibit B1–5. Counsel noted that UILIC was concerned with the volume of replacements, but that it could not confidently comment on suitability issues. *See id.* This e-mail was significantly more balanced than later e-mails, and objectively stated both parties' positions on the replacement issue. A reasonable jury would not infer from this e-mail that defendants intended to fraudulently control plaintiffs. As to e-mails after April 30, 2001, plaintiffs do not explain how they could be part of a scheme to control plaintiffs when the termination of the PUA was the "death knell of any future relationship" between the parties.

**70.** Even if such a theory were plausible, plaintiffs do not explain what is fraudulent or improper about obtaining control over another party to a contract. Contracts impose obligations on the contracting parties and in that sense, the very purpose of a contract is to give one party some measure of "control" over the other party. Plaintiffs do not attempt to distinguish the normal control of another contracting party, inherent in every contract, from the "improper" control which defendants allegedly sought.

C. *Whether Alleged Predicate Acts Constitute A Pattern Of Racketeering Activity*

■ As noted, a violation of RICO requires conduct of an enterprise through a pattern of racketeering activity. A pattern of racketeering activity must include commission of at least two predicate acts. 18 U.S.C. § 1961(5). In addition, to prove a pattern of racketeering activity, plaintiffs must show (1) that the racketeering predicates are related and (2) that the predicates themselves amount to or otherwise constitute a threat of continued criminal activity. *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239–40, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Defendants argue that as a matter of law, plaintiffs cannot satisfy either element. Because the Court has found that plaintiffs cannot show racketeering activity, it necessarily finds that plaintiffs cannot show racketeering predicates which are related. For reasons stated below, it also finds that plaintiffs cannot satisfy the continuity element of a RICO claim.

■ "Continuity" is both a closed-ended and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. *H.J. Inc.*, 492 U.S. at 241–242, 109 S.Ct. 2893. The Supreme Court has noted:

> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

*Id.* at 241–42, 109 S.Ct. 2893. Two factors are particularly relevant to the determination of continuity (either closed-ended or open-ended): the duration of the related predicate acts and the extensiveness of the scheme of the RICO enterprise. *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir.1993).[71] To determine the "extensiveness" of the alleged scheme, the Court considers the number of victims, the number and variety of racketeering acts, whether the injuries caused were distinct, the complexity and size of the scheme, and the nature or character of the enterprise or unlawful activity. *Id.* at 1543–44. The Court analyzes these factors with the goal of achieving a "natural and commonsense result" and may consider external facts that are not necessarily charged as predicate acts. *Id.* at 1543–45 (quoting *U.S. Textiles, Inc. v. Anheuser–Busch Cos., Inc.*, 911 F.2d 1261, 1267 (7th Cir.1990)).[72]

■ Defendants argue that they are entitled to summary judgment because plaintiffs cannot show continuity under RICO. Without any analysis of how they satisfy the continuity element (either closed-ended or open-ended), plaintiffs conclude that defendants' scheme to improperly control them began in March of 1998, at the time of the initial IPO and spin-off, and that "predicate acts were performed continuously in 1999, 2000, 2001, 2002, 2003, and 2004." *See* Plaintiffs' Opposition Memorandum (Doc. # 387) at 80 (citing list of 459 predicate acts). Plaintiffs' conclusory response is insufficient to survive summary judgment. As explained below, under *Stone*, no reasonable jury would find in plaintiffs' favor on the issue of continuity.[73]

---

**71.** The *Stone* factors are primarily used to determine closed-ended continuity. The distinction between closed-ended and open-ended continuity is not clear-cut, however, because continuity determinations must be made on the "specific facts of each case." *McDonald v. Schencker*, 18 F.3d 491, 497 (7th Cir.1994) (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893). Accordingly, the Court's analysis of the *Stone* factors is helpful in evaluating both closed-ended and open-ended continuity.

**72.** The Tenth Circuit has noted that to find continuity, these factors need not be present. The factors merely provide indicia by which the continuity of specified racketeering activity may be judged, and assist the Court in evaluating the significance of the temporal element. *Stone*, 998 F.2d at 1543 n. 9.

**73.** Although plaintiffs have alleged alternative enterprises, they have alleged the very same scheme and acts of racketeering for each enterprise. Accordingly, to determine continuity, the Court need not separately analyze the alleged acts of each enterprise.

The Court first considers the duration of the scheme. Viewing the evidence in a light most favorable to plaintiffs, if a scheme existed, a jury could infer that it lasted 26 months—from March 4, 1998 until May 4, 2000, when the last individual defendants resigned from the board of W & R Financial.[74]

Despite the alleged duration of the scheme, no reasonable jury would find continuity based on these allegations. To evaluate the extensiveness of the scheme, the Court first examines the number of victims. *See Stone,* 998 F.2d at 1543. Here, the alleged predicate acts were directed solely at W & R Financial and its subsidiaries. Plaintiffs have not argued or produced any evidence of other victims.[75] RICO is not aimed at the isolated offender. *Stone,* 998 F.2d at 1543–45; *see Sedima,* 473 U.S. at 496, 105 S.Ct. 3275. Instead, it is concerned with long-term criminal conduct. *H.J. Inc.,* 492 U.S. at 241–42, 109 S.Ct. 2893. The isolated number of victims strongly weighs against a finding of continuity in this case. *See Duran v. Carris,* 238 F.3d 1268, 1271 (10th Cir.2001) (single victim); *Efron v. Embassy Suites (Puerto Rico), Inc.,* 223 F.3d 12, 18 (1st Cir.2000) (closed group of targeted victims), *cert. denied,* 532 U.S. 905, 121 S.Ct. 1228, 149 L.Ed.2d 138 (2001); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 48 F.3d 1260, 1265 (D.C.Cir.1995) (few victims); *Boone v. Carlsbad Bancorporation, Inc.,* 972 F.2d 1545, 1556 (10th Cir.1992) (finite group of victims); *SIL–FLO, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1516 (10th Cir.1990) (one victim); *U.S. Textiles,* 911 F.2d at 1269 (no indication of other potential victims).

The Court next considers the number and variety of racketeering acts. *See Stone,* 998 F.2d at 1543. Plaintiffs allege numerous acts of mail and wire fraud. Courts have cautioned that mail fraud and wire fraud may deceptively create the appearance of a pattern, however, because often the mailing or use of wires is "only tangentially related to the underlying fraud" and is only "a matter of happenstance." *Stone,* 998 F.2d at 1543–45; *U.S. Textiles,* 911 F.2d at 1268; *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1278 (7th Cir.1989). "[T]he raw number of predicate acts has never been determinative, especially when only mail and wire fraud are alleged." *Ashland Oil,* 875 F.2d at 1278. Here, the mail fraud and wire fraud activities were totally normal business communications only tangentially related to the underlying fraud. *See U.S. Textiles,* 911 F.2d at 1268; *Ashland Oil,* 875 F.2d at 1278. For example, many of the predicate acts involve public filings and ordinary board meetings of Torchmark. These communications would be expected to

---

**74.** Although plaintiffs claim that the scheme continued through 2004, they have not tendered any scenario as to how defendants could be secretly seeking to "improperly" control them, especially in light of the facts that (1) since early July of 1999, UILIC demanded that W & R agree to restrict its ability to replace UILIC policies; (2) UILIC filed a declaratory judgment action in Alabama in May of 2000; (3) in January of 2001, W & R began to replace UILIC policies; and (4) UILIC terminated the PUA effective April 30, 2001. If the purpose of the alleged scheme was to force W & R to accept a compensation agreement which included protection against replacement of UILIC in-force variable annuities, see Plaintiffs' Opposition Memorandum (Doc. # 387) at 78, and this is what plaintiffs mean by an effort to "improperly control" them, it is clear that plaintiffs did not capitulate to any demands by Torchmark and UILIC and the alleged scheme was a failure.

Plaintiffs maintain that defendants' NASD communications after April of 2001 continued the scheme to improperly control them. As explained above, no reasonable jury could find that the purpose of those communications was to improperly or fraudulently gain control of plaintiffs.

**75.** In the pretrial order, plaintiffs allege that the fraudulent scheme had multiple victims including plaintiffs, Security Benefit and the 3,000 independent contractors who constitute the W & R distribution network. *See Pretrial Order* (Doc. # 390) at 10. Plaintiff has offered no factual support for this contention. In addition, the Court does not consider Security Benefit or the individuals in the distribution network as separate victims. *Cf. W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.,* 235 F.3d 629, 635 (D.C.Cir.2001) (injury to members of partnership should be viewed as injury to single victim); *Hughes v. Consol–Pa. Coal Co.,* 945 F.2d 594, 611 (3d Cir.1991) (no continuity where alleged scheme affected single victim, albeit class of victims); *Kehr Packages, Inc. v. Fidelcor, Inc.* 926 F.2d 1406, 1418–19 (3d Cir. 1991) (no continuity where direct target of criminal activity was single entity; individual shareholders and guarantors of victim affected only indirectly).

continue before, during and evenafter the alleged scheme to defraud—acquisition of improper control of plaintiffs—was complete. Accordingly, the number and variety of racketeering acts does not suggest any continuity of the alleged scheme. *See Stone*, 998 F.2d at 1543–45; *U.S. Textiles*, 911 F.2d at 1268; *Ashland Oil*, 875 F.2d at 1278.

The Court next examines whether the alleged scheme caused distinct injuries. *See Stone*, 998 F.2d at 1543. Distinct injuries ordinarily favor a finding of continuity. *See Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1050 (7th Cir.1998); *Chen v. Mayflower Transit, Inc.*, 315 F.Supp.2d 886, 913 (N.D.Ill.2004). Plaintiffs have alleged injuries such as the costs of the Alabama and California litigation, the loss of compensation under the letter of July 8, 1999 and the loss of investment management fees. Although plaintiff has alleged distinct injuries, the injuries do not signal, or by themselves constitute, a threat of continuing criminal activity. *U.S. Textiles*, 911 F.2d at 1269 (identical economic injuries suffered over course of two years stemming from single contract do not satisfy continuity element). All of plaintiffs' injuries derive from one failed business deal and one alleged scheme to control them. Accordingly, the distinct nature of plaintiffs' injuries by itself does not permit a reasonable jury to find continuity.

The Court next evaluates the complexity and size of the scheme, and the number of schemes alleged. *See Stone*, 998 F.2d at 1543; *see also H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893 (number of schemes highly relevant to continuity inquiry). Here, the scheme involved Torchmark and the three individual defendants. It required very limited planning—if any—to keep the scheme afloat. Defendants simply had to keep quiet from July 22 to September 28, 1999 about the fact that Torchmark viewed the agreement of July 8, 1999 as "not final." Absent some threat that criminal activity will continue, allegations of a single scheme directed at a discrete goal are insufficient to establish continuity. *See Jackson v. BellSouth Tele-*

comm., 372 F.3d 1250, 1267 (11th Cir.2004); *Turner v. Cook*, 362 F.3d 1219, 1230 (9th Cir.2004); *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir.2003); *W. Assocs.*, 235 F.3d at 634–35; *Edmondson & Gallagher*, 48 F.3d at 1265; *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir.1991); *Kehr Packages*, 926 F.2d at 1413; *SIL–FLO*, 917 F.2d at 1516; *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1273–74 (10th Cir.1989); *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir.1989); *Marks v. Pannell Kerr Forster*, 811 F.2d 1108, 1112 (7th Cir.1987); *see also Efron*, 223 F.3d at 18 (multiple related acts of deception insufficient where all aimed at narrow goal of transforming ownership of partnership); *Stone*, 998 F.2d at 1545 (where scheme has limited purpose, most courts have found no continuity); *Boone*, 972 F.2d at 1555–56 (absent threat of future criminal conduct, period of repeated criminal activity insufficient to establish continuity); *Medallion v. SelecTV of California*, 833 F.2d 1360, 1363–64 (9th Cir.1987) (continuity does not require multiple schemes, but circumstances must suggest that predicate acts indicate threat of continuing activity); *Garbade v. Great Divide Min. & Mill. Corp.*, 831 F.2d 212, 214 (10th Cir. 1987) (to achieve single discrete objective does not create threat of ongoing activity even when that goal is pursued by multiple illegal acts because scheme ends when purpose is accomplished); *Torwest DBC, Inc. v. Dick*, 810 F.2d 925, 928–29 (10th Cir.1987) (multiple illegal acts do not create threat of ongoing activity where scheme ends when singular purpose is accomplished).[76]

Finally, the Court evaluates the nature and character of the alleged scheme. *See Stone*, 998 F.2d at 1544. Plaintiffs claim that all of the alleged predicate acts were directed at one scheme—to improperly control W & R Financial and its subsidiaries. The nature and character of the scheme and underlying predicate acts do not suggest a threat of future illegal activity. At most, plaintiffs have shown that Torchmark and the common directors did not warn them between July 22 and at the latest, September 28, 1999 that

---

**76.** Based on *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Tenth Circuit later clarified that a plaintiffs need not necessarily allege multiple schemes to satisfy the "pattern" element of a RICO claim. *See Boone*, 972 F.2d at 1555.

Torchmark viewed the letter of July 8, 1999 as "not final." All predicate acts of mail fraud and wire fraud are based on a single contract negotiation. Even if the Court assumes that Torchmark and the common directors committed fraud, plaintiffs have not shown any threat of long-term racketeering activity. *See J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991) (commercial dispute between two parties to contract not pattern of racketeering activity); *SIL–FLO*, 917 F.2d at 1516 (RICO does not cover business deal gone sour even if thwarted deal accompanied by breach of fiduciary duty and other torts). The fact that the parties and counsel have managed to keep this dispute alive for more than five years does not transform the limited nature of defendants' alleged scheme into a continuous pattern of racketeering activity.

In sum, plaintiff has not presented evidence from which a reasonable jury would find either closed-ended or open-ended continuity. While plaintiffs may have alleged a closed-ended series of predicate acts, they constitute a single scheme to accomplish one discrete goal, directed solely at plaintiffs, with no credible potential to extend to other persons or entities. *See Kenda*, 329 F.3d at 233 (no continuity where plaintiff did not present evidence that defendants planned to take over other company in same fraudulent manner); *Efron*, 223 F.3d at 19 (no suggestion that defendants would seek to repeat fraud in other partnerships or similar business settings or to indefinitely employ mail and wire fraud in partnership); *Pier Connection, Inc. v. Lakhani*, 907 F.Supp. 72, 78 (S.D.N.Y.1995) (no continuity where plaintiffs did not allege that defendants would pursue similar scheme against someone else in industry). Likewise, plaintiffs have not established open-ended continuity because the predicates themselves do not "involve a distinct threat of long-term racketeering activity, either implicit or explicit," and the predicates are not a regular way of conducting Torchmark's ongoing legitimate business or the RICO enterprise. *Stone*, 998 F.2d at 1543–45 (citing *H.J. Inc.*, 492 U.S. at 242–43, 109 S.Ct. 2893). For these reasons, the Court sustains defendants' motion for summary judgment on plaintiffs' RICO claim.

## III. Fiduciary Duty Claim

W & R Financial alleges that McCormick and Hagopian breached their fiduciary duties as members of its board of directors by not disclosing Torchmark's position that the letter of July 8, 1999 was not a final agreement. *See Pretrial Order* (Doc. # 390) at 5. As explained above, this breach of fiduciary duty claim is limited to the failure to disclose such information between July 22, 1999 and September 28, 1999. W & R Financial also alleges that at a board meeting on April 26, 2000, McCormick breached his fiduciary duty by failing to disclose to fellow directors that UILIC or Torchmark might file suit against W & R Financial. *See id.* at 6. Defendants argue that they are entitled to summary judgment on both aspects of this claim.[77]

■ Because this is a diversity action, the Court applies Kansas choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "The generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and liabilities of its officers, stockholders, and directors." *Consol. Beef Indus., Inc. v. Schuyler*, 239 Kan. 38, 40–41, 716 P.2d 544, 547 (1986). Because Torchmark and W

---

77. In their proposed jury instructions, plaintiffs attempt to assert a claim that between February 28, 2000 and May 4, 2000, McCormick and Hagopian breached their fiduciary duties by siding with the other common directors and urging Tucker to give in to Torchmark's demands. *See Plaintiffs' Proposed Jury Instructions* (Doc. # 449), Inst. No. 20. The Court need not consider this claim because it is not included in the pretrial order. *See Pretrial Order* (Doc. # 390) at 4–10. The pretrial order states that trial is necessary on the issue whether McCormick and Ha-

gopian urged Tucker to give in to Torchmark's demands, *see id.* at 55. To state a claim, however, W & R Financial must allege facts which support the necessary elements of its claim. A party cannot provide inadequate or no allegations on a claim and simply rely on the "issues of fact" section as support for its claim. In any event, defendants' motion for summary judgment on this claim is well taken. W & R Financial did not suffer any damages because it refused to give in to Torchmark's demands.

& R Financial are Delaware corporations, the Court applies Delaware law. The parties also agree that Delaware law applies to this claim. *See Pretrial Order* (Doc. # 390) at 3.

### A. Failure To Disclose That Torchmark Did Not View Agreement As Final

As to W & R Financial's claim that McCormick and Hagopian did not disclose that UILIC viewed the letter of July 8, 1999 as "not final," defendants argue that (1) the record contains no evidence that McCormick or Hagopian knew, as of July 22, 1999 that W & R Financial or anyone else was misinformed about UILIC's view of the letter of July 8, 1999; and (2) under the Articles of Incorporation of W & R Financial, McCormick and Hagopian cannot be liable for negligently failing to discover that W & R Financial was misinformed.

■ As to defendants' first argument, a reasonable jury could conclude that as of July 22, 1999, McCormick and Hagopian knew that W & R Financial viewed the compensation agreement as "finalized," knew that Torchmark viewed the agreement as "tentative," and did not disclose Torchmark's view to W & R Financial. *See supra* text, Analysis, part I. In addition, a reasonable jury could conclude that despite UILIC's letter of July 23, 1999, W & R Financial did not know in July of 1999 that UILIC and Torchmark viewed the letter of July 8, 1999 as something less than a "final agreement." *See supra* text, Analysis, part I. Defendants are not entitled to summary judgment based on any lack of knowledge as of July 22, 1999.

McCormick and Hagopian also argue that they cannot be liable for negligently failing to uncover the fact that W & R Financial was misinformed. Article 8.1 of W & R Financial's Certificate of Incorporation, entitled

"Elimination of Certain Liability of Directors," states as follows:

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) for paying a dividend or approving a stock repurchase in violation of Section 174 of the Delaware General Corporation Law, or (d) for any transaction from which the director derived an improper personal benefit.

Plaintiffs' Exhibit D10 (effective as of March 3, 1998).[78] W & R Financial maintains that the exculpatory clause does not apply because McCormick and Hagopian breached their duties of loyalty.

■ Individuals who hold dual or multiple directorships, as in the parent-subsidiary context, owe each corporation and each set of shareholders an "uncompromising duty of loyalty." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983). A director may breach his duty of loyalty by failing to disclose material information under circumstances in which full disclosure was obviously expected. *See Hollinger*, 844 A.2d at 1061; *see also HMG/Courtland*, 749 A.2d at 121 (concealment of facts from fellow board members implicates duty of loyalty); 1 Principles of Corporate Governance: Analysis & Recommendations, cmt. 6 § 5.02(a)(1) at 215 (director owes duty to avoid misleading corporation by misstatements and omissions and to affirmatively disclose material facts known to him).

■ McCormick and Hagopian do not dispute that their duty of loyalty included a

---

78. Delaware law permits such provisions in order to protect directors from claims for breach of their duty of care. Del.Code Ann. tit. 8, § 102(b)(7). The statutory provision provides in part that corporate articles of incorporation may include:

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided

that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

Del.Code Ann. tit. 8, § 102(b)(7).

duty to disclose to the rest of the board of directors of W & R Financial material facts of which W & R Financial was unaware. In their reply, defendants insist that they had no duty to disclose Torchmark's view of the letter of July 8, 1999 because UILIC had already done so. *See Reply Memorandum In Support Of Defendants' Motion For Summary Judgment* (Doc. # 395) at 48. For reasons explained above, see *supra* text, Analysis, part I, a reasonable jury could conclude that despite the letters from UILIC, W & R Financial did not know in July of 1999, that Torchmark viewed the letter of July 8, 1999 as something other than a "final agreement." Accordingly, the Court overrules defendants' motion for summary judgment on this portion of W & R Financial's fiduciary duty claim.

### B. *Failure To Disclose That UILIC Might File Suit*

 As noted, W & R Financial complains that McCormick did not disclose at its board meeting of April 26, 2000 that UILIC might file suit. *See Pretrial Order* (Doc. # 390) at 6.[79] McCormick argues that on April 26, 2000, he did not know that UILIC planned to file suit. The minutes of the board meeting state as follows:

> Mr. Mallow [of the Skadden Arps law firm] then specifically referenced the current dispute between [Torchmark and W & R] and stated that currently the presence of the common directors puts management in the awkward position of not being able to brief the full Board on the dispute going forward, especially if it proceeds to litigation as Torchmark has threatened. Mr. McCormick then stated that he didn't have any idea of what litigation he was referring to regarding Torchmark. Mr. Tucker then reiterated the threat of litigation that had been communicated by Mr. Hudson.

Defendants' Exhibit J40. At his deposition, McCormick testified that as of April 26, 2000, he may have known about the potential that UILIC would file suit in Alabama. *See* 12/12/00 McCormick Depo. at 152 (knew of Hudson's intent to file suit some ten to 14 days before it was filed). At the board meeting, he did not explicitly state that UILIC would not commence litigation against any W & R entity, but a reasonable jury could infer from his statement that he did not know anything about such litigation. The record reveals a genuine issue of disputed fact as to what McCormick knew on April 26, 2000, about UILIC's intent to file suit. The Court therefore overrules defendants' motion for summary judgment on this portion of the breach of fiduciary duty claim of W & R Financial.

### IV. Fraudulent Failure To Disclose Claim

W & R alleges that the individual defendants committed fraud because in July of 1999, they failed to disclose the position of Torchmark and UILIC—that the letter of July 8, 1999 was a "tentative" agreement— when they knew that W & R Financial had announced the existence of a "final" agreement in a press release and SEC filings. *See Pretrial Order* (Doc. # 390) at 32. Defendants argue that they are entitled to summary judgment on this claim because (1) W & R Financial already knew that UILIC viewed the letter of July 8, 1999 as a tentative agreement; and (2) plaintiffs cannot show that they justifiably relied on the individual defendants to disclose the fact that the letter was not a final agreement. In addition, Richey argues that based on the Alabama judgment, the claim against him should be dismissed under the doctrine of res judicata.

---

79. In their proposed jury instructions, plaintiffs attempt to also assert this claim against Hagopian, because he did not correct McCormick's statement that "he didn't have any idea of what litigation [Mr. Mallow] was referring to regarding Torchmark." Defendants' Exhibit J40. *See Plaintiffs' Proposed Jury Instructions* (Doc. # 449), Inst. No. 20. Because plaintiffs did not include this claim in the pretrial order, the Court will not consider it. Again, the issues of fact

section of the pretrial order states that trial is necessary on the issue whether Hagopian failed to correct McCormick's statement, see *Pretrial Order* (Doc. # 390) at 55, but to state a claim, W & R Financial must allege facts which support the necessary elements of its claim. In particular, W & R Financial has not alleged that at the time of the meeting, Hagopian knew that UILIC might file suit.

The parties agree that plaintiffs' fraud claim is governed by Kansas law. Under Kansas law, to establish fraud through silence, W & R must prove by clear and convincing evidence that:

(1) defendants had knowledge of material facts which plaintiffs did not have and which plaintiffs could not have discovered by the exercise of reasonable diligence;

(2) defendants were under an obligation to communicate the material facts to the plaintiffs;

(3) defendants intentionally failed to communicate to plaintiffs the material facts;

(4) plaintiffs justifiably relied on defendants to communicate the material facts to plaintiffs; and

(5) plaintiffs sustained damages as a result of defendants' failure to communicate the material facts to the plaintiffs.

*See OMI Holdings, Inc. v. Howell,* 260 Kan. 305, 344–45, 918 P.2d 1274, 1299 (1996); *Lesser v. Neosho County Community College,* 741 F.Supp. 854, 863 (D.Kan.1990). Fraud through silence is actionable where a party is under a legal or equitable obligation to communicate and thus cannot remain "innocently silent." *Monarch Normandy Square Partners v. Normandy Square Assocs. Ltd. P'ship,* 817 F.Supp. 899, 906 (D.Kan.1993).

Defendants argue that W & R cannot satisfy the first and fourth elements of their fraud claim. As to the first element, defendants argue that as a matter of law, W & R Financial already knew that UILIC viewed the letter of July 8, 1999 as a tentative agreement. As explained above, however, a reasonable jury could conclude that W & R Financial lacked actual knowledge in July of 1999 that Torchmark viewed the agreement as tentative. *See supra* text, Analysis, part I.[80] The Court therefore overrules that aspect of defendants' motion for summary judgment.

As to the fourth element, defendants argue that plaintiffs cannot show that they justifi-

ably relied on them to disclose that the letter of July 8, 1999 was not a final agreement.[81] Under Kansas law, the injured party's reliance must be "reasonable, justifiable and detrimental." *See Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.,* 45 F.Supp.2d 1164, 1198 (D.Kan.1999). In considering whether reliance is justifiable, the Kansas Court of Appeals has held as follows:

Many factors must be considered in determining whether a statement is a matter of fact or matter of opinion and whether or not a plaintiff has a right to rely on the statement. Among the facts the court will take into consideration are the intelligence, education, business experience and relative situation of the parties; the general information and experience of the persons involved as to the nature and use of the property; the habits and methods of those in the industry or profession involved; the opportunity for both parties to make an independent investigation as well as the nature, extent and result of any investigation so made; and any contract the parties knowingly and understandingly entered into.

*Goff v. Am. Savs. Ass'n,* 1 Kan.App.2d 75, 79, 561 P.2d 897, 901 (1977). It further held that "[a] recipient of a fraudulent misrepresentation is justified in relying upon its truth without investigation, unless he knows or has reason to know of facts which make his reliance unreasonable ... the test is whether the recipient has 'information which would serve as a danger signal and a red light to any normal person of his intelligence and experience.'" *Id.* at 82, 561 P.2d at 903 (citing Restatement (Second) Torts § 540 at 10 and comments to § 540 at 12).

Defendants maintain that at a minimum, the communications from UILIC gave W & R sufficient "danger signals" that it could not blindly rely on the fact that the common directors had not said anything contrary to its position that an agreement had been finalized. Under *Goff,* the Court considers the

---

80. *Defendants do not assert that as a matter of law, by the exercise of reasonable diligence, W & R could have discovered Torchmark's view of the agreement. The Court therefore leaves that issue for the jury to decide.*

81. Defendants apparently concede for purposes of their motion that plaintiffs actually did rely, but they argue that such reliance was not justifiable.

relative situation of the parties. The individual defendants owed a fiduciary duty to W & R Financial, the parent company of W & R. Based on this relationship and the fact that the individual defendants were directors of Torchmark, W & R could expect that the individual defendants would communicate material facts within their knowledge about Torchmark's contrary view of the agreement. A reasonable jury could find that UILIC's letter of July 23, 1999 would not necessarily raise a red flag that the letter of July 8, 1999 might not be an enforceable agreement. As explained above, the letter of July 23 was consistent with plaintiffs' belief that the letter of July 8, 1999 evidenced the parties' entire agreement regarding compensation and product features and a long-term relationship. The Court finds a genuine issue of material fact whether W & R justifiably relied on the individual defendants to communicate information on Torchmark's view of the agreement. Defendants' motion for summary judgment on this issue is overruled.

■ Richey also argues that the fraud claim against him should be dismissed because W & R and W & R Financial asserted the same claim against him in the Alabama litigation, the Alabama trial court granted summary judgment in his favor and the Alabama Supreme Court affirmed that ruling on appeal. To establish that the doctrine of res judicata bars the fraud by silence claim, Richey must show that it is part of the cause of action asserted in Alabama. Under Alabama law, to determine whether the claims asserted in two cases are part of the same cause of action, the Court applies the same evidence test, *i.e.* "whether the same evidence substantially supports both actions." *Gonzalez, LLC v. DiVincenti*, 844 So.2d 1196, 1205 (Ala. Sept.13, 2002); *see Garris v. S. Ala. Prod. Credit Ass'n*, 537 So.2d 911, 914

(Ala.1989) (regardless of form of action, issue is same for res judicata purposes when substantially same evidence supports both actions). "Res judicata applies not only to the exact legal theories advanced in the prior case, but to all legal theories and claims arising out of the same nucleus of operative facts." *Wesch v. Folsom*, 6 F.3d 1465, 1471 (11th Cir.1993), *cert. denied sub nom., Sinkfield v. Wesch*, 510 U.S. 1046, 114 S.Ct. 696, 126 L.Ed.2d 663 (1994); *see Smith v. Scott Paper Co.*, 620 So.2d 976, 982 (Ala.1993).

■ On its fraud claim, W & R seeks damages for loss of income based on the theory that absent Richey's fraud, it could have gone to another provider in July of 1999 and received 25 basis points on variable annuity sales in 2000 and 2001. W & R maintains that it could not have brought this claim in Alabama because the claim did not accrue until September 5, 2003. On that date, the Alabama Supreme Court made it clear that W & R had no right to 25 basis points compensation on UILIC policies which it actually sold during the same period, because the letter of July 8, 1999 was not an enforceable agreement. *See W & R*, 875 So.2d at 1167.

The Court is not persuaded, however, that the claim of fraud by silence claim is a materially different cause of action from the counterclaims which W & R asserted against Richey in the Alabama case on May 24, 2000 and March 8, 2001.[82] In Alabama, W & R alleged that Richey affirmatively misrepresented that (in the opinion of Torchmark and UILIC) the letter of July 8, 1999 was binding; in this case it complains that Richey concealed the fact that (in the opinion of Torchmark and UILIC) it was not. If there is a material difference between these two claims, the Court cannot discern what it is. In sum, the fraud claim of W & R against

82. W & R also asserts that its fraud by silence claim did not accrue until the minutes of the Torchmark board meeting on July 22, 1999 were produced during discovery in the Alabama litigation. *See Brief In Opposition To Defendants' Motion In Limine to Exclude Evidence Of Damages Prior To May 24, 2000* (Doc. # 446) filed August 16, 2004 at 2. At a status conference on August 20, 2004, counsel stipulated that the minutes were produced to W & R after May 24, 2000 (the date when W & R filed its initial counter-

claim against Richey), but before March 8, 2001 (the date when W & R filed its amended counterclaim in Alabama). Even if W & R could not assert its fraud by silence theory in its original counterclaims, because it had not yet discovered the minutes on which the claim is based, it could have asserted the fraud by silence claim as a counterclaim in response to the second amended complaint. Furthermore, to avoid splitting its cause of action against Richey, it was required to do so.

Richey is part of the cause of action which W & R actually asserted in Alabama. The same evidence pertains to both theories of relief, both theories arise out of the identical nucleus of operative facts, and res judicata bars W & R from re-asserting that cause of action here. Therefore the Court sustains defendants' motion for summary judgment on the fraud claim of W & R against Richey.[83]

## V. Res Judicata

Defendants maintain that based on the Alabama judgment, the doctrine of res judicata bars (1) W & R Investment from asserting certain portions of its RICO claim and (2) W & R Financial from recovering the cost of the Alabama litigation from Torchmark and Richey.

### A. *W & R Investment*

W & R Investment is only a plaintiff on the RICO claim on which the Court has granted summary judgment in favor of Torchmark, Richey, McCormick and Hagopian. As an alternative to their motion for summary judgment on the RICO claim, however, defendants maintain that based on the Alabama judgment, the doctrine of res judicata bars W & R Investment from asserting certain portions of its RICO claim. In particular, defendants maintain that because W & R and W & R Financial are barred from asserting a claim based on the termination of W & R Investment as investment advisor for Torchmark, W & R Investment is also prohibited from asserting such a claim.[84] W &

R Investment argues that because it was not a party to the Alabama action, the Alabama judgment does not bar any part of its RICO claim against Torchmark and Richey—the two RICO defendants who were parties to the Alabama case.

■ Judgments in a prior case may bind nonparties where (1) the nonparty was in privity with a party to the prior action or (2) a party to the prior action adequately represented the nonparty's interests. *See Parmater v. Amcord, Inc.*, 699 So.2d 1238, 1241 (Ala.1997); *West v. City of Mobile*, 689 So.2d 14, 16 (Ala.1997); *Century 21 Preferred Props., Inc. v. Ala. Real Estate Comm'n*, 401 So.2d 764, 770 (Ala.1981). Torchmark and Richey argue that in the Alabama action W & R and W & R Financial were virtual representatives of W & R Investment.[85]

■ To show privity by virtual representation, defendants must show that at the time of the Alabama suit, W & R and W & R Financial were so closely aligned with the interests of W & R Investment as to be its virtual representatives. *See West*, 689 So.2d at 16. The strict requirements for virtual representation ensure that the relationship between the party and the non-party "is not so attenuated as to violate due process." *Whisman v. Ala. Power Co.*, 512 So.2d 78, 82 (Ala.1987).

To support a finding of virtual representation, the Court ordinarily must find that the parties in the earlier action were in some sense proper agents for the latter parties so as to support preclusion of the latter claim.

**83.** The Court recognizes that this ruling is at odds with the ruling of the magistrate judge on plaintiffs' motion to amend. On November 20, 2003, the magistrate ruled that the fraud claim of W & R did not accrue until the Alabama Supreme Court ruled that W & R had no right to the 25 basis points on UILIC business. *See Order* (Doc. # 169) at 3. The magistrate judge ruled on the issue in the context of a motion to amend and he did not have the benefit of the summary judgment record.

**84.** The parties vigorously dispute whether W & R and W & R Financial sought damages in the Alabama action for the termination of W & R Investment as investment advisor for Torchmark. This Court has already held that W & R and W & R Financial brought or could have brought such

a claim and that W & R and W & R Financial cannot reassert that claim in this action. *See Memorandum And Order* (Doc. # 79) at 31–32. As to W & R Investment, the relevant inquiry is whether W & R and W & R Financial were its virtual representatives in the Alabama litigation. If so, the claim of W & R Investment is barred because the cause of action asserted by W & R and W & R Financial included such a claim. *See id.* Whether W & R and W & R Financial sought the same *damages* in Alabama as W & R Investment seeks here is not relevant to the virtual representation inquiry.

**85.** For purposes of this motion, Torchmark and Richey do not maintain that W & R Investment was in privity with W & R Financial or W & R. *See* Defendants' Reply (Doc. # 395) at 63–64.

See *Tice v. Am. Airlines, Inc.,* 162 F.3d 966, 971 (7th Cir.1998), *cert. denied,* 527 U.S. 1036, 119 S.Ct. 2395, 144 L.Ed.2d 795 (1999). Such an agency relationship may arise, for example, where the party in the first suit had some obligation to safeguard the interests of the party to the second suit. *See Moldovan v. Great Atl. & Pac. Tea Co.,* 790 F.2d 894, 899 (3d Cir.1986), *cert. denied,* 485 U.S. 904, 108 S.Ct. 1074, 99 L.Ed.2d 233 (1988); *see also Tyus v. Schoemehl,* 93 F.3d 449, 455 (8th Cir.1996) (court will apply virtual representation only when existence of special relationship between parties justifies preclusion), *cert. denied,* 520 U.S. 1166, 117 S.Ct. 1427, 137 L.Ed.2d 536 (1997); *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 43 F.3d 1054, 1070 (6th Cir.) (virtual representation demands express or implied legal relationship in which parties to first suit are accountable to non-parties who file subsequent suit raising identical issues), *cert. denied,* 516 U.S. 912, 116 S.Ct. 296, 133 L.Ed.2d 203 (1995); *Gonzalez v. Banco Cent. Corp.,* 27 F.3d 751, 762 (1st Cir.1994) ("the parties' independence—the inescapable fact that the [prior] plaintiffs were not legally responsible for, or in any other way accountable to, the [nonparty] plaintiffs—weighs heavily against a finding of virtual representation"); *Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 640 (2d Cir.) (interests of non-party must be adequately represented by another vested with authority of representation), *cert. denied,* 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987); *Klugh v. United States,* 818 F.2d 294, 300 (4th Cir.1987) (doctrine of virtual representation not applicable where interests of parties are separate or parties to first suit are not accountable to non-parties who file subsequent suit).

Defendants argue that the issue of virtual representation is a question of law for the Court to decide. *See* Defendants' Memorandum at 83 (citing *N.A.A.C.P. v. Hunt,* 891 F.2d 1555, 1561 (11th Cir.1990)). In *Hunt,* the Eleventh Circuit stated that the question of "privity" for res judicata purposes is a question of law. *Id.* (citing *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.,* 546 F.2d at 95). Although *Hunt* noted earlier that privity could be shown by virtual representation, this Court is not convinced that the issue of virtual representation can always be decided as a matter of law before trial. The Court agrees with those courts which have found that the question of virtual representation is one of fact. *See Aerojet–General Corp. v. Askew,* 511 F.2d 710, 719 (5th Cir. 1975) (question of fact for court); *Phila. Fraternal Order of Corr. Officers v. Rendell,* 1996 WL 296538, at *5 (E.D.Pa. June 4, 1996) (question of fact); *Antrim Min., Inc. v. Davis,* 775 F.Supp. 165, 169 (M.D.Pa.1991) (privity is legal determination, but whether party is "virtual representative" ordinarily is factual question). *But cf. Brewer v. Dupree,* 2003 WL 23507795, at *3 (M.D.Ala. Feb.12, 2003) (privity is question of law); *Maguire v. Thompson,* 1990 WL 179730, at *4 (N.D.Ill. Nov.5, 1990) (virtual representation is question of law).

Even though this Court finds that the question of virtual representation is one of fact, no reasonable fact finder could find in favor of W & R Investment based on the present record.[86] W & R Investment is an indirect wholly-owned subsidiary of W & R Financial and a direct wholly-owned subsidiary of W & R. The same management group has made decisions for the W & R family of companies since the spin-off from Torchmark. This group includes the general counsel, chief financial officer, chief operating officer, chief marketing officer, chief investment officer and the national director of marketing of W & R Financial. From 1999 through 2001, Tucker, Hechler and Herrmann were the only directors of W & R and W & R Investment. As general counsel of W & R Financial, Schulte reported to Tucker and had overall supervisory responsibility for both the Alabama litigation and this litigation, for all W & R entities in each case. Tucker has been the chairman of W & R, W & R Financial and W & R Investment since 1998.

---

86. The Court need not opine whether at a trial, the issue is one for the jury or the court. *See Mother's Rest., Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1572 (Fed.Cir.1983) (question for court); *Aerojet–General,* 511 F.2d at 719 (same); *Brewer,* 2003 WL 23507795, at *3 (privity is question of law); *Maguire,* 1990 WL 179730, at *4 (virtual representation is question of law).

W & R Investment has presented some evidence that it is a legal entity separate from W & R, that it maintains corporate formalities such as holding meetings and maintaining minutes, and that it has separate assets, boards of directors and officers.[87] These facts are consistent with the conclusion that W & R and W & R Financial were proper agents for W & R Investment in the Alabama litigation. In particular, although W & R and W & R Investment had legally distinct boards, the very same directors served on the two boards from 1999 through 2001. Moreover, nearly every court which has addressed the issue has found that a parent corporation is a proper agent for a wholly-owned subsidiary. *See In re Imperial Corp. of Am.*, 92 F.3d 1503, 1507 (9th Cir.1996) (parent/subsidiary relationship dispositive on privity inquiry); *Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp.*, 933 F.2d 724, 728 (9th Cir. 1991) (wholly-owned subsidiary and partnership in which that subsidiary is general partner may invoke two dismissals of subsidiary's parent and claim res judicata), *cert. denied,* 503 U.S. 920, 112 S.Ct. 1295, 117 L.Ed.2d 518 (1992); *In re Gottheiner,* 703 F.2d 1136, 1139–40 (9th Cir.1983) (collateral estoppel barred second suit where defendant in prior suit was wholly owned by defendant in subsequent suit); *see also Pollard v. Cockrell,* 578 F.2d 1002, 1008–09 (5th Cir.1978) (type of express relationship contemplated for virtual representation includes parent corporation and its subsidiary) (citing *Southwest Airlines Co. v. Tex. Int'l Airlines,* 546 F.2d 84, 97 (5th Cir.1977)); *Greenberg v. Potomac Health Sys., Inc.,* 869 F.Supp. 328, 330–31 (E.D.Pa. 1994) (litigation against parent barred subsequent claim against wholly-owned subsidiary).[88]

Defendants previously sought summary judgment on this issue. In a prior order, the Court stated:

Viewing the evidence in the light most favorable to plaintiffs, W & R Investment operates as a separate entity from W & R—with separate assets, a separate board of directors and separate officers—and maintains corporate formalities such as the holding of meetings and maintenance of minutes. In addition, while the Securities and Exchange Commission regulates W & R Investment, the National Association of Securities Dealers regulates W & R. Though the president of W & R Investment holds positions with W & R Financial and all W & R entities share common counsel, defendants have not shown that W & R or W & R Financial had an obligation to safeguard the interests of W & R Investment in the Alabama litigation. W & R and W & R Financial did not have an incentive to throw stones at W & R Investment or otherwise cast it in a negative light in the Alabama litigation. At the same time, defendants have not shown that W & R or W & R Financial were legally responsible for or accountable to W & R Investment for their conduct in the Alabama litigation. Accordingly, the Court overrules defendants' motion for summary judgment as to the claims of W & R Investment.

*Memorandum And Order* (Doc. # 79) at 35–36 (footnote omitted).

In a recent decision, the Alabama Supreme Court found persuasive this Court's earlier discussion of virtual representation under Alabama law. *See Morris v. Cornerstone Propane Partners,* — So.2d —, 2003 WL 22320952, at *2 (Ala. Oct.10, 2003) (citing *Waddell & Reed Fin., Inc. v. Torchmark Corp.,* 243 F.Supp.2d 1232 (D.Kan.2003)). In *Morris,* the Alabama Supreme Court found that virtual representation was not present where one group of poultry farmers were members of same association as a second

---

87. Plaintiffs also noted that while the SEC regulates W & R Investment, the NASD regulates W & R. The fact that the companies are regulated by different organizations does not show that W & R did not adequately represent W & R Investment in the Alabama litigation.

88. Several courts have gone even further and declared that a parent corporation is in privity

with its wholly-owned subsidiary. *See, e.g., Circle v. Jim Walter Homes, Inc.,* 654 F.2d 688, 692 (10th Cir.1981) (subsidiary in privity with parent and sister corporation); *B–S Steel of Kan., Inc. v. Tex. Indus., Inc.,* 327 F.Supp.2d 1252, 1259–60 (D.Kan.2004) (parent-subsidiary relationship sufficient for privity).

group of poultry farmers in prior litigation. *Morris* noted that the poultry farmers in the prior litigation were not in any way accountable to or agents of the other poultry farmers. *Morris* emphasized that "[a]n elastic concept of privity violates due process of law." —— So.2d at ——, 2003 WL 22320952, at *3.

Here, a finding of virtual representation does not unfairly stretch the concept of privity. W & R, W & R Financial and W & R Investment are much more closely aligned than common members of a trade association. As explained above, W & R was the corporate parent of W & R Investment, and the two shared the same directors, chairman and general counsel. The general counsel had supervisory responsibility for both the Alabama action and this case. W & R Investment has not argued or offered any evidence that it had different interests than W & R and W & R Financial in the Alabama litigation. For these reasons, the Court finds that as a matter of law, W & R and W & R Financial were the virtual representatives of W & R Investment in the Alabama litigation for purposes of res judicata. Accordingly, the doctrine of res judicata bars the portion of the RICO claim of W & R Investment based on its termination as investment advisor for Torchmark.

### B. *Damages For Costs Of Alabama Litigation*

Defendants argue that under the Court's earlier rulings related to res judicata, W & R and W & R Financial cannot recover the cost of the Alabama litigation from Torchmark and Richey.[89] Initially, the Court notes that in the pretrial order, W & R does not seek damages for the cost of the Alabama litigation. *See Pretrial Order* (Doc. # 390) at 86. The Court therefore limits its analysis to W & R Financial, which seeks to recover the costs of the Alabama litigation in its RICO and breach of fiduciary duty claims. Torchmark and Richey, however, are not defendants as to the fiduciary duty claim. Therefore the Court only addresses the question whether the doctrine of res judicata bars W

& R Financial from recovering the cost of the Alabama litigation on its RICO claim against Torchmark and Richey. This issue is moot, in view of the fact that the Court has entered summary judgment for Torchmark and Richey on the RICO claim. In the alternative, however, the Court addresses this aspect of defendants' motion. In response to defendants' argument that res judicata prevents it from recovering the cost of the Alabama litigation in this case, W & R Financial maintains that (1) in the Alabama action, it could not have recovered its fees and expenses in that case; and (2) even if it could have sought such expenses in the Alabama action, it may seek in this Court those fees and expenses which it incurred in the Alabama action after Torchmark and Richey were dismissed. *See* Plaintiffs' Opposition Memorandum (Doc. # 387) at 94–95.

 To address the parties' arguments, the Court returns to Alabama law on the doctrine of res judicata. The Full Faith and Credit Statute, 28 U.S.C. § 1738, requires a federal court to apply the preclusion law of the state in which the previous judgment was rendered. *See Marrese v. Am. Acad. Of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). In Alabama, "the elements of res judicata are: (1) a prior judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) substantially the same parties involved in the prior case are involved in the current case; and (4) the same cause of action presented in both suits." *Ex parte Jefferson County,* 656 So.2d 382, 384–85 (Ala.1995); *see Lee L. Saad Constr. Co., Inc. v. DPF Architects, P.C.,* 851 So.2d 507, 516–18 (Ala.2002). If those four elements are present, any claim that was adjudicated or could have been adjudicated in the prior action is barred from further litigation. *Equity Res. Mgmt., Inc. v. Vinson,* 723 So.2d 634, 636 (Ala.1998).

 A claimant generally does not have to amend its pleadings to assert claims that arise after the filing of its initial complaint or counterclaim. *See Manning v. City of Auburn,* 953 F.2d 1355, 1360 (11th Cir.1992);

---

89. Because Hagopian and McCormick were not parties in the Alabama case, the Court's earlier rulings on res judicata did not apply to them.

*see also* Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, 18 Federal Practice & Procedure: Juris 2d § 4409, at 213 (2d ed.2002) (filing of amended complaint to add claims that could not have been asserted in original complaint not mandatory); *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1202 (10th Cir.2000) (doctrine of claim preclusion does not necessarily bar plaintiffs from litigating claims based on conduct that occurred after filing of initial complaint). In contrast to amendments to add new *claims,* however, amendments to add *damages* which accrue after the initial complaint or counterclaim are mandatory if the additional damages arise from the cause of action asserted in the initial complaint or counterclaim. *See Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 669 F.2d 490, 494 (7th Cir.) (new cause of action accrues for damages caused by defendant's post-verdict antitrust conduct) (citing *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955)), *cert. denied,* 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982); *see also N.W. Fin. Group, Inc. v. County of Gaston,* 110 N.C.App. 531, 430 S.E.2d 689, 694–95 (1993) (res judicata precludes subsequent claim for damages if any portion of damages incurred before first action commenced). Accordingly, the Court must determine whether W & R Financial's damages for the costs of the Alabama litigation are based on a cause of action which accrued after May 24, 2000—the date when W & R Financial filed its initial counterclaim in Alabama. *See Memorandum And Order* (Doc. # 79) at 29–30.

■ In Alabama, W & R Financial asserted a cause of action based primarily on (1) its belief that the letter of July 8, 1999 was a binding contract; (2) its claim that Richey breached his fiduciary duty to W & R Financial by serving as director for both W & R Financial and Torchmark and making decisions adverse to its interests; (3) the fact that Torchmark and Richey did not disclose that absent a non-replacement agreement, UILIC would not agree to pay additional compensation; and (4) its belief that Torchmark and Richey interfered with the con-

tracts/business relationship between W & R and UILIC by threatening and instituting legal action against W & R. *See id.* at 28–29. In this case, as to events before May 24, 2000, plaintiffs' RICO claim largely mirrors the factual allegations of the Alabama counterclaims. *See id.* Shortly after UILIC filed suit in Alabama, W & R Financial had a cause of action against Torchmark and Richey based on the allegedly wrongful conduct which culminated in the filing of the Alabama litigation. W & R Financial attempted to recover its litigation expenses in Alabama in that case, but the Alabama court dismissed with prejudice those claims against Torchmark and Richey. Plaintiffs cannot evade the preclusive effect of that ruling by asserting damage claims for the same conduct complained of in the Alabama action.[90] In Alabama, W & R Financial asserted that by directing UILIC to file the Alabama litigation, Torchmark and Richey interfered with the contract/business relationship between W & R and UILIC. *See* Alabama Counterclaims ¶ 66, attached as defendants' Exhibit A3. Here, W & R Financial asserts that by directing UILIC to file the Alabama litigation, Torchmark attempted to defraud and exercise improper control over plaintiffs. The legal theories may be different, but the cause of action is the same. W & R Financial does not address the question whether the costs of the Alabama litigation are based on a cause of action which accrued after May 24, 2000. In its prior order, the Court held that "[b]ecause plaintiffs have alleged conduct under RICO which extended beyond the date when they filed their Alabama counterclaims and plaintiffs did not assert a claim based on that conduct in their amended Alabama counterclaims, res judicata does not bar their amended RICO claims in this case." *Memorandum And Order* (Doc. # 171) at 17–18. The Court permitted plaintiffs to go forward on their amended RICO claim because they alleged a continuing course of wrongful conduct which extended beyond May 24, 2000, when W & R Financial filed its first counterclaim in Alabama. *Id.* at 16–17. Under RICO as well as other areas of the law, "a defendant's continuing course of con-

---

**90.** If the Alabama court had ruled in favor of W & R Financial but awarded damages only to a certain date, plaintiffs possibly could have sought to recover damages incurred after that date.

duct, even if related to conduct complained of in the earlier lawsuit, generally creates a separate cause of action." *United Food & Commercial Workers v. City Foods, Inc.,* 878 F.Supp. 122, 123 (N.D.Ill.1995). In its prior order, the Court did not specifically address whether the doctrine of res judicata bars any category of damages on plaintiffs' amended RICO claim. W & R Financial apparently maintains that because defendants engaged in a continuing course of conduct, it can seek damages which accrued after the Alabama judgment. Based on the reasoning of the Court's prior orders, however, any cause of action which accrued before May 24, 2000 (the date W & R Financial filed its initial counterclaim in Alabama) is barred. *See Memorandum And Order* (Doc. # 79) at 29–30; *see Reisner v. Stoller,* 51 F.Supp.2d 430, 451 (S.D.N.Y.1999) (RICO claims based on injuries to plaintiffs before commencement of first action barred by doctrine of res judicata).

W & R Financial argues that it could not have recovered the Alabama expenses in the Alabama case, but this Court has held:

The Kansas Plaintiffs ... allege that they incurred substantial litigation costs in the Alabama action, presumably referring to attorneys' fees and other litigation expenses. Though the precise amount was uncertain when W & R and W & R Financial filed their initial counterclaims in Alabama, they had already retained counsel and knew when they filed their counterclaims that they had sustained damages for attorneys fees, litigation expenses and court costs. Indeed, W & R and W & R Financial sought recovery of their fees and costs in the Alabama action. *See Alabama Defendants' Initial Counterclaim* at pp. 31, 33, 35, 36, 38.

*Memorandum And Order* (Doc. # 79) at 33 (footnote omitted). The Court concluded that the doctrine of res judicata barred the RICO claim of W & R Financial against Torchmark and Richey. *See id.* at 36.[91] The dismissed RICO claim was based in part on litigation costs which plaintiffs incurred in the Alabama action. W & R Financial did not timely seek reconsideration of this ruling, see D. Kan. Rule 7.3(b) (motion to reconsider non-dispositive order must be filed within 10 days of order) and it has not presented sufficient grounds for the Court to reconsider it at this time. *See id.* (motion to reconsider shall be based on intervening change in controlling law, availability of new evidence, or need to correct clear error or prevent manifest injustice). In sum, W & R Financial could have filed a claim for the Alabama costs in the Alabama case.

As to the argument that W & R Financial should be able to recover those fees and expenses which it incurred after the Alabama court dismissed Torchmark and Richey,[92] the Court disagrees. Although the Alabama litigation was "ongoing," the wrongful conduct which allegedly caused W & R Financial to incur legal expenses ended when UILIC filed suit on May 3, 2000. W & R Financial cannot distinguish its present claim, based on the fact that it seeks fees and expenses which it incurred after the Alabama court dismissed Torchmark and Richey. The Court previously stated:

A difference in damages is not grounds for distinguishing two causes of action for res judicata purposes. *Robinson v. Holley,* 549 So.2d 1, 2 (Ala.1989); *see id.* (cause of action grows out of wrongful action and not out of various forms of damages that may flow from wrongful act); *see also Estate of Young v. Williams,* 810 F.2d 363, 365 (2d Cir.1987) (different requests for relief do not limit scope of res judicata). Despite the fact that additional *damages* may have accrued after W & R and W & R Financial filed their counterclaims in Alabama, the issue is whether their *claims* or

---

**91.** If a separate *cause of action* accrued after W & R Financial filed its counterclaims in Alabama, it was not required to assert that cause of action in the Alabama litigation. *See Manning,* 953 F.2d at 1360; *see also Mitchell,* 218 F.3d at 1202 (doctrine of claim preclusion does not necessarily bar plaintiffs from litigating claims based on

conduct that occurred after initial complaint was filed).

**92.** The Alabama trial court granted summary judgment in favor of Torchmark and Richey on the counterclaims of W & R and W & R Financial and dismissed them with prejudice.

*causes of action* accrued after they filed their initial counterclaims.

*Id.* at 30–31 (emphasis in original). If W & R Financial had any cause of action related to the filing of the Alabama litigation, it accrued before W & R Financial filed its initial counterclaims in Alabama on May 24, 2000, and W & R Financial asserted that cause of action in Alabama. *Id.* at 29–33. The fact that the Alabama court dismissed the claims of W & R Financial against Torchmark and Richey, before the Alabama case was completed, is irrelevant. W & R Financial should have sought, and actually did seek, to recover its costs and fees in the Alabama action.

For these reasons, the Court finds that as a matter of law, res judicata bars W & R Financial from recovering from Torchmark and Richey the fees and costs which it incurred in the Alabama litigation. To that extent, defendants' motion for summary judgment is sustained.

## VI. NASD Investigation

W & R Financial alleges that defendants caused it to incur legal fees because they gave NASD false and misleading information which caused it to investigate the 1035 exchanges of UILIC policies and file a formal complaint against W & R. *See Pretrial Order* (Doc. # 390) at 7. On this claim, W & R Financial seeks to recover $3,998,435.91 for costs incurred in responding to the NASD investigation which NASD commenced in April of 2001 and the formal complaint which it filed on January 14, 2004. Defendants argue that as a matter of law, W & R Financial cannot recover such damages because (1) it cannot show that defendants initiated the NASD investigation; (2) such damages are barred under the *Noerr–Pennington* doctrine; see *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and (3) plaintiff's claim is really one for malicious prosecution, which cannot proceed until the investigation terminates in favor of W & R Financial. *See* Defendants' Memorandum (Doc. # 369) at 73–77.

### A. Evidence That Defendants Initiated NASD Investigation

Defendants argue that W & R Financial cannot recover any damages related to the NASD investigation because it cannot show that defendants initiated it. Although the record does not reflect what prompted the investigation, the record reflects that it commenced in April of 2001. W & R Financial cites no admissible evidence that defendants provoked the investigation, however, and Bassett's initial communication with NASD was apparently in response to its request for information. On this record, no reasonable jury would find that defendants prompted the initial NASD investigation.

This conclusion does not end the matter. Defendants do not attempt to establish that they did not influence NASD to broaden its investigation and to file a formal complaint against W & R. Absent testimony from NASD representatives, plaintiffs may be hard pressed to establish causation. That issue, however, is beyond the scope of this motion. The Court sustains defendants' motion for summary judgment on the issue whether defendants caused NASD to investigate plaintiffs' replacement of UILIC policies. The record reveals a genuine issue of material fact whether defendants goaded NASD into a broader investigation than it would have otherwise conducted and to file a formal complaint and, if so, the extent of any damages which plaintiffs sustained on account of the more extensive investigation and the filing of the complaint. Those issues remain for trial.

### B. Immunity Under Noerr–Pennington Doctrine

 Defendants also argue that under the *Noerr–Pennington* doctrine, see *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), they are entitled to summary judgment on damages related to the NASD investigation. "The *Noerr–Pennington* doctrine is based upon the protections of the First Amendment and exempts

from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition." *Zimomra v. Alamo Rent–A–Car, Inc.*, 111 F.3d 1495, 1503 (10th Cir.) (citations omitted), *cert. denied*, 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997); *see Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (those who petition government for redress are generally immune from antitrust liability). The *Noerr–Pennington* doctrine has been extended beyond antitrust cases and places limits on liability for a range of common law torts. *See Scott v. Hern*, 216 F.3d 897, 914 (10th Cir.2000). Outside the antitrust context, however, any immunity is based solely on the right to petition the government which is guaranteed by the Petition Clause of the First Amendment. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889–90 (10th Cir.2000) (en banc) (citing *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 742–43, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983)), *cert. denied*, 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000).

W & R Financial argues that because the NASD is not a governmental entity, the *Noerr–Pennington* doctrine does not bar their damage claim. NASD is a private, not-for-profit corporation and it receives no federal or state funding. *See D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 162 (2d Cir.2002); *Desiderio v.*

*NASD, Inc.*, 191 F.3d 198, 206 (2d Cir.1999), *cert. denied*, 531 U.S. 1069, 121 S.Ct. 756, 148 L.Ed.2d 659 (2001); *United States v. Shvarts*, 90 F.Supp.2d 219, 222 (E.D.N.Y. 2000), *abrogated on other grounds by United States v. Coppa*, 267 F.3d 132 (2d Cir.2001). It is a self-regulatory agency whose creation was not mandated by statute, and the government does not appoint its members or serve on any NASD board or committee. *Desiderio*, 191 F.3d at 206. NASD is related and closely supervised by a governmental agency, the SEC. The nature of this relationship, however, does not dictate that petitions to NASD should be cloaked with the same immunity as petitions to the SEC.[93] The NASD and SEC represent distinct interests—one the industry and the other the regulator. *Jones v. S.E.C.*, 115 F.3d 1173, 1180 (4th Cir.1997); *see Lang*, 154 F.3d at 220 (SEC makes de novo determination of NASD decisions and issues "independent" decision on violation and penalty). Petitions to NASD are therefore, in essence, petitions to a private party which represents securities brokers.

Defendants maintain that because NASD is entitled to absolute immunity in connection with its disciplinary proceedings, those who petition NASD should be entitled to similar immunity under the Petition Clause of the First Amendment. Several courts have recognized that self-regulatory organizations exercising quasi-governmental powers should be immune from suit. *See Sparta Surgical*

---

**93.** For a detailed explanation of the relationship between NASD and the SEC, see *Lang v. French*, 154 F.3d 217, 219–20 (5th Cir.1998). In sum, NASD is a private non-profit corporation organized under the laws of Delaware and is registered with the SEC as a national securities association. As a prerequisite to its registration, the NASD had to promulgate association rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade ... and, in general, to protect investors and the public interest." Exchange Act, § 15A(b)(6), 15 U.S.C. § 78o–3(b)(6) (1994). NASD enforces its own professional rules and compliance with the Exchange Act, rules and regulations thereunder, and rules of the Municipal Securities Regulation Board. Exchange Act, § 15A(b)(7), 15 U.S.C. § 78o–3(b)(7) (1994).

The Exchange Act requires NASD to impose sanctions when violations are found. Through its sanctioning authority, NASD has been "dele-

gated governmental power ... to enforce, at (its) own initiative, compliance by members of the [securities] industry with both the legal requirements laid down in the Exchange Act and ethical standards going beyond those requirements." *Lang*, 154 F.3d at 219 (quoting *Merrill Lynch, Pierce, Fenner & Smith v. Nat'l Ass'n of Sec. Dealers, Inc.*, 616 F.2d 1363, 1367 (5th Cir.1980) (quoting Senate Report)).

Several tiers of administrative review are available to persons aggrieved in the NASD disciplinary process, and disciplinary orders are reviewable by the SEC after administrative remedies within NASD are exhausted. Following a de novo determination of the facts and the law and an independent decision on the violation and the penalty, the SEC is authorized to affirm, modify or set aside any sanction, and if necessary remand to NASD for further proceedings. Final SEC orders are appealable to the United States Court of Appeals.

*Corp. v. NASD, Inc.,* 159 F.3d 1209, 1213–14 (9th Cir.1998) (NASD is immune from liability based on discharge of duties under the Exchange Act); *Barbara v. N.Y. Exch.,* 99 F.3d 49, 58 (2d Cir.1996) (N.Y.SE has absolute immunity because it performs regulatory functions that would otherwise be performed by government agency); *Austin Mun. Sec., Inc. v. NASD, Inc.,* 757 F.2d 676, 689 (5th Cir.1985) (NASD members entitled to absolute immunity from civil liability for actions taken within scope of official duties). Defendants, however, have cited no authority which suggests that individuals who petition self-regulatory organizations are entitled to such immunity.

In a variety of contexts, courts have granted immunity to private parties who exercise quasi-governmental powers. *See, e.g., Warner v. Grand County,* 57 F.3d 962, 964–67 (10th Cir.1995) (private actor who performed strip search at officer's direction); *Austern v. Chi. Bd. Options Exch., Inc.,* 898 F.2d 882, 885–86 (2d Cir.) (arbitrators who heard case pursuant to contractual arbitration clause), *cert. denied,* 498 U.S. 850, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990); *Kwoun v. S.E. Mo. Prof'l Standards Review Org.,* 811 F.2d 401, 407–09 (8th Cir.1987) (private medical peer review group which conducted quasi-prosecutorial medical performance review), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988); *Wasyl, Inc. v. First Boston Corp.,* 813 F.2d 1579, 1582 (9th Cir. 1987) (appraisers who performed quasi-judicial acts); *Bushman v. Seiler,* 755 F.2d 653, 655 (8th Cir.1985) (consultant of Medicare carrier); *Corey v. New York Stock Exchange,* 691 F.2d 1205, 1208–11 (6th Cir.1982) (private arbitrators) (private arbitrators); *Citrano v. Allen Corr. Ctr.,* 891 F.Supp. 312, 317 (W.D.La.1995) (private contractor operating prison is functional equivalent of state prison employees; same rationales underlying grant of qualified immunity to state prison officials have equal application to private contractor); *Weissman v. Hassett,* 47 B.R. 462, 466–67 (S.D.N.Y.1985) (bankruptcy trustee); *Lythgoe v. Guinn,* 884 P.2d 1085, 1087–89 (Alaska 1994) (court-appointed psychologists). Sound public policy reasons support immunity for private parties who in good faith perform certain quasi-governmental tasks. Absent any controlling authority on the issue, however, the Court is reluctant to extend immunity to those who petition private parties who engage in such tasks. Because petitions to the NASD are essentially petitions to a private trade organization, the Court finds that the Petition Clause of the First Amendment does not provide blanket immunity for Torchmark's communications with NASD in the investigative process. *See Cardtoons,* 208 F.3d at 891 (communications between private parties are not protected). Defendant's motion for summary judgment on this issue is overruled.

### C. Whether NASD Investigation Must Terminate In Favor Of W & R

Defendants argue that the NASD damage claim by W & R Financial is really one for malicious prosecution, which cannot proceed until the disciplinary process terminates in its favor. W & R Financial concedes that it cannot recover future attorney fees or any future NASD fine, because such costs will not be provable at the time of trial.[94] W & R Financial claims that it has already incurred attorney fees, however, and that it has an actionable claim regardless of the outcome of the investigation.

The record establishes that beginning January 1, 2001, plaintiffs made unsuitable replacements for some UILIC annuities. *See* 4/19/04 Tucker Depo. at 65–67 (some replacements were "not suitable"); 2/5/04 Schulte Depo. at 310–359 (between 175 and 200 replacements were "problematic"). Assuming that NASD has this information—and nothing in the record suggests that it does not—no reasonable jury would conclude that the NASD investigation is likely to be resolved in favor of W & R. Therefore, to recover any of the attorneys fees which it has incurred to date, W & R Financial must demonstrate at trial that (1) defendants caused the NASD to

94. In any event, at the pretrial conference, the magistrate judge overruled plaintiffs' attempt to amend their claims to seek a declaration that defendants must pay any fine that NASD imposes against them. *See Pretrial Order* (Doc. # 390) at 86–87. Plaintiffs did not seek review of the magistrate judge's ruling or reconsideration of the pretrial order.

conduct a more comprehensive investigation and file a more expansive complaint than it would have otherwise conducted and filed; and (2) in response to a more focused NASD investigation and/or complaint, W & R Financial would have incurred fewer attorneys' fees to date. This sounds well and good, in the abstract, and if W & R Financial were asserting a claim for malicious prosecution, this theory of damages would be plausible. Here, however, W & R Financial asserts two theories of liability: a RICO violation (on which the Court is granting summary judgment for defendants) and a breach of fiduciary duty by McCormick and Hagopian. Apparently, the latter damage theory on the latter claim runs as follows:

(1) in July of 1999, McCormick and Hagopian knew that Torchmark did not view the letter of July 8, 1999 as a "final agreement;" (2) in July of 1999, W & R Financial did not know Torchmark's views on the subject, and McCormick and Hagopian did not tell it; (3) if McCormick and Hagopian had disclosed Torchmark's view between July 22, 1999 and October of 1999, W & R Financial would have "immediately resumed negotiations with other variable annuity providers and entered into an alternative relationship;" (4) because McCormick and Hagopian did not do so, W & R Financial was forced into a "dysfunctional relationship" with Torchmark, throughout 2000 and the first quarter of 2001; and (5) as a result of that "dysfunctional relationship," W & R Financial incurred $3,998,435.91 in legal costs in response to an NASD investigation and complaint that were broader than they would have been if attorneys for UILIC and Torchmark had not goaded NASD into unwarranted action.

Nothing in the pretrial order sheds any light on why W & R Financial believes that McCormick and Hagopian should be personally liable for $4 million in attorneys fees which W & R Financial allegedly sustained on account of activity by lawyers for Torchmark and UILIC—activity which occurred long after W & R Financial had secured an "alternative relationship" with Nationwide, and long after McCormick and Hagopian resigned from the board of directors of W & R Financial, and of which McCormick and Hagopian were apparently unaware.

W & R Financial cannot show that any breach of fiduciary duty by McCormick and Hagopian was the proximate cause of the expenses which it incurred in responding to the NASD investigation and complaint. A proximate cause is one that "in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Culver*, 588 A.2d at 1097 (Del. 1991); *see Cullip*, 266 Kan. at 556, 972 P.2d at 782. A third party's act is an intervening, superseding cause if it was either unforeseeable, or was foreseeable but conducted in an extraordinarily negligent manner. *Duphily*, 662 A.2d at 830.

Here, the chain of events between any breach of fiduciary duty and the NASD investigation is long and attenuated, and includes a 12-month break between when McCormick and Hagopian last served on the board of W & R Financial and the initiation of the NASD investigation. During this period, W & R decided to replace many UILIC policies with Nationwide policies. Plaintiffs concede that some of these replacements were unsuitable. *See* 4/19/04 Tucker Depo. at 65–67 (some replacements were "not suitable"); 2/5/04 Schulte Depo. at 310–359 (between 175 and 200 replacements were "problematic"). In sum, no reasonable jury could find that any breach of fiduciary duty by McCormick and Hagopian was the proximate cause of the expenses which W & R Financial incurred during the NASD investigation.[95] W & R Financial concedes that it cannot recover future fees and fines, because they will not be provable at the time of trial. On this record, its claim for previously incurred

95. Although the issue is not before the Court, it also appears that any damages on such a claim would be based on mere speculation or conjecture. *See Dougan v. Rossville Drainage Dist.*, 2 Kan.App.2d 125, 129, 575 P.2d 1316, 1320 (1978). Plaintiffs have offered no evidence as to the cause of the NASD investigation, and yet they concede that some of the replacements of UILIC policies were unsuitable. In these circumstances, absent speculation or conjecture, no reasonable jury could determine damages.

expenses will likewise be unprovable at the time of trial. It is simply too attenuated. As a matter of law, W & R Financial cannot recover its expenses related to the NASD investigation. Therefore, the Court sustains defendants' motion for summary judgment on this issue.

## VII. Intervening Causes

On its RICO and breach of fiduciary duty claims, W & R Financial seeks damages for the cost of the Alabama and the California litigation, including any potential judgments in those actions. Defendants argue that plaintiffs' own intervening acts caused such damages and that W & R Financial cannot recover them in this case.

A proximate cause is one that "in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Culver v. Bennett,* 588 A.2d 1094, 1097 (Del.1991) (citation omitted); *see Cullip v. Domann,* 266 Kan. 550, 556, 972 P.2d 776, 782 (1999). The Delaware Supreme Court has explained "intervening" and "superseding" causes as follows:

> An intervening cause is one which comes into active operation in producing an injury subsequent to the negligence of the defendant. The mere occurrence of an intervening cause, however, does not automatically break the chain of causation stemming from the original tortious conduct.... In order to break the causal chain, the intervening cause must also be a superseding cause, that is, the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor.

*Duphily v. Del. Elec. Coop., Inc.,* 662 A.2d 821, 829 (Del.1995) (citations omitted). A third party's act is an intervening, superseding cause if it was either unforeseeable, or it was foreseeable but the third party acted in an extraordinarily negligent manner. *Id.* at 830. A foreseeable event is one where defendant should have recognized the risk under the circumstances. *Id.*

### A. *Alabama Case*

■ On its RICO and breach of fiduciary duty claims, W & R Financial seeks $12,146,101.01 in costs and $30,000,000.00 in punitive damages assessed against it in the Alabama litigation. Defendants argue that the Alabama litigation resulted from W & R's decision to divert M & E payments which W & R Target owed UILIC. W & R Financial maintains that defendants forced them to divert these payments because they violated RICO and failed to disclose Torchmark's view of the letter of July 8, 1999. Because the Court has sustained defendants' motion for summary judgment on plaintiffs' RICO claim and because W & R Financial is not a plaintiff on the fraudulent non-disclosure claim, the Court only considers plaintiffs' allegations related to the breach of fiduciary duty claim.

W & R Financial alleges that McCormick and Hagopian breached their fiduciary duties as directors by failing to disclose Torchmark's view that the letter of July 8, 1999 was not a final agreement. The Alabama litigation was not a natural or probable consequence of this alleged breach of fiduciary duty. A very substantial intervening cause—W & R's decision to withhold M & E charges—led UILIC to file suit. McCormick and Hagopian could neither anticipate nor reasonably foresee that W & R would attempt to exercise its alleged rights in this manner. Indeed, the Alabama Supreme Court held that by diverting the M & E charges, W & R wrongfully converted them. No reasonable jury could find that the alleged breach of fiduciary duty by McCormick and Hagopian was the proximate cause of the expenses or judgment which W & R Financial incurred in the Alabama litigation.

W & R Financial also alleges that at a board meeting on April 26, 2000, McCormick breached his fiduciary duty by failing to disclose to fellow directors that UILIC or Torchmark might file suit against it. Of course, McCormick's breach of fiduciary duty (if any) did not cause Torchmark and UILIC to file suit in Alabama, and presumably, disclosure by McCormick would not have prevented them from filing that suit. At most, disclosure would have allowed plaintiffs to

file their declaratory judgment suit in Kansas before defendants filed suit in Alabama. As Judge Murguia noted, plaintiffs had been on notice since at least January of 2000 that litigation might be necessary. If McCormick had made further disclosures on April 26, 2000, plaintiffs theoretically could have won the race to the courthouse by seven days instead of losing it by one day, by filing suit on April 27, 2000. The record contains no evidence, however, that Torchmark and UILIC would have foregone the Alabama filing if W & R had first filed its declaratory judgment action in Kansas.

W & R Financial cannot establish that as a proximate cause of any breach of fiduciary duty by McCormick, it suffered damages because it lost the race to the courthouse by one day. A jury cannot award damages based on speculation or conjecture. *See Dougan,* 2 Kan.App.2d at 129, 575 P.2d at 1320. Plaintiffs have not cited admissible evidence that the litigation costs and/or the outcome of the parties' litigation would have been different if W & R had filed its suit first, in Kansas. Furthermore, Judge Murguia could have declined to exercise jurisdiction over the declaratory judgment suit of W & R Financial, even if plaintiffs had filed it seven days earlier. Absent speculation and conjecture, no reasonable jury would award W & R Financial $42,146,101.01 in damages because it forfeited the race to the courthouse by one day. The Court therefore sustains this portion of defendants' motion for summary judgment.

### B. *California Case*

▆ On October 10, 2001, on behalf of variable annuity policyholders in California, UILIC filed the California action against W & R, W & R Financial and other W & R entities and financial advisors. On its RICO and breach of fiduciary duty claims, W & R Financial seeks $967,762.88 for the cost of that litigation. Defendants argue that they are entitled to summary judgment on this claim because the California litigation was the direct result of W & R's decision to replace UILIC policies with those of another provider beginning in January of 2001. Plaintiffs argue that the California litigation was foreseeable because (1) replacements are common in the industry and account for approximately 50 per cent of all variable annuity sales; and (2) the Nationwide products which became available on January 1, 2001 were much more competitive than the UILIC products. *See* Plaintiffs' Opposition Memorandum (Doc. # 387) at 92–93.[96]

W & R Financial, however, cannot show that any breach of fiduciary duty by McCormick or Hagopian was the proximate cause of the expenses it incurred in the California litigation. UILIC filed the California action in October of 2001, long after McCormick and Hagopian had resigned from the board of W & R Financial and long after they allegedly failed to disclose Torchmark's view of the letter of July 8, 1999. The California action primarily concerns the replacement of UILIC annuities with Nationwide ones beginning in January of 2001, eight months after McCormick and Hagopian had resigned from the board of W & R Financial. McCormick and Hagopian's failure to disclose Torchmark's view of the letter of July 8, 1999 did not give rise to the replacements. W & R admits that it would have replaced UILIC annuities even if it had entered into an alternate agreement with Security Benefit or another provider in July of 1999.[97] No reasonable jury could find that any breach of fiduciary duty by McCormick or Hagopian was the proximate cause of the expenses which W & R Financial incurred in the California litigation. The Court therefore sustains defendants' motion for summary judgment as to the damage claim of W & R Financial for the cost of the California litigation.[98]

---

96. Because the Court has sustained defendants' motion for summary judgment on plaintiffs' RICO claim, it need not address plaintiffs' arguments that defendants' conduct in violation of RICO triggered the California action.

97. McCormick's failure to disclose that UILIC might file suit in Alabama, at the board meeting of W & R Financial on April 26, 2000, is not related to the filing of the California litigation in October of 2001.

98. Defendants also seek summary judgment on the claim of W & R Investment for lost revenue from the payment of surrender charges, arguing that W & R's decision to replace UILIC policies

## VIII. Damages Based On Pending Litigation

On its RICO and breach of fiduciary duty claims, W & R Financial seeks $12,146,101.01 for the cost of the Alabama litigation, $30,000,000.00 for the jury verdict in the Alabama litigation, and $967,762.88 for the cost of the California litigation. On its RICO and fraudulent non-disclosure claims, W & R seeks $15,000,000.00 for the jury verdict in the Alabama litigation. Defendants argue that as a matter of law, W & R Financial and W & R cannot recover any judgments or future expenses in the Alabama and California litigation because those actions are still pending. Plaintiffs concede that the California judgment will not be final before trial in this case, but they argue that the Alabama litigation may be finally concluded.

Courts routinely dismiss claims as premature if the alleged injury is contingent upon the outcome of a separate, pending lawsuit. *See In re United Telecomms. Inc., Secs. Litig.*, 1993 WL 100202, at *3 (D.Kan. Mar.4, 1993) (citing cases). On July 14, 2004, the Alabama trial court overruled the post-trial motions of the W & R entities. The Alabama judgment is subject to appeal, however, and plaintiffs have stated that they will appeal the judgment. *See Pretrial Order* (Doc. # 390) at 87; *see also* Plaintiffs' Third Supplemental Required Disclosures at 2, attached as Exhibit A to defendants' *Supplemental Memorandum In Support Of Motion For Summary Judgment* (Doc. # 420) filed August 3, 2004. Likewise, counsel has represented that UILIC intended to appeal the California litigation, and presumably it has done so. The damage claims of W & R Financial and W & R therefore are speculative at this time. *See Dollens v. Zionts*, 2002 WL 1632261, at *9 (N.D.Ill. July 22, 2002) (plaintiffs cannot bring suit to recover expenses from pending action until case has proceeded to final judgment or settlement); *Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 174, 913 P.2d 1092, 1096 (1996) (economic injury from verdict necessarily re-mains uncertain and speculative until final judgment on appeal); *Vanderloop v. Progressive Cas. Ins. Co.*, 769 F.Supp. 1172, 1175 (D.Colo.1991) (same).

Admittedly, trial is not set to begin until August 31, 2004. Nothing in the record, however, gives any reason to hope that the Alabama and California litigation will be concluded by that time. In other circumstances, because any costs and liability in the Alabama and California actions are speculative, the Court would dismiss those damages without prejudice, as premature. Here, however, the Court is sustaining defendants' motion for summary judgment on these damage claims for other reasons. Therefore, defendants' motion on this issue is overruled as moot.

## IX. Recovery Of Alabama Punitive Damages Award

As previously noted, on its RICO and breach of fiduciary duty claims, W & R Financial seeks to recover $30,000,000.00 for the punitive damage award which the jury assessed against it and W & R Financial Services in the Alabama litigation. On its RICO and fraudulent nondisclosure claims, W & R seeks to recover $15,000,000.00 for the punitive damage award which the jury assessed against it in that case. The Alabama trial court recently overruled the post-trial motions of the W & R entities. Plaintiffs state that they will appeal the punitive damage awards in the Alabama case. As noted, the Court has sustained defendants' motion for summary judgment on the RICO claims. It therefore evaluates defendants' argument in the context of plaintiffs' claims for breach of fiduciary duty and fraudulent nondisclosure. Defendants argue that as a matter of law, they are entitled to judgment because (1) W & R Financial does not have standing to claim the $15 million in punitive damages which the jury assessed against W & R Financial Services; (2) W & R did not seek such damages in the second amended

triggered the surrender charges and was a superceding cause of any damages to W & R Investment. W & R Investment is only a plaintiff on the RICO claim on which the Court has granted summary judgment in favor of Torch-mark, Richey, McCormick and Hagopian. The Court therefore need not address defendants' alternative argument as to this damage claim of W & R Investment.

complaint and it has not sought leave to add such a claim; and (3) public policy prohibits W & R Financial and W & R from shifting punitive damage liability to defendants.

### A. Standing Of W & R Financial To Assert Claim For Punitive Damages Assessed Against W & R Financial Services

■ Defendants argue that W & R Financial lacks standing to recover the $15 million in punitive damages assessed against its subsidiary, W & R Financial Services. Injury that arises solely out of harm done to a subsidiary corporation is insufficient to confer standing to sue on a parent corporation. *Classic Communications, Inc. v. Rural Tel. Serv. Co., Inc.,* 956 F.Supp. 896, 902 (D.Kan. 1996); *see also USA Interactive v. Dow Lohnes & Albertson,* 328 F.Supp.2d 1294, 1310–12 (M.D.Fla.2004) (inequitable to allow parent to consciously cloak itself in corporate veil as shield to liabilities of its subsidiaries only to allow it to voluntarily disregard that separateness when it serves its interest). A limited exception exists where the alleged wrongdoer owed a fiduciary duty directly to the parent corporation and the parent seeks to recover for breach of that duty which resulted in the diminution in value of the parent's shares of the subsidiary. *Feinberg v. Katz,* 2002 WL 1751135, at *8 (S.D.N.Y. 2002); *Qantel,* 771 F.Supp. at 1367. "In such a case, the plaintiff parent shareholder has standing to recover for that decline in value, despite the fact that the subsidiary corporation may itself have a claim against the defendant for the direct injury to it." *Id.*

■ W & R Financial apparently argues that because it also was injured, it may seek damages on behalf of W & R Financial Services.[99] The Court rejects the notion that because W & R Financial has suffered a jury verdict which is still in litigation, its corporate parent can recover damages for the amount of the verdict. *See Qantel Corp. v. Niemuller,* 771 F.Supp. 1361, 1367 (S.D.N.Y.

1991). W & R Financial cannot claim standing under the foregoing exception because it does not assert that it was itself injured by the decline in value of its shares of W & R Financial Services.[100] Accordingly, the Court sustains defendants' motion for summary judgment on the claim of W & R Financial for punitive damages assessed against W & R Financial Services.

### B. Failure To Include Claim For Punitive Damages Assessed Against W & R

Because the Court has sustained defendants' motion for summary judgment on plaintiffs' RICO claim, W & R's only remaining claim is its claim for fraud by silence against the three individual defendants. Defendants argue that on that claim, W & R cannot recover the $15 million punitive damage award because it did not include such a claim in the second amended complaint. The pretrial order recites W & R's claim for punitive damages, subject to defendants' objection that W & R did not seek such damages in the second amended complaint. *See Pretrial Order* (Doc. # 390) at 86 n.8. W & R agrees that it did not seek the punitive damages in the second amended complaint and that even now, it has not sought leave to add such a claim. W & R argues that the second amended complaint generally included a claim for the Alabama damage awards, see Plaintiffs' Opposition Memorandum (Doc. # 387) at 101, but it does not cite any portion of the second amended complaint which includes such a claim on its behalf.

■ To determine whether W & R properly asserted its claim for the Alabama judgment in the pretrial order, the Court looks to the general standards for amending pleadings. Leave to amend is a matter committed to the sound discretion of the district court. *See First City Bank. N.A. v. Air Capitol Aircraft Sales, Inc.,* 820 F.2d 1127 (10th Cir.1987). Rule 15(a) of the Federal

---

**99.** W & R Financial clearly incurred attorney fees in the Alabama action, but the record contains no evidence that it has paid any verdict or judgment rendered against it or W & R Financial Services.

**100.** In the original complaint, W & R Financial asserted damages for the decline of the value of its shares in W & R Financial Services, see *Complaint* (Doc. # 1) ¶ 62, but it did not do so in the amended complaints or in the pretrial order.

Rules of Civil Procedure provides that "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Absent flagrant abuse, bad faith, futility of amendment, or truly inordinate and unexplained delay, prejudice to the opposing party is the key factor in deciding a motion to amend. *See Lange v. Cigna Individual Fin. Servs. Co.,* 759 F.Supp. 764, 769 (D.Kan.1991). Prejudice under Rule 15 means undue difficulty in defending a lawsuit because of a change of tactics or theories on the part of the other party. *See Sithon Maritime Co. v. Holiday Mansion,* 177 F.R.D. 504, 508 (D.Kan.1998) (citing *LeaseAmerica Corp. v. Eckel,* 710 F.2d 1470, 1474 (10th Cir.1983)).

Untimeliness alone is a sufficient reason to deny leave to amend, however, especially when the party filing the motion has no adequate explanation for the delay. *Pallottino v. City of Rio Rancho,* 31 F.3d 1023, 1027 (10th Cir.1994). The Court has the discretion to deny leave to amend for untimeliness or undue delay without a showing of prejudice to the other party after looking to the reasons for the delay and the presence of excusable neglect. *Steinert v. The Winn Group, Inc.,* 190 F.R.D. 680, 683 (D.Kan.2000). If movant has been aware of the facts on which the amendment is based for some time prior to the motion to amend, the Court may properly deny the motion for failure to demonstrate excusable neglect. *Braintree Labs., Inc. v. Nephro–Tech, Inc.,* 31 F.Supp.2d 921, 923 (D.Kan.1998).

Here, W & R has not explained its delay in seeking damages based on the punitive damage award in the Alabama case. W & R sought damages for "substantial litigation costs in the Alabama litigation" in the initial complaint, *Complaint* (Doc. # 1) filed July 26, 2001 ¶ 63, but it did not seek such costs or the amount of the Alabama judgment in the first or second amended complaints. *See Amended Complaint* (Doc. # 114) filed June 6, 2003 ¶ 88 (lost income from lost variable sales in 2001); *Second Amended Complaint* (Doc. # 172) filed November 26, 2003 ¶¶ 88, 102 (lost income from lost variable sales in 2001 and lost compensa-

tion in 2000 and 2001 under letter of July 8, 1999). W & R cannot complain that it did not know the precise amount of such damages until the Alabama trial court entered judgment in March of this year because its parent corporation and co-plaintiff, W & R Financial, sought such damages in the first amended complaint filed in June of 2003. *See Second Amended Complaint* (Doc. # 172) ¶ 87 (W & R Financial sought amount of any judgment after retrial of Alabama case); *Amended Complaint* (Doc. # 114) filed June 6, 2003 ¶¶ 87, 94 (same).

Because W & R has offered no reason for its failure to seek damages for the amount of the Alabama judgment before the pretrial order, the Court sustains defendants' motion for summary judgment on this aspect of damages. Defendants have not made a strong showing of prejudice, but the mere fact that the amended claim would add $15 million to W & R's damage claim—without explanation—is sufficient for the Court to deny such a claim at this late stage.

C. *Public Policy Against Reimbursement Of Punitive Damages*

Defendants argue that W & R Financial and W & R cannot recover the punitive damage awards because public policy prohibits reimbursement of punitive damages. In support of their argument, defendants cite public policy which primarily involves recovery of a punitive damage award from an insurance company or guarantor. *See, e.g., Hartford Acc. & Indem. Co. v. Am. Red Ball Transit Co., Inc.,* 262 Kan. 570, 938 P.2d 1281 (1997) (insurance company); *Flint Hills Rural Elec. Co-op. Ass'n v. Federated Rural Elec. Ins. Corp.,* 262 Kan. 512, 517, 941 P.2d 374, 378 (1997) (insurance company); *St. Paul Surplus Lines Ins. Co. v. Int'l Playtex. Inc.,* 245 Kan. 258, 273, 777 P.2d 1259, 1269 (1989) ("guiltless" insurance company should not have to pay award); *In re Smith's Estate, Guardianship of Smith,* 211 Kan. 397, 402, 507 P.2d 189, 194 (Kan.1973) (bonding company as guarantor); *Am. Med. Nursing Centers–Greenbrook v. Heckler,* 592 F.Supp. 1311, 1313 (D.D.C.1984) (nursing facility cannot recover punitive damages assessed against it under Medicare program).

Here, plaintiffs' request for punitive damages is an element of their compensatory damage claim for wrongful conduct by Torchmark, Richey, McCormick and Hagopian. No public policy of the United States or Kansas prohibits such recovery where defendants' actions are the proximate cause of the punitive damage award. In legal malpractice actions, for example, Kansas courts expressly allow a plaintiff to recover the punitive damages awarded in an underlying action. *See Hunt v. Dresie*, 241 Kan. 647, 661–62, 740 P.2d 1046, 1057 (1987); *see also* 3 Mallen & Smith, *Legal Malpractice* (5th ed. 2000) *Damages*, § 20.7, p. 136 (attorneys can be liable for exemplary or punitive damages imposed because of their negligence); John J. Kircher & Christine M. Wiseman, 2 *Punitive Damages: Law and Practice* § 17:8 at 17–19 n.1 (2d ed.2000) (in legal malpractice action, punitive damages are recoverable as element of compensatory damages if plaintiff suffers award in underlying action as result of attorney negligence). Accordingly, the Court overrules defendants' motion for summary judgment on this issue.[101]

**IT IS THEREFORE ORDERED** that *Defendants' Motion For Summary Judgment* (Doc. # 368) filed May 7, 2004 be and hereby is **SUSTAINED in part.** The motion is sustained as to (1) the RICO claim of Waddell & Reed Financial, Inc., Waddell & Reed, Inc., and Waddell & Reed Investment Management Company against all defendants; (2) the fraud by silence claim of W & R against Richey; (3) the damage claims of W & R Financial for the fees and costs incurred in the Alabama litigation, the California litigation and the NASD investigation, and the punitive damages awarded in the Alabama litigation; and (4) the damage claim of W & R for punitive damages awarded in the Alabama litigation. The motion is otherwise overruled.

The following claims remain for trial: (1) the claim of W & R Financial against McCormick and Hagopian for breach of fiduciary duty and (2) the claim of W & R Financial against McCormick and Hagopian for fraud by silence.[102]

**IT IS FURTHER ORDERED** that defendants' *Request For Oral Argument* (Doc. # 408) filed June 9, 2004 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that *Defendants' Motion To Strike Portions Of Affidavit Of Daniel C. Schulte* (Doc. # 393) filed June 4, 2004 be and hereby is **OVERRULED.**

---

**101.** Although public policy does not prohibit recovery of the punitive damages awards in the Alabama case, W & R Financial (whose claim for punitive damages in the Alabama litigation is the sole remaining claim for such damages) faces an extremely difficult hurdle on the issue of causation. In their motion for summary judgment, defendants did not argue a lack of proximate cause on the punitive damage award. The Court cannot fathom how W & R Financial can show that any breach of fiduciary duty by McCormick and Hagopian was the proximate cause of the award of punitive damages in the Alabama litigation.

**102.** As to the claim of W & R Financial for breach of fiduciary duty, the Court has sustained defendants' motion for summary judgment on all damages which W & R Financial sought on this claim.